# EXHIBIT  A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

Plaintiff,

-vs.-

PLATFORM SOLUTIONS, INC.,

Defendant.

Civil Action No. 06 CV 13565 (SCR)

JURY TRIAL DEMANDED

REDACTED VERSION

## AMENDED COMPLAINT

Plaintiff International Business Machines Corporation ("IBM"), by and through its attorneys, Quinn Emanuel Urquhart Oliver & Hedges, LLP, as and for its Amended Complaint against defendant Platform Solutions, Inc. ("PSI"), states as follows:

### Introduction

1.     PSI's entire business model is built on PSI's theft of IBM's intellectual property. Even the limited discovery produced in this case to date confirms that PSI has been engaged in the long-term, systematic theft of IBM's trade secrets, IBM's confidential documents, IBM's copyrighted software, and IBM's patented intellectual property, which continues through to this day.

2.     PSI has developed and is offering for sale emulators that seek to imitate IBM's computers. PSI sells its emulators to consumers by telling them expressly that their PSI emulator will run IBM's operating systems and other copyrighted IBM software

and will act as if it is an IBM machine.  Not surprisingly, in order to create emulators that mimic IBM's computer systems, PSI has relied on the wholesale theft of IBM's intellectual property.  Without IBM's intellectual property, PSI's emulators could simply not exist.

3.      IBM has invested billions of dollars of time, effort, know-how, creativity, and money to develop its computers, the architectures for those computers, and the operating systems and other software programs that are compatible with and run on those architectures.  IBM has developed combinations of computer hardware and software specifically tailored to meet the most demanding customer requirements.  As a result of IBM's massive and multi-decade investment, IBM's computer systems provide unparalleled performance, reliability, availability, serviceability, and security and are widely used where accuracy, data integrity, and reliability are critically important.  PSI now seeks to usurp the value of IBM's investment by stealing and misusing IBM's intellectual property.

4.      PSI's emulators, to work as PSI claims, necessarily infringe IBM patents -- a fact that has been confirmed by IBM's analysis of a PSI emulator, the source code for the PSI emulators, and other materials produced by PSI in this litigation.  As predicted in IBM's original Complaint, analysis of PSI's technology has confirmed broad and systematic infringement of important IBM patents, including patents covering significant aspects of IBM's computer architectures and the very emulation techniques that PSI has used to mimic those architectures.

5.      The documents produced also show that PSI <u>knew</u> it needed a patent license from IBM for its emulators to work, yet when IBM refused to license its patents

to PSI, PSI knowingly and willfully chose to use the IBM patents it needs without IBM's consent.

6.       Discovery has also revealed that -- contrary to PSI's flat-out denials over a number of years and continuing until today -- PSI has misappropriated and used IBM trade secrets that it admitted it was not authorized to have.  PSI simply took those trade secrets without IBM's consent and used them to design and test its emulators in an effort to make them compatible with IBM's architectures.

7.       In addition, PSI has actually produced back to IBM in discovery IBM's own confidential and proprietary documents, dated as recently as 2007 and labeled "This document is classified IBM Confidential Information and is for the exclusive use of IBM sales personnel and authorized IBM Business Partners sales personnel.  Any other use or distribution is prohibited."  Ignoring IBM's requests, PSI and its counsel have refused to explain how PSI obtained IBM's confidential documents, how many other such documents are in its possession, or to return or certify destruction of all copies in its possession.

8.       The IBM intellectual property at issue here also includes IBM's copyrighted operating system and other software.  PSI's emulators "translate" that software to enable it to run on computers that do not implement IBM's proprietary architectures.  By making such translations, PSI has breached its contracts with IBM and has encouraged its customers to do the same.  PSI has also violated the copyright laws by copying, or participating in the copying of, copyrighted IBM software.

9.       By this action, IBM seeks, among other things, (a) an injunction precluding PSI from making, using, offering for sale, and selling emulators that infringe

IBM's patents; (b) further injunctions to prevent ongoing irreparable harm to IBM from PSI's misappropriation of IBM's trade secrets, tortious interference with IBM's contracts, and copyright infringement; (c) damages; and (d) a declaration that IBM is authorized to terminate PSI's software licenses based on PSI's breach of contract and PSI's active encouragement of similar breaches by its customers.

10.    IBM also seeks declaratory relief from threatened antitrust claims.  At the same time that PSI was infringing IBM's patents and copyrights, misappropriating IBM's trade secrets, tortiously interfering with contracts relating to those trade secrets, and breaching IBM's software license agreements, PSI insisted that IBM agree to license (a) PSI to use IBM's patents and (b) PSI and third parties to use IBM's copyrighted operating systems and other software on PSI's emulators.  When IBM declined to grant the requested licenses because, among other reasons, PSI was infringing IBM's patents, PSI responded by threatening baseless antitrust litigation seeking substantial alleged damages. And PSI has now filed antitrust Counterclaims in this action.  IBM therefore seeks a declaration that its refusal to license IBM's patents to PSI and IBM's copyrighted operating systems and other software for use on PSI's emulators does not violate the antitrust laws -- a declaration for which IBM relies, in part, on the same evidence of patent infringement by PSI that forms the basis for IBM's claims for affirmative relief under the patent laws.

**The Parties**

11.    Plaintiff IBM is a corporation organized and existing under the laws of New York, having its principal place of business at New Orchard Road, Armonk, New York 10504.  IBM's business activities, including research and development,

manufacturing, marketing, and service, are primarily in the field of information

processing products and services.  IBM develops, manufactures, markets, and services

computers, computer equipment, and software on a worldwide basis in competition with

a large number of firms both inside and outside of the United States.

12.     Defendant PSI is a corporation organized and existing under the laws of

California, having its principal place of business at 501 Macara Avenue, Suite 101,

Sunnyvale, California 94085.

### Jurisdiction and Venue

13.     IBM's claims arise under the patent, antitrust, and copyright laws of the

United States, 35 U.S.C. §§ 1 *et seq.*, 15 U.S.C. §§ 1 *et seq.*, and 17 U.S.C. §§ 101 *et seq.*

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§§ 1331 and 1338(a).

14.     This Court has jurisdiction over IBM's claims for misappropriation of

trade secrets, tortious interference with contract, and breach of contract pursuant to

28 U.S.C. §§ 1332 and 1367.  There is complete diversity of citizenship, and the amount

in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has authority to grant declaratory relief pursuant to the

Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*

16.     PSI has admitted in its Answer to IBM's original Complaint in this action

that this Court has personal jurisdiction over PSI.

17.     Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391(b),

1391(c), and 1400(b).  PSI has admitted in its Answer to IBM's original Complaint in

this Action that venue is proper in this District.

**Factual Background**

A.    **IBM Has Invested Heavily To Develop Computer Systems, Architectures, Operating Systems, And Other Software.**

18.    For over forty years, IBM has invested massive amounts of time, effort, know-how, and creativity, and money, in developing and improving its computer architectures and the computer systems that implement those architectures.

19.    As a result of its investments over time, IBM has developed System z. System z is the brand name for IBM's current mainframe computer systems.  System z evolved from IBM computer systems dating back to 1964.  Its predecessors include IBM's System/390® ("S/390®"), which was introduced in 1990.  System z is an umbrella term for:  IBM zSeries® servers (introduced in 2000), IBM System z9 servers (introduced in 2005), and IBM operating systems and other IBM software that run on zSeries® or z9 servers.

20.    zSeries® servers and their predecessors have been the backbone of commercial computing for decades -- renowned for their reliability, scalability, availability, serviceability, and other industrial-strength attributes.  The zSeries® server and z/OS® were designed for environments requiring very high performance, reliability, accuracy, and security.  Many z/OS® customers have business requirements for continuous system availability.  System down time or unplanned outages, even of short duration, can cause millions of dollars in lost revenue or other significant negative business impact.  IBM has a strong interest in ensuring the excellent and well-deserved reputation of its System z.

21.    A computer's architecture defines the logical structure and functional operation of the computer.  System z computers implement IBM's current 64-bit

z/Architecture®. IBM's z/Architecture® evolved over time from predecessor

architectures, including IBM's 31-bit Enterprise Systems Architecture/390® ("ESA/390"),

Enterprise Systems Architecture/370 ("ESA/370"), and several earlier architectures.

22.    Operating systems comprise the fundamental software that controls the

execution of programs on the computer and provides basic services such as resource

allocation, scheduling, input/output control, and data management. IBM's operating

systems, like its architectures and computer systems, are the product of massive

investments over time.

23.    Particular operating systems are designed to run on computers that

implement a particular architecture and to capitalize on the features and characteristics of

that architecture. IBM's copyrighted OS/390®, for example, was designed to run on

IBM's S/390® computers, which implement IBM's ESA/390 Architecture. IBM's

copyrighted z/OS® is the successor operating system to OS/390® and is designed to run

on IBM's System z computers, which implement IBM's z/Architecture®. The relationship

between IBM's computer architectures and the operating systems designed to run on

those architectures is one of the important factors contributing to the accuracy and

reliability of IBM's computer systems, to customer acceptance of those systems for

mission-critical applications, and to the ability of IBM's computer systems to compete

with alternative computer systems offered by IBM's many competitors.

24.    In addition to mainframe operating systems, architectures, and computers

that implement those architectures, IBM has invested huge amounts of time, effort,

know-how, creativity, and money in developing other software programs that work in

conjunction with those operating systems and computers. Examples of such other IBM

software programs include IBM's Customer Information Control System ("CICS<sup>®</sup>") and IBM's Database 2 ("DB2<sup>®</sup>").  Like IBM's operating systems, these programs are designed to operate in conjunction with IBM's computer architectures and to capitalize on the features and characteristics of IBM's architectures.

        25.     IBM holds a large portfolio of patents relating to System z and predecessor computer systems.  IBM's patents are directed, among other things, to aspects of its z/Architecture<sup>®</sup> and its predecessor ESA/390 Architecture, and to emulation technology, including the very technology that PSI is using to mimic IBM's architectures. IBM has further sought to protect its investment in computer intellectual property by maintaining certain aspects of its z/Architecture<sup>®</sup>, ESA/390 Architecture, and predecessor architectures as IBM trade secrets, by copyrighting its mainframe operating systems and other software, and by imposing reasonable contractual restrictions on the manner in which customers may use those IBM computer programs.

**B.    PSI Now Seeks To Convert IBM's Investment In Intellectual Property By Developing And Marketing PSI Emulator Systems.**

        26.     Recognizing the value of IBM's intellectual property, PSI has developed and is now implementing a business model that seeks to usurp IBM's massive long-term investment for PSI's own benefit.

        27.     PSI is free-riding on IBM's efforts by stealing and misusing IBM's intellectual property to develop, make, and sell emulator systems that mimic IBM's computer architectures.  An emulator is a combination of software, firmware, and/or hardware added to a computer that implements one architecture (*e.g.*, the Itanium<sup>®</sup> Architecture developed by PSI's investor and business partner Intel Corporation ("Intel")) for the purpose of translating computer programs written for a different architecture (*e.g.*,

the IBM z/Architecture®) and enabling those programs to be run on the computer to which the emulator has been added. An emulator is intended to allow the computer to which it has been added to accept the same data and the same instructions, run the same programs, and achieve the same results as does the computer whose architecture is being emulated. According to PSI, PSI's emulator systems accomplish this by translating IBM's copyrighted software into a set of instructions that can be executed by an Intel processor that is not capable of executing the original IBM software instructions.

28.     The PSI emulator systems run on servers supplied by PSI's business partner Hewlett-Packard Corporation ("H-P"), which use Itanium® microprocessors supplied by PSI's investor and business partner Intel. According to PSI, its emulator systems are capable of running IBM's OS/390® and z/OS® and other IBM computer programs that run on those operating systems, such as IBM's CICS® and DB2®.

29.     As PSI's public statements acknowledge, a complete emulator of an IBM computer architecture must, by definition, fully and exactly mimic the relevant IBM architecture. IBM's z/Architecture® is defined, in part, in an approximately 1000-page Principles of Operation ("POP"), the sixth edition of which was published in April 2007. If the POP indicates that a facility is present (or if a required facility is present in the architecture despite lack of definition in the POP), and PSI's emulator does not exactly mimic it, software that attempts to make use of the facility will not work properly. To be a viable emulator, PSI's emulator systems would have to be able to accurately run z/OS® and at least any additional System z software required by the customers that PSI is targeting.

30.    PSI has asserted that its emulator systems are in fact able to execute "the 1200+ instructions from the z/OS and S/390 instruction set," and that its emulator systems are compatible with -- *i.e.*, capable of running -- IBM's OS/390® and z/OS®, other IBM software intended to run on OS/390® and z/OS®, and vendor and customer application software that runs on those operating systems.  PSI (through one of its licensees and marketing partners) has elaborated on this statement, asserting that PSI's emulator systems will run IBM's "latest" z/OS® operating system.  PSI has further asserted that z/OS® workloads will run "identically" on PSI's emulator systems as on IBM mainframe computers.

**C.    In Developing Its Emulator Systems, PSI Improperly Obtained And Used IBM Trade Secrets.**

31.    PSI has repeatedly sought to trace its roots to Amdahl Corporation ("Amdahl"), a company that formerly made IBM-compatible computers.  PSI has built its business using emulation software, diagnostic tools, and other information obtained from Amdahl around the time of PSI's formation.



By so doing, PSI has wrongfully misappropriated IBM's trade secrets.

1.    **Amdahl Obtained IBM Trade Secrets Under Licenses With IBM.**

32.    Amdahl licensed from IBM, and used with IBM's consent, (a) IBM patents and (b) IBM trade secrets relating to important non-public aspects of IBM's computer architectures.

33.    Certain aspects of the IBM architectures are not published in the <u>POP</u> and are instead maintained by IBM as trade secrets. For this reason, Amdahl entered into various agreements with IBM by which it requested and received IBM trade secrets relating to various non-public aspects of IBM's OS/390® and predecessor architectures.

34.    In 1986, IBM entered into an IBM Technical Information Disclosure Agreement (the "TIDA") with Amdahl. In 1996, IBM entered into an IBM Technical Information License Agreement (the "TILA") with Amdahl. The TIDA and TILA set forth terms and conditions governing Amdahl's treatment and use of the trade secrets ("Technical Information") that IBM chose to license to Amdahl in specific negotiated transactions in response to Amdahl's requests for information to be used by Amdahl as permitted by the TIDA and TILA.

35.    The TIDA and TILA required Amdahl to hold in confidence all IBM Technical Information and not to disclose, publish, or disseminate it without IBM's written consent. The TIDA and TILA also strictly limited the uses to which Amdahl could put technology that Amdahl developed with the aid of IBM Technical Information. Specifically, Amdahl was permitted to use, sell, transfer, or license such technology only in and/or with an Amdahl product. The TIDA and TILA did not permit Amdahl to use or disclose IBM Technical Information to develop materials, tools, or products that could then be used to develop or manufacture a non-Amdahl product, such as PSI emulator systems.

36.    IBM also entered into TIDA and TILA agreements with Fujitsu Computer Systems Corporation ("Fujitsu"), which at relevant times had a substantial ownership interest in Amdahl and completed the acquisition of Amdahl in 1998. The Fujitsu TIDA and TILA were in all material respects identical to the Amdahl TIDA and TILA, except that Fujitsu -- rather than Amdahl -- was the designated "Licensee" of IBM Technical Information. References to Amdahl in this Amended Complaint are intended to include both Amdahl and Fujitsu.

37.    IBM licensed important IBM trade secrets to Amdahl under the TIDA and TILA. The IBM Technical Information licensed to Amdahl defined certain non-public aspects of IBM's ESA/390 Architecture (and predecessor IBM architectures).

38.    Amdahl used IBM Technical Information licensed to it under the TIDA and TILA in various ways,



41. ████████████████████████████████

████████████████████████████

**2.    PSI Improperly Acquired And Is Now Using IBM Trade Secrets.**

42.    The development of what became PSI's emulator systems originated at

Amdahl in or about 1995.  According to PSI, this emulator development program

continued at Amdahl until 1999, during which time Amdahl spent hundreds of millions of

dollars and developed several versions of S/390® emulation software called "Manta,"

"Merlin," and "Stingray."

43.    In the latter part of the 1990s, Amdahl and its parent, Fujitsu, determined

that they did not wish to make further investments in developing IBM-compatible

computers because their analysis of "trends in the industry" led them to conclude that

"S/390 [was] in a declining market" and that "[c]ustomers are choosing to migrate to

open systems and open source platforms."

44.    At that point, Ronald N. Hilton, then an Amdahl employee who was

heavily involved in Amdahl's emulator development program, formed PSI as a separate

corporation and arranged for PSI to license various materials from Amdahl. ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████

45.    Mr. Hilton is now the Chief Technology Officer of PSI, and in that

capacity is responsible for the overall design of PSI's emulator systems.  On information

and belief, Amdahl's interests in the negotiations concerning the PSI/Amdahl License

were represented by Gregory Handschuh, who later joined PSI's Board of Directors and

became its Vice President and General Counsel. Messrs. Hilton and Handschuh were fully aware of the terms of the TIDA and TILA.

46.    IBM never authorized Amdahl to provide, and never authorized PSI to receive, TIDA/TILA Technical Information. PSI and its personnel recognized at all relevant times that the TIDA and TILA did not permit PSI to obtain any IBM Technical Information in Amdahl's possession.

47.

48.

49.



███████████████████████████████████████

████████████████████████████

50.    Thus, PSI has stated that, "We have successfully run Amdahl's system-level diagnostic such as HOT and DIRT to ascertain full compatibility."

**3.    PSI Recognized The Value Of The IBM Trade Secrets ████████**
**██████████.**

51.    ██████████████████████████████████████

████████████████████████████████████████

████████████████████

52.    In December 2000, PSI proposed that IBM join with PSI in a program to develop emulation software capable of running OS/390® and z/OS®. One of PSI's proposed terms and conditions was that IBM provide PSI with "TILA specifications of all IBM proprietary features and capabilities of the S/390 architecture, z/Architecture, and any future extensions thereto." IBM declined.

53.    In March 2001, PSI presented IBM with a grandiose vision, which included "negat[ing] any need of further S/390 custom chip design" by IBM, and having IBM "fully replace custom S/390 development" with PSI emulation software. In support of this proposal, PSI requested that IBM "provide PSI with TIDA, TILA and 64-bit (z/Architecture) specifications" in exchange for equity in PSI. IBM again declined.

54.    Also in March 2001, PSI inquired of IBM whether PSI could gain access to TIDA/TILA Technical Information by acquiring Amdahl's business. IBM responded by informing PSI that it could not do so: "Basically, Amdahl is licensed to use solely and does not own the documents, additionally Amdahl is prohibited from passing along either

the material or the license in all cases. In essence it is not an asset of Amdahl's." PSI did

not dispute IBM's response.

55.    Among the other options considered by PSI at that time was whether to try

to license IBM's trade secrets directly, as Amdahl had done. PSI rejected this option

because it recognized that IBM's trade secrets would command a "high fee," which PSI

was unwilling to pay. ███████████████████████████

███████████████████████████████

████████████████████

**4.    PSI Misled IBM For Years About PSI's Use Of IBM's Trade Secrets.**

56.    On November 11, 2003, PSI sent IBM a letter advising that, "we have

acquired the rights to the former Amdahl patents and all of their technology that doesn't

contain TIDA or TILA." ███████████████████████

57.    In April 2005, responding to IBM's request for information that would

allow IBM to determine whether PSI was using IBM's intellectual property, PSI's Vice

President and General Counsel, Gregory Handschuh, denied IBM's request and wrote:

"Let me categorically state that PSI has not misappropriated any IBM trade secret

information nor does it knowingly possess any such information." ███████████

████████████████████████

58.    Until discovery was permitted in this lawsuit, and despite repeated

requests by IBM, PSI did not permit IBM to inspect a PSI emulator system. In June

2007, as PSI began producing its emulation software for inspection by IBM in this action,

PSI suddenly advised IBM that, "PSI believes it may have inadvertently received IBM

confidential information" from Amdahl "in the form of source code listings for test and

diagnostic programs which were originally licensed to PSI in object code form by

Amdahl . . . when PSI was formed." 

59.

60.



61.

62.

63.



**5.    PSI Obtained Additional Confidential IBM Information.**

67.    ██████████████████████████████████████████

██████ PSI also has acquired confidential IBM business documents setting forth IBM

pricing strategies and other IBM confidential business information. These documents are

plainly labeled as IBM "confidential" information and contain proprietary business

information that should never get into the hands of competitors like PSI.

68.    When asked, PSI refused to explain how it obtained IBM's confidential

documents, to identify how many other such documents are in its possession, and to

return or certify destruction of its copies of these documents. Discovery to date has not

yet disclosed the circumstances under which PSI acquired these IBM documents, but

given the nature of the documents, PSI plainly knew that it was not authorized to possess

them.

**D.    PSI's Emulator Systems Infringe Numerous IBM Patents.**

69.    On February 7, 2003, PSI wrote to IBM concerning PSI's request for

software licenses and advised IBM of its plans to emulate IBM's z/Architecture®: "We

realize that some of this functionality may be covered by IBM patents. . . ." ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

70.    Based on (a) the purpose and nature of PSI's emulator systems, as stated

by PSI, (b) IBM's knowledge of emulator technology, (c) IBM's analysis of the source

code for PSI's emulation software or firmware; and (d) IBM's inspection of a PSI

emulator system purchased from PSI as part of the discovery process in this case, IBM

has determined that the making, using, selling, or offering for sale of PSI emulator

systems necessarily infringes IBM patents, and/or will contribute to or induce

infringement of those patents by users of PSI's emulator systems.

71.    The IBM patents that are infringed by PSI include the following:

a.    On December 28, 1999, the USPTO issued U.S. Patent No.

6,009,261 entitled "Preprocessing Of Stored Target Routines For Emulating

Incompatible Instructions On A Target Processor" (hereinafter "the '261 patent").

A true and correct copy of the '261 patent is attached hereto as Exhibit 1.

b.    On September 14, 1999, the United States Patent and Trademark

Office ("USPTO") issued U.S. Patent No. 5,953,520 entitled "Address Translation

Buffer For Data Processing System Emulation Mode" (hereinafter "the '520

patent").  A true and correct copy of the '520 patent is attached hereto as Exhibit

2.

c.    On December 9, 1997, the USPTO issued U.S. Patent No.

5,696,709 entitled "Program Controlled Rounding Modes" (hereinafter "the '709

patent").  A true and correct copy of the '709 patent is attached hereto as Exhibit

3.

d.    On October 20, 1998, the USPTO issued U.S. Patent No.

5,825,678 entitled "Method And Apparatus For Determining Floating Point Data

Class" (hereinafter "the '678 patent"). A true and correct copy of the '678 patent is

attached hereto as Exhibit 4.

e.    On November 11, 1997, the USPTO issued U.S. Patent No.

5,687,106 entitled "Implementation Of Binary Floating Point Using Hexadecimal

Floating Point Unit" (hereinafter "the '106 patent"). A true and correct copy of the '106 patent is attached hereto as Exhibit 5.

    f.     On November 16, 1999, the USPTO issued U.S. Patent No. 5,987,495 entitled "Method and Apparatus For Fully Restoring A Program Context Following An Interrupt" (hereinafter "the '495 patent"). A true and correct copy of the '495 patent is attached hereto as Exhibit 6.

    g.     On August 10, 2004, the USPTO issued U.S. Patent No. 6,775,789 entitled "Method, System and Program Products For Generating Sequence Values That Are Unique Across Operating System Images" (hereinafter "the '789 patent"). A true and correct copy of the '789 patent is attached hereto as Exhibit 7.

    h.     On May 9, 1995, the USPTO issued U.S. Patent No. 5,414,851 entitled "Method and Means For Sharing I/O Resources By A Plurality Of Operating Systems" (hereinafter "the '851 patent"). A true and correct copy of the '851 patent is attached hereto as Exhibit 8.

    i.     On November 29, 2005, the USPTO issued U.S. Patent No. 6,971,002 entitled "Method, System, and Product For Booting A Partition Using One Of Multiple, Different Firmware Images Without Rebooting Other Partitions" (hereinafter "the '002 patent"). A true and correct copy of the '002 patent is attached hereto as Exhibit 9.

    j.     On November 25, 2003, the USPTO issued U.S. Patent No. 6,654,812 entitled "Communications Between Multiple Partitions Employing

Host-Network Interface" (hereinafter "the '812 patent"). A true and correct copy of the '812 patent is attached hereto as Exhibit 10.

72.     IBM is the owner of all right, title, and interest in and to the '261, '520, '709, '678, '106, '495, '789, '851, '002, and '812 patents by assignment, with full and exclusive right to bring suit to enforce each of these patents, including the right to recover for past infringement.

73.     ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████

### E.     In Developing And Promoting Its Emulator Systems, PSI Breached Its Software License Agreements With IBM.

74.     In March 2004, PSI executed an IBM Customer Agreement ("ICA") with IBM. A true and correct copy of that ICA is attached hereto as Exhibit 11. The ICA expressly prohibits PSI from, among other things, "translating" licensed ICA Programs, including z/OS®. After executing the ICA, PSI licensed copies of z/OS® and other IBM software from IBM pursuant to the terms of the ICA.

75.     PSI's emulator systems use software, which PSI refers to as firmware, to mimic IBM's ESA/390 Architecture and z/Architecture® by translating IBM software (written for computer systems using those architectures) into instructions that can be executed by the Intel processors contained in the emulator systems. PSI's translated Itanium® instructions are then executed by the Itanium® processor, with the intent of

producing the same result as if the IBM software had been executed on an IBM zSeries®

server.

76.    According to PSI, PSI's emulator systems translate what PSI calls "legacy

instructions" contained in IBM's copyrighted software into what PSI calls "translated

instructions." PSI's emulator systems use what PSI calls dynamic just-in-time translation,

in which IBM's operating system instructions are translated, the translated instructions

are stored or "cached" in the memory of the PSI emulator, and the translated instructions

stored in memory are then executed by the emulator.

77.    U.S. Patent No. 7,092,869 ("the '869 patent") issued to Ronald N. Hilton,

PSI's founder and Chief Technology Officer, sets out the manner in which PSI translates

IBM software so that such software can be run on a computer not based on IBM's

architectures.

78.    PSI's public presentations on its emulator systems have confirmed that

those systems translate IBM software so that the software can be run on a computer using

an Itanium® processor. Such translation is expressly prohibited by the ICA.

79.    In addition to breaching its own ICA, PSI has encouraged its customers to

translate IBM software using PSI's emulator systems and otherwise to violate the terms of

their ICAs, and has even offered to indemnify customers against claims arising from their

use of PSI's emulator systems.

**F.    PSI Has Threatened And Initiated Antitrust Litigation Against IBM.**

80.    PSI and IBM have met and corresponded concerning PSI's activities.

Before commencing this litigation, IBM advised PSI that PSI's emulator systems infringe

various IBM patents, and offered PSI the opportunity to prove that this was not so. PSI

declined IBM's offer, as well as IBM's requests for information about, and access to,

PSI's emulator systems.

81.    IBM and PSI have also met and corresponded concerning PSI's demands

that IBM agree to license its patents to PSI and its copyrighted operating systems and

other software for use on PSI's emulator systems. IBM has declined to provide the patent

and software licenses demanded by PSI.

82.    Before the commencement of this litigation, PSI repeatedly asserted, in

words or substance, that IBM's refusal to license IBM's patents to PSI and IBM's

software for use on PSI's emulator systems is both unlawful under the antitrust laws and

damaging to PSI.

83.    As early as March 16, 2001, PSI stated in correspondence to IBM that its

"major concern" was "IBM's stated decision not to license the z/Architecture at all at this

point," and that PSI assumed IBM would "continue to reevaluate that position, given the

potential anti-trust issues that could be raised." On October 29, 2002, PSI wrote to IBM

and (a) asserted that IBM's decision not to license its software for use on PSI's systems is

"not consistent with the long term IBM practice of licensing its software regardless of the

implementation of the computing platform"; (b) requested licensing terms for commercial

operation of IBM's software on PSI's emulator systems; and (c) stated that "each day that

goes by is directly impacting our development schedule." On December 23, 2002, at a

time when PSI said it was preparing "for the commercial introduction of our product line

early next year," PSI wrote to IBM's President and CEO (a) criticizing IBM's decision not

to license IBM's software for use on PSI's emulator systems; (b) arguing that IBM's

refusal conflicts with historical "precedent" and is "discriminatory" and "purely

arbitrary"; and (c) claiming that the effect of IBM's decision is "intentionally anti-competitive" and that "our survival as a company has been placed in immediate jeopardy as a result." On February 7, 2003, PSI wrote to IBM seeking a letter of intent from IBM confirming IBM's willingness to license its software for use on PSI's emulator systems and asserting that "[t]he unexpected uncertainty on this point has severely hampered the execution of our business plans, jeopardizing the entire venture." On November 10, 2003, PSI wrote to IBM and stated that IBM's licensing position with respect to z/OS® "has severely impacted our ability to deliver a 64 bit machine" and requested reconsideration of that position. On October 5, 2005, PSI wrote to IBM (a) again criticizing IBM's refusal to license IBM's software to be run on PSI's emulator systems; (b) arguing that IBM's licensing position is inconsistent with IBM's "prior practices and precedents"; and (c) asserting that IBM's licensing position is "causing confusion -- both to us and to our end user customers" and "is not just causing confusion in the market" but "is causing harm to our business."

84.    At a meeting in February 2006, PSI requested that IBM reconsider PSI's request that IBM grant PSI a patent license for PSI's emulator systems and agree to license z/OS® and other IBM software for use on PSI's emulator systems. On May 24, 2006, IBM declined PSI's request. IBM stated at that time that "IBM continues to believe that PSI's products infringe IBM's intellectual property rights" and that "we continue to see indications that PSI is engaged in infringing activity . . . . IBM has clearly articulated to PSI its belief that by developing and/or offering for sale a product that can run IBM's z/OS operating system, PSI is infringing a number of IBM patents, including IBM's z/Architecture patents. A non-exhaustive list of IBM U.S. patents potentially infringed

by PSI was provided to you on August 18, 2005. PSI provided IBM with no substantive

response. Instead, PSI continued its development and marketing efforts notwithstanding

IBM's rights and interests."

85.    On June 8, 2006, PSI asserted that IBM's decision not to license its patents

to PSI and not to license z/OS® to run on PSI systems was "completely unjustified." PSI

asserted that IBM's position "will undoubtedly result in significant harm to both PSI and

its customers" and "strongly urge[d]" IBM to reconsider its decision. In light of the

history of communications between the parties, IBM reasonably construed this letter as

threatening antitrust litigation if IBM continued to decline to license its patents to PSI and

its operating systems and other software for use on PSI's emulator systems.

86.    On August 3, 2006, IBM declined PSI's request for reconsideration of

IBM's decisions not to grant PSI a patent license and not to license z/OS® and other

software to run on PSI's emulator systems: "As we have explained, we believe that a PSI

emulator that runs IBM's z/OS operating system infringes a number of IBM patents. We

have repeatedly expressed this view to PSI, and you have acknowledged that PSI believes

it requires patent licenses from IBM. In asking us to reconsider our decision, PSI has

provided no new information. IBM would welcome the opportunity to examine one of

PSI's systems and, following such an examination, would be willing to discuss PSI's

infringements in greater detail." At the same time, IBM advised PSI that, "We are very

concerned that, despite the fact that PSI is unlicensed to IBM's patents and has been

informed that IBM will not license z/OS on PSI systems, PSI continues to make public

statements that it intends to offer systems that run z/OS. IBM is extremely concerned

that these statements will induce potential users of PSI systems to infringe IBM's

intellectual property rights.  Please ensure that PSI does not in any way represent or imply that PSI systems are authorized or eligible for a license to run the IBM z/OS operating system."

87.    On August 9, 2006, PSI asserted that "PSI does not believe its systems infringe any patents that IBM may hold" in the fields of z/Architecture® and coupling; admitted that PSI "has not undertaken the lengthy effort and expense of a detailed infringement analysis" with respect to other IBM patents; and stated that it "was most surprised and disappointed" by IBM's position that it would not grant PSI a patent license.  PSI further stated that, "PSI believes that IBM's current posture in dealing with PSI to be unwarranted and calculated to cause it substantial harm.  It is for this reason that PSI urged IBM to reconsider its position, and does so again here."  IBM reasonably construed this correspondence as threatening antitrust litigation if IBM continued to decline to license its patents to PSI and its operating systems and other software for use on PSI's emulator systems.

88.    In response to IBM's Complaint in this action, PSI asserted various antitrust Counterclaims seeking substantial alleged damages.  PSI's Counterclaims demonstrate that IBM's perception that PSI was threatening groundless antitrust litigation was well-founded and that there is an actual and justiciable controversy between the parties.

**G.    PSI's Activities Brought The Parties' Dispute To A Head In 2006.**

89.    In March 2006, PSI announced that it was demonstrating and "delivering to customers today around the world" emulator systems that run IBM's z/OS® operating system.  In March 2006, PSI also publicly announced that its z/Architecture® emulator

systems would be "generally available" in the second half of 2006. In June 2006, PSI publicly described its then-current activities as involving beta test customer placements and initial early shipment program shipments, as well as establishing a "direct and channel sales force," and "ISV relationships." In July 2006, PSI issued a press release stating that, "Later this year, PSI expects to deliver z/OS® compatible servers that use dual-core processor technology to address the performance requirements of more than 90 percent of the z/OS installed base." In the Fall of 2006, PSI publicly demonstrated its infringing emulator systems in, among other places, Baltimore, Maryland; Houston, Texas; and San Jose and San Francisco, California; identified beta customers; and stated that its emulator systems would be generally available in the fourth quarter of 2006. During that same period, PSI actively marketed and offered for sale its emulator systems to potential customers, and publicly stated that a PSI system is installed and in use at a customer location in New York. IBM remains unwilling to license its patents to PSI or its software for use on PSI's emulator systems. Accordingly, the parties' dispute is now ripe.

90.    In addition to PSI's own activities, beginning in November 2006, one of PSI's licensees and marketing partners launched a new website trumpeting the availability of one PSI emulator system and the imminent availability of another. PSI's emulator systems are now being actively marketed and offered for sale to potential customers, including potential customers in New York.

91.    PSI (directly and/or through its licensees and marketing partners) has expressly and impliedly advised potential customers that they will be able to license IBM's mainframe operating systems and other software for use on PSI's emulator

systems; has offered to indemnify customers against claims based on their use of PSI emulator systems; and has falsely stated, among other things, that (a) PSI's systems "will run" the "latest" IBM operating systems; (b) IBM software will be available for licensing for use on PSI's systems; (c) IBM will license its operating systems for use on PSI's emulator systems in a "business as usual" manner; (d) licensing of 64-bit software from IBM is available for PSI's systems but not for a competing emulator; (e) PSI is in discussions with IBM concerning software pricing for PSI systems and PSI will take care of software licensing issues with IBM; (f) software pricing for z/OS® will be the same as the price of that software when licensed on certain IBM machines; (g) PSI's systems have what PSI describes as "advanced partitioning capabilities that allow customers to control z/OS-based software licensing fees by isolation of individual workloads or logical server"; (h) PSI's systems will involve the use of a "[r]educed Z image" and therefore "qualify" for lower IBM software licensing rates for z/OS® and other IBM software; and has further stated that (i) their lawyers "are ready for anything" and are prepared to sue IBM over a refusal to license IBM software for use on PSI's emulator systems or the imposition by IBM of higher licensing fees for software used on PSI's systems than for software licensed for use on allegedly comparable IBM mainframe systems. As PSI reasonably expected, these statements and threats were communicated to IBM.

92.    As a result of these and other activities, an article appeared in a trade publication on September 26, 2006 entitled "A Joint Assault on the Mainframe Hardware Market." The article, which was subsequently posted on PSI's website, described PSI as having a series of computers "that can load and run software written for the [IBM] System z9 and its antecedents" and that are compatible with "IBM's current 64-bit

processor architecture." The article asserted that PSI has "rights to obtain IBM software

licenses, and the legal know-how required to preserve and extend these rights," and

suggested that with the "commercial marketing of PSI systems," IBM "will supply and

support its full range of mainframe software products."

## COUNT ONE

### (Infringement of the '261 Patent)

93.     IBM realleges and incorporates herein the allegations of paragraphs 1

through 92 of this Amended Complaint as if fully set forth herein.

94.     In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to

infringe, literally and/or under the doctrine of equivalents, the '261 patent by practicing

one or more claims in the '261 patent in the manufacture, use, offering for sale, and sale

of PSI's emulator systems.

95.     In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to

infringe the '261 patent by contributing to or actively inducing the infringement by others

of the '261 patent by providing PSI's emulator systems and offering to indemnify

customers against claims based on the use of those emulator systems.

96.     PSI has willfully infringed the '261 patent.

97.     PSI's acts of infringement of the '261 patent will continue after the service

of this Amended Complaint unless enjoined by the Court.

98.     As a result of PSI's infringement, IBM has suffered and will suffer

damages.

99.     IBM is entitled to recover from PSI the damages sustained by IBM as a

result of PSI's wrongful acts in an amount subject to proof at trial.

100.    Unless PSI is enjoined by this Court from continuing its infringement of the '261 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

## COUNT TWO

### (Infringement of the '520 Patent)

101.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 100 of this Amended Complaint as if fully set forth herein.

102.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '520 patent by practicing one or more claims in the '520 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

103.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '520 patent by contributing to or actively inducing the infringement by others of the '520 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

104.    PSI has willfully infringed the '520 patent.

105.    PSI's acts of infringement of the '520 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

106.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

107.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

108.    Unless PSI is enjoined by this Court from continuing its infringement of the '520 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

### COUNT THREE

### (Infringement of the '709 Patent)

109.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 108 of this Amended Complaint as if fully set forth herein.

110.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '709 patent by practicing one or more claims in the '709 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

111.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '709 patent by contributing to or actively inducing the infringement by others of the '709 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

112.    PSI has willfully infringed the '709 patent.

113.    PSI's acts of infringement of the '709 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

114.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

115.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

116.    Unless PSI is enjoined by this Court from continuing its infringement of the '709 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

## COUNT FOUR

### (Infringement of the '678 Patent)

117.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 116 of this Amended Complaint as if fully set forth herein.

118.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '678 patent by practicing one or more claims in the '678 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

119.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '678 patent by contributing to or actively inducing the infringement by others of the '678 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

120.    PSI has willfully infringed the '678 patent.

121.    PSI's acts of infringement of the '678 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

122.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

123.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

124.    Unless PSI is enjoined by this Court from continuing its infringement of the '678 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

## COUNT FIVE

### (Infringement of the '106 Patent)

125.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 124 of this Amended Complaint as if fully set forth herein.

126.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '106 patent by practicing one or more claims in the '106 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

127.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '106 patent by contributing to or actively inducing the infringement by others of the '106 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

128.    PSI has willfully infringed the '106 patent.

129.    PSI's acts of infringement of the '106 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

130.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

131.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

132.    Unless PSI is enjoined by this Court from continuing its infringement of the '106 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

## COUNT SIX

### (Infringement of the '495 Patent)

133.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 132 of this Amended Complaint as if fully set forth herein.

134.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '495 patent by practicing one or more claims in the '495 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

135.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '495 patent by contributing to or actively inducing the infringement by others of the '495 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

136.    PSI has willfully infringed the '495 patent.

137.    PSI's acts of infringement of the '495 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

138.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

139.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

140.    Unless PSI is enjoined by this Court from continuing its infringement of the '495 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

## COUNT SEVEN

### (Infringement of the '789 Patent)

141.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 140 of this Amended Complaint as if fully set forth herein.

142.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '789 patent by practicing one or more claims in the '789 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

143.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '789 patent by contributing to or actively inducing the infringement by others of the '789 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

144.    PSI has willfully infringed the '789 patent.

145.    PSI's acts of infringement of the '789 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

146.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

147.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

148.    Unless PSI is enjoined by this Court from continuing its infringement of the '789 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights. Thus, IBM is entitled to an injunction against further infringement.

## COUNT EIGHT

### (Infringement of the '851 Patent)

149.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 148 of this Amended Complaint as if fully set forth herein.

150.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '851 patent by practicing one or more claims in the '851 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

151.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '851 patent by contributing to or actively inducing the infringement by others of the '851 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

152.    PSI has willfully infringed the '851 patent.

153.    PSI's acts of infringement of the '851 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

154.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

155.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

156.    Unless PSI is enjoined by this Court from continuing its infringement of the '851 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

## COUNT NINE

### (Infringement of the '002 Patent)

157.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 156 of this Amended Complaint as if fully set forth herein.

158.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '002 patent by practicing one or more claims in the '002 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

159.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '002 patent by contributing to or actively inducing the infringement by others of the '002 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

160.    PSI has willfully infringed the '002 patent.

161.    PSI's acts of infringement of the '002 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

162.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

163.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

164.    Unless PSI is enjoined by this Court from continuing its infringement of the '002 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights.  Thus, IBM is entitled to an injunction against further infringement.

## COUNT TEN

### (Infringement of the '812 Patent)

165.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 164 of this Amended Complaint as if fully set forth herein.

166.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '812 patent by practicing one or more claims in the '812 patent in the manufacture, use, offering for sale, and sale of PSI's emulator systems.

167.    In violation of 35 U.S.C. § 271, PSI has infringed and is continuing to infringe the '812 patent by contributing to or actively inducing the infringement by others of the '812 patent by providing PSI's emulator systems and offering to indemnify customers against claims based on the use of those emulator systems.

168.    PSI has willfully infringed the '812 patent.

169.    PSI's acts of infringement of the '812 patent will continue after the service of this Amended Complaint unless enjoined by the Court.

170.    As a result of PSI's infringement, IBM has suffered and will suffer damages.

171.    IBM is entitled to recover from PSI the damages sustained by IBM as a result of PSI's wrongful acts in an amount subject to proof at trial.

172.    Unless PSI is enjoined by this Court from continuing its infringement of the '812 patent, IBM will suffer additional irreparable harm and impairment of the value of its patent rights. Thus, IBM is entitled to an injunction against further infringement.

## COUNT ELEVEN

### (Trade Secrets Misappropriation)

173.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 172 of this Amended Complaint as if fully set forth herein.

174.    IBM owns trade secrets with respect to its computer architectures. Certain of these trade secrets -- including information that disclosed various features of IBM's architectures not described in the POP and IBM's actual implementation of those features -- were licensed to Amdahl as Technical Information pursuant to the TIDA and the TILA.

175.    IBM's trade secrets derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure and use. These IBM trade secrets give IBM a significant advantage over its existing and would-be competitors, including PSI, and the advantage would be lost if companies like PSI were able to gain access to and use them, and to benefit from their use in product development programs, without IBM's consent.

176.    The Technical Information that IBM disclosed to Amdahl under the TIDA and TILA generally was derived from a confidential version of the POP and from other confidential architecture documents. Confidential aspects of IBM's architectures disclosed to Amdahl are still maintained today in a confidential version of the POP and in other confidential architecture documents.

177.    IBM has made reasonable efforts to maintain the confidentiality of its Technical Information.

178.    PSI was prohibited by the terms of the TIDA and TILA from acquiring the IBM trade secrets licensed to Amdahl pursuant to those agreements and also was prohibited from acquiring Amdahl's S/390® diagnostic tools and other materials developed by Amdahl with the use of IBM's trade secrets and derived from and/or containing those trade secrets.

179.    PSI was at all relevant times aware of the terms of the TIDA and TILA



180.

181.    IBM did not discover PSI's misappropriation as alleged herein until after PSI produced evidence of such misappropriation during this case. PSI has asserted to IBM that it was not using IBM trade secrets. IBM had no reasonable way to learn that

PSI had misappropriated its trade secrets before PSI's disclosures in the discovery process.

182.    PSI's conduct was, is, and remains willful and wanton, and was taken in blatant disregard for IBM's valid and enforceable rights.

183.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████

184.    As a direct result of PSI's unauthorized misappropriation and use of IBM's trade secrets, IBM has been damaged in an amount to be proved at trial and PSI has been unjustly enriched in an amount to be proved at trial.

185.    By reason of the foregoing, IBM has suffered irreparable harm, which cannot be adequately addressed at law, unless PSI and its agents, and all those acting in concert with PSI, are enjoined from engaging in any further use of IBM's trade secrets.

## COUNT TWELVE

### (Tortious Interference with Contract)

186.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 185 of this Amended Complaint as if fully set forth herein.

187.    IBM's TIDA and TILA contracts did not permit Amdahl to transfer IBM trade secrets to PSI for PSI's use in developing its emulator systems.

188.    At all relevant time herein, PSI was aware of the TIDA and TILA restrictions described above.

189. 

190.

191.    PSI's interference with the foregoing contracts has been willful, improper,

and unlawful.

192.    IBM has sustained damages as a result of PSI's conduct.

193.    IBM has suffered irreparable injury as a result of PSI's interference with

IBM's TIDA and TILA contracts.  Unless enjoined by this Court, the foregoing

violations will continue, and IBM will continue to suffer irreparable harm.

### COUNT THIRTEEN

#### (Breach of Contract)

194.    IBM realleges and incorporates herein the allegations of paragraphs 1

through 193 of this Amended Complaint as if fully set forth herein.

195.    PSI has licensed copies of z/OS® and other IBM software from IBM

pursuant to the terms of the ICA.

196.    The ICA is, by its terms, governed by New York law.

197.    IBM has fully performed all of its obligations under its license agreements

with PSI.

198.    The ICA expressly prohibits PSI from, among other things, "translating" licensed ICA Programs, including z/OS®.

199.    PSI has used its emulator systems to translate z/OS® and other IBM software in violation of the express prohibitions of the ICA. By so doing, PSI has breached its license agreements with IBM.

200.    In addition, PSI has encouraged its customers to translate IBM software using PSI's emulator systems and otherwise to violate the terms of their own ICAs with IBM, including by offering to indemnify customers against claims arising from their use of PSI's emulator systems.

201.    As a result of PSI's activities, IBM has been damaged in an amount to be proved at trial.

202.    As a result of PSI's breaches of its license agreements with IBM, IBM is entitled, pursuant to the terms of the ICA and New York law, to terminate the ICA and to terminate PSI's authorization to use the licensed software.

## COUNT FOURTEEN

### (Copyright Infringement)

203.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 202 of this Amended Complaint as if fully set forth herein.

204.    IBM is the author and owner of z/OS® and OS/390®. Whether expressed in human-readable source code, or computer-readable object code, z/OS® and OS/390® are original works of authorship within the meaning of the Copyright Act, and are copyrightable subject matter.

205.    The United States Copyright Office issued Certificates of Registration for the following works ("the IBM copyrights") under the following registration numbers, effective on the following dates:

| Work | Registration No. | Date Effective |
|---|---|---|
| OS/390 Version 1 Release 1 | TXu 735-688 | Apr. 8, 1996 |
| OS/390 Version 1 Release 2 | TXu 769-716 | Nov. 22, 1996 |
| OS/390 Version 1 Release 3 | TXu 807-358 | May 20, 1997 |
| OS/390 Version 2 Release 4 Mod 0 | TX 5-455-669 | Mar. 4, 2002 |
| OS/390 Version 2 Release 5 Mod 0 | TX 5-455-670 | Mar. 4, 2002 |
| OS/390 Version 2 Release 6 Mod 0 | TX 5-455-671 | Mar. 4, 2002 |
| OS/390 Version 2 Release 7 | TXu 905-902 | Jun. 3, 1999 |
| OS/390 Version 2 Release 8 | TXu 923-305 | Sep. 27, 1999 |
| OS/390 Version 2 Release 9 and kits | TXu 954-890 | Mar. 30, 2000 |
| OS/390 Version 2 Release 10 and kits | TXu 952-049 | May 16, 2000 |
| z/OS Version 1 Release 1 Mod 0 | TX 5-425-067 | Apr. 2, 2001 |
| z/OS Version 1 Release 2 Mod 0 | TX 5-564-013 | Oct. 29, 2001 |
| z/OS Version 1 Release 3 Mod 0, including web deliverables | TX 5-597-330 | Oct. 10, 2002 |
| z/OS Version 1 Release 4 Mod 0, including msys and bimodal web deliverables | TX 5-560-060 | Oct. 2, 2002 |
| z/OS Version 1 Release 5 Mod 0 | TX 5-950-229 | Mar. 31, 2004 |
| z/OS Version 1 Release 6 Mod 0 | TX 6-037-031 | Sep. 27, 2004 |
| z/OS Version 1 Release 7 Mod 0 | TX 6-266-402 | Oct. 7, 2005 |
| z/OS Version 1 Release 8 Mod 0 | TX 6-438-572 | Oct. 2, 2006 |
| z/OS Version 1 Release 4 Feature 0, including Feature 0 web deliverables | TX 5-802-855 | Jun. 17, 2003 |
| z/OS Version 1 Release 4 Mod 0 Feature 1 - z990 Exploitation Support | TX 5-867-351 | Nov. 4, 2003 |

| z/OS Version 1 Release 4 Mod 0 Feature 2 - Consoles Enhancements | TX 5-945-844 | Mar. 31, 2004 |
|---|---|---|
| zIIP Release 6 dependent base | TX 6-404-747 | Jun. 30, 2006 |
| zIIP Release 7 dependent base | TX 6-408-482 | Jun. 30, 2006 |

206.    IBM's OS/390® and z/OS®, and all versions thereof, are copyrighted. IBM, at all relevant times, has owned the copyrights, and the copyrights are properly registered with the United States Copyright Office. IBM has duly and legally complied in all respects with the provisions of the Copyright Laws of the United States with respect to these copyrights, and the copyrights are valid and subsisting.

207.    PSI has infringed one or more of the IBM copyrights by, among other things, making and/or running unauthorized copies of OS/390® and/or z/OS® on PSI's emulator systems without authorization from IBM.



208.

209.    The infringement of each of IBM's rights in and to its copyrighted software constitutes a separate and distinct act of infringement.

210.    PSI knew or should have known of this copyright infringement.

211.    In addition, PSI has knowingly caused, induced, and materially contributed to copyright infringement.

212.    PSI's conduct constitutes both direct and indirect infringement of IBM's copyrights and exclusive rights under copyright in violation of 17 U.S.C. §§ 106 and 501.

213.    IBM is entitled to the maximum statutory damages under 17 U.S.C. § 504(c) with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c) and to an award of attorneys' fees under 17 U.S.C. § 505.

214.    Unless PSI is enjoined by this Court from continuing its infringement of IBM's copyrights, IBM will suffer additional irreparable harm and impairment of the value of its rights.  Thus, IBM is entitled to an injunction against further infringement under 17 U.S.C. § 502.

## COUNT FIFTEEN

### (Declaratory Judgment)

215.    IBM realleges and incorporates herein the allegations of paragraphs 1 through 214 of this Amended Complaint as if fully set forth herein.

216.    There is a real and actual controversy between IBM and PSI concerning IBM's refusal to license its patents to PSI and its copyrighted mainframe software for use on PSI's emulator systems.  IBM's refusal to license IBM's patents to PSI and IBM's copyrighted operating systems and other software for use on PSI's emulator systems does not violate the antitrust laws because, among other reasons, the antitrust laws recognize

IBM's right, under the patent and copyright laws, to refuse to license its patents and copyrights. PSI's emulator systems infringe IBM patents, and the antitrust law specifically recognizes a copyright holder's right to decline to license copyrighted software for use on a system that infringes the copyright holder's patents. Thus, this controversy requires resolution of substantial questions of patent law and involves the same evidence of patent infringement by PSI that forms the basis for IBM's claims for affirmative relief under the patent laws. In addition, IBM has a strong interest in ensuring that z/OS® is not used on computer systems with which z/OS® is not fully compatible or used in ways that have the potential to undermine either the reputation of z/OS® for accuracy, data integrity, and reliability or customer acceptance of z/OS® for mission-critical applications.

217.    IBM has concluded -- based on (a) the purpose and nature of PSI's emulator systems, as stated by PSI, (b) IBM's knowledge of emulator technology, (c) IBM's analysis of the source code for PSI's emulator, and (d) IBM's inspection of a PSI emulator purchased from PSI as part of the discovery process in this case -- that those emulator systems infringe IBM patents. PSI has not ameliorated IBM's reasonable, good faith concerns that PSI's emulator systems infringe IBM patents.

218.    Nevertheless, PSI (directly and/or through its licensees and marketing partners) has (a) demanded that IBM license IBM's patents to PSI and IBM's copyrighted mainframe operating systems and other software for use on PSI's emulator systems; (b) expressly and implicitly asserted that a refusal by IBM to license its patents, operating systems, and other software is anti-competitive and in violation of the antitrust laws; (c) asserted to IBM customers that purchasers of PSI's emulator systems will be able to

license IBM's copyrighted operating systems and other copyrighted IBM software for the same license prices as users of allegedly comparable IBM mainframe systems; (d) acknowledged confusion in the market over this issue; (e) has raised the specter of substantial alleged harm to PSI from IBM's decision not to license its patents and copyrighted software; (f) advised IBM customers (in ways that it reasonably expected would be communicated to IBM) that their lawyers "are ready for anything" and are prepared to sue IBM; and (g) filed antitrust Counterclaims seeking substantial alleged damages.

219.    IBM has refused to agree to license its patents to PSI and its copyrighted operating systems and other software for use on PSI's emulator systems despite PSI's demands because, among other reasons, IBM has no obligation to do so, and IBM is unwilling to allow its software to be run on an emulator that infringes IBM's patents. IBM and PSI therefore have a real and actual controversy concerning the issue of patent infringement by PSI's emulator systems.

220.    IBM has told PSI that IBM will not license its patents to PSI or its operating systems and other software for use on PSI's emulator systems. PSI has asserted that IBM's refusal to license IBM's patents, operating systems, and other software is anti-competitive, violates the antitrust laws, and is causing confusion in the market and substantial damage to PSI's business. PSI is wrong. The antitrust laws do not restrict IBM's rights, under the patent and copyright laws, to refuse to license IBM's lawfully acquired patents and copyrights. Further, it is IBM's objective, reasonable, good faith belief that PSI's emulator systems infringe IBM's patents. That belief, standing alone, is a well-recognized and legally sufficient basis for IBM's decision to decline to license its

operating systems and other software, as the antitrust laws do not require IBM to license its copyrighted software for use on a computer system that infringes IBM's patents. Judicial resolution of the parties' disputes is now required.

221.    When IBM filed its initial Complaint in this action, litigation over the propriety of IBM's licensing position under the antitrust laws was inevitable and imminent, in light of, among other things, (a) PSI's demands that IBM agree to license its patents to PSI and its copyrighted operating systems and other software for use on PSI's emulator systems; (b) PSI's baseless assertions that IBM's decision not to license its patents and software is anti-competitive and in violation of the antitrust laws; (c) PSI's statements concerning the impact on PSI's business of IBM's refusal to license its patents to PSI and its operating systems and other software for use on PSI emulator systems; (d) PSI's recent requests that IBM reconsider its refusal to license its operating systems and other software for use on PSI's emulator systems and IBM's decision not to do so; and (e) statements by PSI (directly and/or through its licensees and marketing partners) that their lawyers "are ready for anything" and are prepared to sue IBM over IBM's licensing decisions.  In light of these facts and the antitrust Counterclaims filed by PSI, IBM and PSI have a real and actual controversy over IBM's refusal to license its patents to PSI and its copyrighted operating systems and other software for use on PSI's emulator systems.

222.    IBM is entitled to a declaratory judgment that IBM's refusal to license its patents to PSI and its copyrighted operating systems and other software for use on PSI's emulator systems is not anti-competitive and does not violate the antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, IBM prays for the following relief:

a.      That PSI, its officers, agents, servants, employees, and those persons acting in active concert or in participation with it be enjoined from further infringement of the '261 patent, the '520 patent, the '709 patent, the '678 patent, the '106 patent, the '495 patent, the '851 patent, the '789 patent, the '002 patent, and the '812 patent pursuant to 35 U.S.C. § 283;

b.      That PSI, its officers, agents, servants, employees, and those persons acting in active concert or in participation with it be enjoined from further misappropriation of IBM trade secrets and confidential information, including but not limited to all such information provided by IBM to Amdahl under the TIDA and TILA and from selling any product based in whole or in part on (i) emulation software or diagnostic tools that are based on or embody, or developed by persons who had access to, IBM Technical Information provided under the TIDA and TILA or (ii) any other confidential IBM information improperly obtained by PSI;

c.      That this Court require that PSI certify the destruction of all copies of all diagnostic tools -- whether in source, listing, or object code/executable form -- and other information that currently contain, or that contained in earlier versions, IBM trade secrets and confidential information, including but not limited to all versions of DIRT, HOT, ALPHA, and 8E7 and all BUPs;

d.      That PSI, its officers, agents, servants, employees, and those persons acting in active concert or in participation with it be enjoined from further infringement of IBM's copyrights in OS/390® and z/OS® pursuant to 17 U.S.C. § 502;

e.      That this Court declare that IBM is entitled to terminate the ICA and all

software licenses previously granted to PSI under the terms of the ICA as a result of PSI's

breaches of the terms of the ICA;

f.      That this Court declare that IBM's refusal to license its patents to PSI and

its copyrighted operating systems and other software for use on PSI's emulator systems is

not anti-competitive and does not violate the antitrust laws;

g.      That PSI be ordered to pay damages adequate to compensate IBM for

PSI's infringement of the '261 patent, the '520 patent, the '709 patent, the '678 patent, the

'106 patent, the '495 patent, the '851 patent, the '789 patent, the '002 patent, and the '812

patent pursuant to 35 U.S.C. § 284 and adequate to compensate IBM for PSI's breaches

of the IBM license agreements pursuant to which PSI has licensed IBM software for

purposes of its emulator development program;

h.      That PSI be ordered to pay statutory or other damages for its copyright

infringement pursuant to 17 U.S.C. § 504(c);

i.      That PSI be ordered to pay damages for its trade secret misappropriation

and interference with the TIDA and TILA and/or to disgorge all sums by which PSI has

been unjustly enriched;

j.      That PSI be ordered to pay treble damages pursuant to 35 U.S.C. § 284;

k.      That PSI be ordered to pay attorneys' fees pursuant to 35 U.S.C. § 285

and/or 17 U.S.C. § 505;

l.      That PSI be ordered to pay prejudgment interest;

m.      That PSI be ordered to pay all costs associated with this action; and

n.    That IBM be granted such other and additional relief as the Court or a jury

may deem just and proper.


### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, IBM hereby

demands a trial by jury as to all issues so triable.


DATED:    New York, New York
            August 17, 2007

QUINN EMANUEL URQUHART OLIVER &
    HEDGES, LLP


By: _____

Richard I. Werder, Jr. (RW-5601)
Edward J. DeFranco (ED-6524)
David L. Elsberg (DE-9215)
Thomas D. Pease (TP-5258)
51 Madison Avenue
22nd Floor
New York, New York  10010-1601
(212) 849-7000


Frederick A. Lorig
865 S. Figueroa Street
Los Angeles, California  90017
(213) 443-3000


Attorneys for Plaintiff
International Business Machines Corporation

## Certificate of Service

The undersigned certifies that I caused to be served the following documents by first class mail on August 17, 2007 true and correct copies of **IBM's Redacted Amended Complaint** on the attorneys for the parties at their places of business listed below as follows:

Stephen Edward Morrissey
Susman Godfrey LLP
1901 Avenue of The Stars, Ste 950
Los Angeles, CA 90067

Stephen D. Susman
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

James T. Southwick
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002

Ryan C. Kirkpatrick
Susman Godfrey LLP
1901 Avenue of the Stars
Suite 950
Los Angeles, CA 90067

Tibor Ludovico Nagy, Jr.
Susman Godfrey LLP(NYC)
590 Madison Ave.
New York, NY 10022

Dated August 17, 2007

Rachel Gatewood