# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Plaintiff,

v.

PLATFORM SOLUTIONS, INC.,

        Defendant.

06-cv-13565 (CLB) (MDF)


**<u>JURY TRIAL DEMANDED</u>**

**<u>REDACTED VERSION</u>**

(electronically filed)

---

### DEFENDANT AND COUNTERCLAIMANT PLATFORM SOLUTIONS, INC.'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO INTERNATIONAL BUSINESS MACHINES CORPORATION'S AMENDED COMPLAINT

Defendant and Counterclaimant Platform Solutions, Inc. ("PSI") hereby answers the Amended Complaint of Plaintiff International Business Machines Corporation ("Plaintiff" or "IBM"), admitting, denying, and alleging as follows:

In a spurious effort to call attention away from its own abusive and predatory behavior by denigrating PSI's reputation, IBM, in its Amended Complaint, has made the sweeping assertion that PSI's business model is built on a theft of IBM intellectual property. PSI rejects this assertion and denies IBM's allegations that it has infringed any valid IBM patent, misappropriated any trade secrets, violated any copyright, or breached any contract through the conduct alleged in the Amended Complaint, and denies that IBM is entitled to any of the relief claimed in its Amended Complaint. For the past several decades, IBM has taken a distinct approach to competition law in the mainframe industry. After its monopolistic behavior drew the scrutiny of antitrust authorities in the 1950s and 1960s, it adopted a position of openness and free competition, inducing programmers, competitors, developers, and customers to adopt IBM's unique

architectural platform.  By representing that it would license its intellectual property relating to its mainframe products on reasonable and non-discriminatory terms, and by providing customers, business partners, application developers, and competitors—such as Amdahl and Hitachi—with the interoperability information and licenses needed to develop compatible products on a reasonable and non-discriminatory basis for decades, IBM caused the mainframe industry to standardize on the IBM mainframe architecture. Then, when regulatory attention moved elsewhere and IBM acquired an even larger base of customers locked in to IBM's architectural platform, it changed course: retracting promises to license technical information on the same terms as before; delaying requests for formal positions; renouncing a publicly-touted policy of reasonable, non-discriminatory patent licensing; and resuming its policies of tying and bundling that were so unequivocally denounced decades ago.

PSI—which is now marketing the first open architecture mainframe computer, capable of running IBM's mainframe operating systems and other operating systems such as Linux, Unix and Microsoft Windows and stands as the only viable threat to IBM's mainframe monopoly—is the target of IBM's current campaign to eliminate competition in the worldwide market for mainframe computers.  Consumers want PSI's product. Trade publications have touted it.  Organizations ranging from local governments to large, multi-national companies have either implemented it or are considering its implementation.  IBM itself has projected that ███████████████████████████ ████████████████████████████████████████████. Rather than competing on the merits against PSI by offering better products, better service or lower prices, however, IBM has sought to extinguish the threat posed by PSI by, *inter alia*: (a) conditioning the license of its mainframe operating systems on the purchase or continued use of an IBM mainframe, (b) taking the novel position that any computer capable of running IBM's operating systems necessarily infringes IBM patents, and (c) attempting to enforce patents that purport to read on architectural standards for making IBM-compatible mainframe products after representing throughout the development of

2

those standards that it would engage in reasonable and non-discriminatory licensing of interoperability information and allegedly applicable patents.

There is no pro-competitive justification for IBM's conduct; it is purely designed to eliminate competition and suppress consumer choice. By its Amended Counterclaims, PSI seeks to recover damages based on the harm that IBM's conduct has caused and is causing to PSI's business. Further, PSI seeks the injunctive relief that is necessary to restore free and fair competition in the worldwide market for computers and applications running on IBM's architectural platform—a platform that IBM's now-discarded licensing policies made the industry standard.

The bait and switch tactics that IBM is now using to maintain its mainframe monopoly are not only anticompetitive, but hypocritical. Consistent with its longstanding practice of providing customers, business partners, application developers and competitors with reasonable and non-discriminatory access to interoperability information in the mainframe industry, IBM to this day champions open standards when they suit its business interests. As recently as July 2006, an IBM-backed trade group filed a complaint before the European Commission claiming that another dominant firm—Microsoft—had violated the antitrust laws by refusing to supply to IBM the interoperability information necessary to make competitive compatible products "in a timely and adequate manner and thus discriminat[ing] in the supply of such information against third parties and in favour of its own products." IBM cannot have it both ways; it must live by the same principles that it invokes to its advantage against dominant firms in other markets.

PSI now responds to IBM's individual allegations using the same paragraph numbers that appear in the Amended Complaint. All factual allegations not expressly admitted below are denied.

## The Nature of the Action

1.    Denied.

2.    PSI admits that it has developed and is bringing to market and offering for sale computer systems that are compatible with and will run IBM's copyrighted operating

systems, other software programs written for IBM's operating systems, and other operating systems and software programs, and that it has informed customers and potential customers of this compatibility. PSI denies that its products are "emulator systems" that merely seek to "imitate" IBM's computers; PSI's products are open mainframe servers that are compatible with the broadest set of datacenter environments and operating systems, including IBM z/OS, Linux, Windows, and HP-UX. PSI developed its products to provide mainframe computer customers with choice in the mainframe computer and operating systems markets in which IBM wields monopoly power. PSI denies the remaining allegations of paragraph 2.

3.      PSI admits that IBM's efforts have included the development of computer hardware and software products tailored to meet demanding customer requirements, but denies that all of IBM's efforts were directed to those goals and denies the remaining allegations of the second sentence of paragraph 3. PSI admits the allegations of the third sentence of paragraph 3 except that PSI denies that IBM's computer systems provide "unparalleled performance, reliability, availability, serviceability, and security," and further denies that customer acceptance of IBM's computer systems and programs has resulted solely from IBM's investments. PSI denies the remaining allegations of paragraph 3.

4.      Denied.

5.      PSI admits that it expected IBM to grant PSI a patent license based on its publicly-advertised policy of reasonable, non-discriminatory patent licensing and its express statements to PSI. PSI denies the remaining allegations of paragraph 5.

6.      Denied.

7.      PSI admits that after the commencement of this litigation one of its officers received, unsolicited, documents labeled "IBM confidential materials" from a source outside of PSI, that these materials were promptly turned over to trial counsel, and that PSI has produced those documents in discovery to IBM. PSI admits that its counsel is unwilling to engage in informal discovery by answering requests for information not made through the discovery process. PSI denies that these documents were ever

4

circulated within PSI, that they were used in any way, that they are of any value to PSI, and PSI denies the remaining allegations of paragraph 7.

8.    PSI admits that IBM's intellectual property includes copyrighted materials. PSI admits that its firmware enables its products to execute instructions written for IBM's ESA/390 Architecture and z/Architecture.  PSI denies that this enablement constitutes "translating" within the meaning of ICA.  PSI denies the remaining allegations of paragraph 8.

9.    PSI admits that IBM seeks the remedies set forth in paragraph 9, but denies that it is entitled to any of them.

10.    PSI admits that IBM seeks declaratory relief set forth in paragraph 10. PSI admits that it requested, out of an abundance of caution, that IBM license any patents that might arguably be necessary for PSI to develop and market its products.  PSI admits that it has demanded that IBM not tie its mainframe computers to its operating systems, and license its operating systems to PSI and its customers.  PSI admits that prior to this suit it notified IBM that its conduct violates the antitrust laws, and that PSI has filed antitrust counterclaims in this action.  PSI admits that IBM has raised its patent rights as a *post hoc* justification for its anticompetitive conduct, but denies that its allegations justify its conduct.  PSI denies the remaining allegation of paragraph 10.

## The Parties

11.    PSI denies the allegation that IBM faces competition from a large number of firms both inside and outside the United States with respect to the mainframe computer systems and operating systems at issue in this action, and admits the remaining allegations of paragraph 11.

12.    Admitted

## Jurisdiction and Venue

13.    Admitted.

14.    Admitted.

15.    Admitted.

16.    Admitted.

17.    Admitted.

## Factual Background

18.    PSI denies that IBM has invested the time, effort, money, know-how, and creativity that it would have under competitive conditions, and avers that "massive" is too vague an adjective to permit a response and therefore denies that allegation.    PSI otherwise admits the allegations of paragraph 18.

19.    PSI admits that System z is the brand name that IBM uses for its current mainframe computers, mainframe operating systems, and software applications for mainframe computers, and that System z is an umbrella term IBM uses for those products.    PSI further admits that IBM's current mainframe computers and operating systems evolved from products dating back to 1964, and that the S/390, introduced in 1990, is among the predecessors to IBM's current mainframe computers.    PSI admits that the System z products include zSeries servers and z9 servers and IBM mainframe operating systems and products that run on those computers or other IBM-compatible mainframe computers.    PSI denies that the development of System z or the System z products resulted solely from IBM's investments, and denies any remaining allegations of paragraph 19.

20.    Admitted, except that PSI denies the allegation of the first sentence of paragraph 20 that zSeries servers and their predecessors have been the backbone of commercial computing for decades on the ground that the allegation is too vague to permit a response.    To the extent the allegation is meant to suggest that IBM mainframes are the only mainframe computers that have been renowned for their reliability, scalability, availability, serviceability and industrial-strength attributes, PSI denies the allegation; to the extent that this allegation suggests that IBM has a dominant position in the market for mainframe computers, PSI admits this allegation.

21.    Admitted.

22.    PSI admits the first sentence of paragraph 22.    PSI denies the second sentence inasmuch as the word "massive" is too vague to permit a response.

23.    PSI admits that particular operating systems are designed to capitalize on the features and characteristics of compatible architectures, that IBM's OS/390 operating system is compatible with its S/390 computers, that its z/OS operating system is compatible with its Series Z computers, and that the compatibility between IBM's operating systems and the architectures of its mainframe computer systems is an important factor contributing to the accuracy and reliability of those systems and customer acceptance of those systems for mission-critical applications.  PSI denies the remaining allegations of paragraph 23.

24.    PSI admits the allegations of the first two sentences of paragraph 24.  With respect to the third sentence of paragraph 24 PSI admits that the software programs referenced in the second sentence of paragraph 24 will operate in conjunction with IBM computer architectures, but notes that such programs also will operate in conjunction with IBM-compatible architectures such as those previously marketed by Amdahl and Hitachi and now marketed by PSI.

25.    PSI is without information or knowledge sufficient to form a belief as to the allegations regarding IBM's patent portfolio, and therefore denies those allegations.  PSI admits that IBM has sought to copyright its mainframe operating system and other software products, but denies that all its intellectual property is copyrighted and denies that IBM's contractual restrictions are reasonable.   The statement that IBM has maintained "certain aspects of its z/Architecture®, ESA/390 Architecture, and predecessor architectures as IBM trade secrets" is too vague to permit a response, and PSI is further without information or knowledge sufficient to form a belief as to this allegation.  PSI denies the remaining allegations of Paragraph 25.

26.    Denied.

27.    PSI admits that PSI's products run on Intel Itanium chips and are capable of executing the instructions of IBM's OS/390 and z/OS operating systems and other IBM computer programs that run in conjunction with those operating systems, such as IBM's CICS and DB2.  PSI admits that Intel is an investor in and business partner of PSI.  PSI otherwise denies the allegations of paragraph 27.

7

28.     PSI admits that its products run on Intel Itanium-based servers, admits that its products are compatible with certain standards and specifications of IBM's ESA/390 architecture and z/Architecture computer systems, admits that they are capable of running IBM's OS/390 and z/OS operating systems and other IBM computer programs that run in conjunction with those operating systems, such as IBM's CICS and DB2. PSI further admits that certain Hewlett Packard servers use Intel Itanium chips, and that certain of PSI's products incorporate Hewlett Packard servers. PSI denies the remaining allegations of paragraph 28.

29.     PSI admits the allegations of the second sentence of paragraph 29, admits that compatibility with any particular facility supported by IBM's z/Architecture requires the ability to support that facility, and admits that the viability of PSI's IBM-compatible products depends in part on the ability to run z/OS and other System z software required or licensed by its customers. PSI denies the remaining allegations of paragraph 29.

30.     PSI admits that it has stated that its products are designed to execute the instructions in the z/Architecture and s/390 instruction sets required by its intended customers and that its products are compatible with the OS/390 and z/OS operating systems and other IBM, vendor and customer application software that runs on those operating systems. PSI further admits that it has confirmed that its products will run IBM's latest version of its z/OS operating system and will perform many z/OS workloads as if they were operating on an IBM mainframe. PSI denies the remaining allegations of paragraph 30.

31.     PSI admits that it was founded by employees of Amdahl; admits that it acquired rights to use Amdahl-created software and diagnostics; and admits that IBM had entered into certain agreements with Amdahl under which IBM disclosed technical information to it. PSI otherwise denies the allegations of paragraph 31.

32.     PSI admits the allegations of paragraph 32, but further states that IBM licensed the basic interoperability information to Amdahl only after it was threatened with antitrust enforcement proceedings and in order to avoid such proceedings.

33.    PSI admits that certain aspects of the IBM architectures are not published in the public POP and that Amdahl received information regarding some of these aspects pursuant to certain agreements with IBM.  PSI otherwise denies the allegations of paragraph 33.

34.    PSI admits that IBM and Amdahl entered into the TIDA agreement in 1986, and subsequently entered into the TILA agreement in 1996, and that those agreements were specifically negotiated and set forth terms and conditions governing technical information that IBM provided to Amdahl pursuant to those agreements, and avers that the TIDA agreement was entered into pursuant to IBM's commitment to the European antitrust authorities to make interoperability information available to competing undertakings, such as Amdahl, on a timely basis.  PSI denies that all the technical information disclosed to Amdahl then constituted or now constitute "trade secrets,"[1] and avers that much of it is freely available from multiple sources, including, *inter alia*, Hercules's open source emulation program and IBM's United States and foreign patent applications.  PSI denies the remaining allegations of paragraph 34.

35.    PSI admits that the TILA/TIDA agreements prohibited Amdahl from disclosing, publishing, or disseminating TILA/TIDA information except as provided by the TILA/TIDA agreement.  PSI denies the remaining allegations of paragraph 35.

36.    Admitted, except that PSI is without knowledge sufficient to admit or deny that the Amdahl and Fujitsu TILAs and TIDAs were in all respects identical.

37.    PSI admits that the technical information disclosed to Amdahl and Fujitsu defined certain standards and specifications for IBM's ESA/390 and predecessor architectures that were not disclosed in the publicly-available POP at the time. PSI otherwise denies the allegations of paragraph 37.

---

[1] PSI objects to IBM's definition of IBM Technical Information as "trade secrets" throughout the Amended Complaint, and denies the allegation that they are the same. To the extent that PSI uses the term "technical information" in its answer, it refers to the plain meaning of the term, not the definition assigned by IBM.

38.     PSI admits that technical information provided to Amdahl under the TILA and TIDA was used in Amdahl's development of diagnostic tools, but denies that such tools were based entirely or principally on such information and avers that the tools were based principally and substantially on Amdahl's own innovations and publicly available information, and denies that the principal use of the TILA and TIDA information was in the creation of diagnostic tools rather than the development of Amdahl's IBM-compatible processors.  PSI further admits that Amdahl diagnostic tools were used to test whether Amdahl processors were compatible with IBM's architectures and would produce the same results as IBM processors.  PSI further admits that Amdahl's diagnostic tools can be used to assist in the testing of S/390-compatible processors, including an Intel Itanium processor overlaid with PSI-developed firmware and microcode.  PSI otherwise denies the allegations of paragraph 38.

39.     PSI admits that IBM technical information was used by Amdahl in developing diagnostic tools, including DIRT, HOT, ALPHA and 8E7, as well as various "bring-up-programs" or "BUPs."  PSI denies that those Amdahl diagnostic tools were based entirely or principally on IBM technical information, and on information and belief avers that substantially less than 10% of the code in those programs was based on any IBM technical information disclosed under the TIDA or TILA agreements, and the development of those programs was based on Amdahl's own innovative efforts.

40.     Admitted.

41.     PSI admits that some of Amdahl's diagnostic tools contains code derived from IBM technical information, but denies that any of the tools were laced with such information or were based principally on such information.  On information and belief PSI avers that far less than 10% of the code contained in Amdahl's diagnostic tools was derived from IBM technical information that IBM claimed was confidential, and much of that information has subsequently become publicly available and thus non-confidential.

42.     Admitted.

43.     PSI admits that Amdahl decided to stop marketing IBM-compatible computers around 1999.  PSI denies the remaining allegations of paragraph 43.

44.    Admitted, except PSI avers that it was the understanding of both parties that the emulation software, diagnostic tools and related materials would not contain IBM confidential information or materials from which such information could be readily discerned.

45.    PSI admits the first two sentences of paragraph 45, except that it avers that Amdahl's interests in the negotiations were negotiated by a member of Mr. Handschuh's staff. PSI admits that Mr. Handschuh and Mr. Hilton, to varying degrees, were aware that the TILA and TIDA agreements contained restrictions on disclosure. PSI otherwise denies the allegations of paragraph 45.

46.    Admitted, except to the extent that IBM considers TILA/TIDA information to be "provide[d]" or "receive[d]" when object code diagnostic tools are transferred, or to include non-confidential information, which PSI denies.

47.    PSI admits that it unknowingly or inadvertently received certain diagnostic program listings that may have contained some TIDA-derived information from Amdahl/Fujitsu after both parties agreed that PSI should not receive such listings, and that it subsequently learned that it had received such information and took steps to ensure that it made no improper use of such information. PSI denies that it ever used IBM trade secrets, and denies the remaining allegations of paragraph 47.

48.    Denied.

49.    PSI admits that, prior to this suit, it maintained that it did not receive IBM confidential information. PSI admits that Mr. Hilton did unknowingly receive and retain BUP source listings in electronic form that Fujitsu had produced to PSI. PSI admits that it subsequently received diagnostic binary modules and source code listings for HOT and Alpha. PSI denies that it received source code listing for all programs, and specifically denies that it received them for HOT and 8E7. PSI further denies that it has ever used, or is using, source code listings to discern IBM's confidential information for the purpose of designing its products or that its products are derived from such information. PSI denies the remaining allegations of paragraph 49.

50.    Admitted.

11

51.    Denied.

52.    Admitted.

53.    PSI admits the first sentence of paragraph 53 except for the "grandiose vision" characterization, which is too vague and conclusory to require a response. PSI admits the second sentence of paragraph 53. PSI admits that IBM declined to license its S/390 architectures and system designs in exchange for equity, but avers that it did so because of its own "similar business plans" and that it was at all times willing to license the interfaces and architectures "that have already been made available to others on comparable terms." PSI otherwise denies the allegations of paragraph 53.

54.    PSI admits that it inquired as to the implications of acquiring Amdahl's S/390 business on the TIDA/TILA information that Amdahl licensed from IBM. PSI admits that IBM told PSI that Amdahl could not transfer the information. PSI admits that it did not dispute this assertion to IBM. PSI otherwise denies the allegations of paragraph 54.

55.    PSI admits that it considered licensing the TIDA/TILA information directly from IBM, and admits that its decision not to was in part guided by a cost-benefit analysis of whether it was worthwhile to purchase the information from IBM at a relatively high cost. PSI denies the remaining allegations of paragraph 55.

56.    PSI admits the first sentence of paragraph 56. PSI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56, but denies the alleged falsity of the statement.

57.    PSI admits the first sentence of paragraph 57. PSI denies that the quoted statement is false. PSI avers that in the same letter Mr. Handschuh requested IBM to advise PSI if it had any basis for suspecting that PSI was using IBM intellectual property, and that PSI received no response. PSI further avers that it had advised IBM in 2001 that PSI possessed Amdahl diagnostic tools. PSI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57, and therefore denies those allegations.

58.    PSI admits that it refused IBM's unprecedented request that PSI allow it to inspect PSI's machine prior to it going to market.  PSI admits that it notified IBM of the presence of diagnostics source code listings with TIDA tags, and admits the language quoted in paragraph 58. PSI further admits that, as set forth in the quoted language, PSI acknowledged that it received source code listings in addition to the object code versions of certain of Amdahl's test and diagnostic programs.  PSI otherwise denies the allegations of paragraph 58.

59.    PSI admits the first sentence of paragraph 59.   PSI admits the quoted portion of the second sentence of paragraph 59.  PSI denies the remaining allegations of paragraph 59.

60.    PSI admits the first sentence of paragraph 60.  PSI admits that after IBM sent a letter containing dozens of demands for detailed information, essentially asking for a written narrative of the creation of PSI's product, PSI informed IBM that it would not engage in extensive informal discovery.  PSI lacks sufficient knowledge and information to respond to the third sentence of paragraph 60, and therefore denies the allegations contained therein.  All remaining allegations of paragraph 60 are denied.

61.    PSI admits that various versions of diagnostics have been transferred to and created by PSI over time and that they exist in different locations.  PSI further admits that it inadvertently received some listings that contain source code related to functions that may have been initially disclosed to Amdahl pursuant to the TILA/TIDA agreements. PSI denies the remaining allegations of paragraph 61.

62.    PSI admits that the listings reflected in the letter to IBM were the result of a preliminary scan and that PSI's investigation of IBM's allegations has been and is continuing.  PSI is without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 62, and therefore denies them.

63.    PSI admits that the scan results do not reflect other diagnostic tools licensed by Amdahl that do not contain TILA/TIDA-derived source code, may not pick up all potential TILA/TIDA information, and may pick up source code that may be derived from TILA/TIDA information that is now in the public domain. PSI denies that all

13

Amdahl diagnostic tools—and specifically executable versions of ALPHA and DIRT—illegally contain or reveal TIDA/TILA information, and avers that IBM has been aware since March 5, 2001 that PSI received DIRT, HOT and BUPs from Amdahl and that IBM has never—prior to its Amended Complaint—asserted that PSI's use of such diagnostics is improper or violates any agreement. PSI denies the remaining allegations of paragraph 63.

64.    PSI admits that it inadvertently obtained assembly listings, some of which potentially disclose TILA/TIDA information, from Fujitsu, and avers that no IBM trade secrets were used in the development of its product. PSI denies the allegations of paragraph 64.

65.    Denied.

66.    Denied.

67.    PSI admits that one of its officers received, unsolicited, documents labeled as IBM confidential materials from a source outside of PSI, which he promptly turned over to trial counsel, and that these documents contain IBM pricing information and business information. PSI promptly produced those documents to IBM, and has maintained their confidentiality. PSI denies that these documents were ever circulated within PSI, that they were used in any way, that they are of any value to PSI, and PSI denies the remaining allegations of paragraph 67.

68.    PSI admits that its counsel informed IBM that it was unwilling to engage in informal discovery by answering requests for information not made through the discovery process. PSI admits that it knew that the documents were labeled IBM confidential and it therefore promptly turned them over to trial counsel. PSI otherwise denies the allegations of paragraph 68.

69.    PSI admits the use of the language quoted in paragraph 69, the dates of the correspondence, and the authors of the correspondence. PSI denies the remaining allegations of paragraph 69, including the characterization of the quoted language.

70.    PSI is without knowledge or information sufficient to form a belief as to IBM's subjective beliefs, and therefore denies the allegations of paragraph 70 concerning what IBM believes. PSI denies the remaining allegations of paragraph 70.

71.    Denied.

72.    PSI admits that IBM is designated on the face of the patents as the assignee. PSI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 72, and therefore denies those allegations.

73.    PSI denies the first sentence of paragraph 73. The second sentence of paragraph 73 is both a statement of intent and a legal conclusion, neither of which require a response.

74.    PSI admits that it has, at various times, licensed copies of z/OS and other IBM software pursuant to the terms of the ICA. PSI admits that, among other things, the ICA requires the user to agree not to "reverse assemble, reverse compile, or otherwise translate the ICA Program unless expressly permitted by applicable law without the possibility of contractual waiver." PSI otherwise denies that allegations in paragraph 74.

75.    PSI admits that its firmware enables its products to execute instructions written for IBM's ESA/390 Architecture and z/Architecture, admits that it has described z/OS and other zSeries software as having the capability to be run on top of the firmware layer in PSI's products, admits that its firmware works in conjunction with Intel Itanium processors to execute the z/Architecture and ESA/390 Architecture instructions utilized by z/OS and other software written for those architectures, and admits that its products are intended, in part, to ensure that z/OS and other zSeries software run on a PSI system will produce the same results as they would when run on an IBM zSeries mainframe computer. PSI denies the remaining allegations of paragraph 75.

76.    PSI admits that its products execute the "legacy instructions" included in the current version of IBM's mainframe operating system, that it has referred to its products' ability to execute the instructions contained in IBM's operating systems as "just in time translation," and that instructions are stored in cache in the computer's memory. PSI denies the remaining allegations of paragraph 76.

77.    PSI admits that its founder and Chief Technology Officer Ronald N. Hilton was the inventor of the inventions claimed in U.S. Patent No. 7,092,869 (the "'869 patent"), and that its products practice the invention claimed by the '869 patent. PSI denies the remaining allegations of paragraph 77.

78.    PSI admits that it has stated in public presentations that its products execute the instructions of IBM's mainframe operating systems and that it has referred to this function as "just in time translation." PSI denies the remaining allegations of paragraph 78.

79.    PSI admits that it has offered to indemnify and agreed to indemnify certain of its customers for patent infringement claims, and further avers that IBM indemnifies its own customers from claims of infringement related to its products. PSI denies the remaining allegations of paragraph 79.

80.    PSI admits that it has met with and corresponded with IBM regarding PSI's efforts to market IBM-compatible mainframe products. PSI denies the remaining allegations of paragraph 80.

81.    PSI admits that it has met and corresponded with IBM regarding PSI's requests that IBM provide licenses for any patents that IBM believes are necessary to develop, sell and distribute IBM-compatible mainframes and that IBM make its operating systems and other software available to PSI and customers of PSI's products. PSI further admits that IBM has refused to provide PSI or its customers with access to IBM's operating systems and software. PSI denies the remaining allegations of paragraph 81.

82.    PSI admits that, prior to the commencement of this litigation, it informed IBM that IBM's conduct is unlawful under the antitrust laws and is damaging to PSI. PSI denies the remaining allegations of paragraph 82.

83.    PSI admits that the allegations contained in paragraph 83 except insofar as the allegations refer to PSI's products as "emulator systems." PSI denies the remaining allegations of paragraph 83.

84.    With respect to the first sentence of paragraph 84, PSI admits that it met with IBM in New York in February 2006 to discuss the licensing of any patents that IBM

believed were relevant to PSI's products, but denies the remaining allegations of that sentence. PSI admits the allegations of the second sentence of paragraph 84, and that IBM's correspondence dated May 24, 2006 contained the language quoted in the remainder of paragraph 84.

85.    PSI admits the content of the June 8, 2006 correspondence alleged in paragraph 85, but denies that IBM did or could reasonably construe this as threatening antitrust litigation.

86.    PSI admits that IBM declined PSI's request for reconsideration of IBM's decision not to grant PSI a patent license and not to license its software to run on PSI's products using the language quoted in paragraph 86. PSI denies the remaining allegations of paragraph 86.

87.    PSI admits the content of the communications alleged in paragraph 41, and avers that the letter also indicated that PSI had relied on IBM's representations that it would license the s/390 patents. PSI denies that IBM did or could reasonably construe this correspondence as threatening antitrust litigation.

88.    PSI admits that it has filed counterclaims alleging antitrust violations and claims substantial damages as a result of IBM's antitrust violations and other unlawful conduct. PSI otherwise denies the allegations in paragraph 88.

89.    PSI denies that its products infringe the asserted IBM patents and denies that the parties' dispute was ripe as of the filing of IBM's complaint. PSI otherwise admits the allegations in paragraph 89.

90.    PSI admits that a distributor began marketing IBM-compatible mainframes containing PSI firmware in November 2006, that the distributor's web site announced the availability of those products and the imminent availability of additional open system mainframes containing PSI technology, and that the distributor is actively marketing those products and offering them for sale in New York and elsewhere. PSI denies the remaining allegations of paragraph 90.

91.    PSI admits that its products will run the latest IBM operating system and that its products have advanced partitioning capabilities that allow customers to control

z/OS based software licensing fees by isolation of individual workloads on logical servers, but not in any way contrary to IBM's licensing rules. PSI has no knowledge as to whether the alleged "statement and threats" have been communicated to IBM. PSI otherwise denies the allegations of paragraph 91.

92.    PSI admits that the referenced article appeared in a trade publication on September 26, 2006 and contained the quoted passages, but denies the allegation that the publication of the article resulted from "these and other activities" on the ground that it is too vague to permit a response.

**Count One: Infringement of the '261 Patent**

93.    PSI incorporates by reference its responses to paragraphs 1-92 of the Amended Complaint.

94.    Denied.

95.    Denied.

96.    Denied.

97.    Denied.

98.    Denied.

99.    Denied.

100.    Denied.

**Count Two: Infringement of the '520 Patent**

101.    PSI incorporates by reference its responses to paragraphs 1-100 of the Amended Complaint.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

### Count Three: Infringement of the '709 Patent

109.    PSI incorporates by reference its responses to paragraphs 1-108 of the Amended Complaint.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Denied.

### Count Four: Infringement of the '678 Patent

117.    PSI incorporates by reference its responses to paragraphs 1-116 of the Amended Complaint.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

### Count Five: Infringement of the '106 Patent

125.    PSI incorporates by reference its responses to paragraphs 1-124 of the Amended Complaint.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

19

132.    Denied.

### Count Six: Infringement of the '495 Patent

133.    PSI incorporates by reference its responses to paragraphs 1-132 of the Amended Complaint.

134.    Denied.

135.    Denied.

136.    Denied.

137.    Denied.

138.    Denied.

139.    Denied.

140.    Denied.

### Count Seven: Infringement of the '789 Patent

141.    PSI incorporates by reference its responses to paragraphs 1-140 of the Amended Complaint.

142.    Denied.

143.    Denied.

144.    Denied.

145.    Denied.

146.    Denied.

147.    Denied.

148.    Denied.

### Count Eight: Infringement of the '851 Patent

149.    PSI incorporates by reference its responses to paragraphs 1-148 of the Amended Complaint.

150.    Denied.

151.    Denied.

152.    Denied.

153.    Denied.

154.    Denied.

155.   Denied.

156.   Denied.

### Count Nine: Infringement of the '002 Patent

157.   PSI incorporates by reference its responses to paragraphs 1-156 of the Amended Complaint.

158.   Denied.

159.   Denied.

160.   Denied.

161.   Denied.

162.   Denied.

163.   Denied.

164.   Denied.

### Count Ten: Infringement of the '812 Patent

165.   PSI incorporates by reference its responses to paragraphs 1-164 of the Amended Complaint. Denied.

166.   Denied.

167.   Denied.

168.   Denied.

169.   Denied.

170.   Denied.

171.   Denied.

172.   Denied.

### Count Eleven: Trade Secrets Misappropriation

173.   PSI incorporates by reference its responses to paragraphs 1-172 of the Amended Complaint.

174.   PSI is without knowledge or information sufficient to form a belief as to the first sentence of paragraph 174, and therefore denies those allegation.  PSI admits that IBM licensed to Amdahl certain information that was not disclosed in the POP.  PSI otherwise denies the allegations of paragraph 174.

21

175.    Denied inasmuch as this paragraph relates to the purported trade secrets alleged to have been misappropriated by PSI.  To the extent the allegations relate to other purported trade secrets that may be owned or created by IBM, PSI is without knowledge or information sufficient to form a belief, and therefore denies those allegations.

176.    PSI admits that the technical information disclosed to Amdahl may have initially been derived from a version of the POP that was different from the public version of the POP.  PSI denies the remaining allegations of paragraph 176.

177.    Denied inasmuch as this allegation relates to the purported trade secrets alleged to have been misappropriated by PSI.

178.    On information and belief, PSI admits that trade secrets, if any, disclosed to Amdahl under the TILA/TIDA licenses were not transferable to PSI so long as such information remained confidential.  PSI otherwise denies the allegations of paragraph 178.

179.    PSI admits that it was generally aware that the TIDA/TILA agreements had restrictions on use and that Amdahl had used certain information disclosed under the TIDA/TILA agreements in developing certain diagnostic programs.  Upon information and belief, PSI avers that, at a maximum, less than ten percent of these diagnostics related to the so-called TIDA/TILA information.   PSI denies the remaining allegations of paragraph 179.

180.    Denied.

181.    Denied.

182.    Denied.

183.    This paragraph contains a legal conclusion and statement of intent that does not require a response.

184.    Denied.

185.    Denied.

### Count Twelve: Tortious Interference with Contract

186.    PSI incorporates by reference its responses to paragraph 1-185 of the Amended Complaint.

22

187.   This allegation is too vague to permit a response, and is therefore denied.

188.   Denied.

189.   Denied.

190.   Denied.

191.   Denied.

192.   Denied.

193.   Denied

### Count Thirteen: Breach of Contract

194.   PSI incorporated by reference its responses to paragraph 1-193 of the Amended Complaint.

195.   PSI admits that it has, at various times, licensed copies of z/OS and other IBM software pursuant to the terms of the ICA.  PSI denies, however, that the scope of these licenses apply to any of the facts alleged in the Amended Complaint.

196.   Admitted.

197.   Denied.

198.   PSI admits that, among other things, the ICA requires the user to agree not to "reverse assemble, reverse compile, or otherwise translate the ICA Program unless expressly permitted by applicable law without the possibility of contractual waiver." PSI otherwise denies that allegations in paragraph 198.

199.   PSI admits that its products execute the "legacy instructions" contained in z/OS, and that those instructions are executed by the Itanium processors contained in those products.  PSI denies that running an IBM operating system on a PSI mainframe involves translation within the meaning of paragraph 4.1 of the ICA, and denies the remaining allegations of paragraph 199.

200.   Denied.

201.   Denied.

202.   Denied.

## Count Fourteen: Copyright Infringement

203.    PSI incorporates by reference its responses to paragraphs 1-202 of the Amended Complaint.

204.    PSI admits that certain versions of OS/390 and z/OS are registered as copyrighted. PSI is without knowledge or information sufficient to respond to the remaining allegations of paragraph 204.

205.    Admitted.

206.    PSI admits that IBM is identified as the owner of registered copyrights for z/OS and S/390. PSI is without knowledge or information sufficient to respond to the remaining allegations of paragraph 206, and therefore denies them.

207.    PSI admits that it has made duplicates of certain copies of IBM's operating systems. PSI denies the remaining allegations of paragraph 207.

208.    PSI admits paragraph 208, except inasmuch as it implies that PSI did any of the alleged copying referenced in this paragraph, participated in any of the alleged copying referenced in this paragraph, or that any such copying was unlawful.

209.    Denied.

210.    Denied.

211.    Denied.

212.    Denied.

213.    Denied.

214.    Denied.

## Count Fifteen: Declaratory Judgment

215.    PSI incorporates by reference its responses to paragraphs 1-214 of the Amended Complaint.

216.    PSI admits that, now that it has filed counterclaims in this action, there is a real and actual controversy between PSI and IBM relating to IBM's antitrust liability. PSI denies that there was a real and actual controversy between PSI and IBM at the time that IBM filed this action, and denies the remaining allegations of paragraph 216.

217.   PSI is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 217.

218.   PSI admits that it has (a) requested licenses to any patents that IBM believes to be relevant on the same terms as offered to other competitors and IBM's own customers, (b) requested software licenses, (c) asserted that IBM's refusal to license on nondiscriminatory terms is anticompetitive, (d) acknowledged confusion in the market over IBM's policies, (e) acknowledged on numerous occasions the harm to PSI flowing from IBM's discriminatory policy, (f) has filed antitrust counterclaims in this action, and (g) and stated that it is prepared to litigate the issues in this case. PSI otherwise denies the allegations in paragraph 218.

219.   PSI admits that IBM has refused to agree to license any arguably applicable patents to PSI, and it has refused to license its copyrighted operating systems and other software for use on PSI's systems. PSI admits that there is a real and actual controversy regarding IBM's claims of patent infringement, except inasmuch as IBM has asserted patents based on possible future alleged infringement by PSI. PSI otherwise denies the allegations of paragraph 219.

220.   PSI admits that, after initially agreeing to license its patents and operating systems, IBM has told PSI that it will not license its patents or its operating systems and other software for use on PSI's mainframes. PSI otherwise denies the allegations in paragraph 220.

221.   PSI admits that there is a real and actual controversy regarding IBM's antitrust liability now that PSI has filed antitrust counterclaims. PSI denies that there was a real and actual controversy at the time that IBM filed this action, and denies the remaining allegations of paragraph 221.

222.   Denied.

## AFFIRMATIVE AND OTHER DEFENSES

Further answering the Amended Complaint, PSI asserts the following defenses. PSI's investigation of IBM's claims and its defenses is ongoing, and PSI reserves the right to amend its answer with additional defenses as further information is obtained.

### First Defense:  Non-infringement of the Asserted Patents

1.    PSI has not infringed, contributed to the infringement of, or induced the infringement of any valid claim of the '261 patent, '520 patent, '709 patent, the '678 patent, '106 patent, '495 patent, '789 patent, '851 patent, '002 patent or '812 patent (collectively, the "Asserted Patents"), and is not liable for infringement thereof.

2.    All PSI methods, systems, apparatus, and/or products that are accused of infringement have substantial uses that do not infringe and therefore cannot induce or contribute to the infringement of the Asserted Patents.  Moreover, PSI does not intend or have knowledge that its customers will use its products in a manner that infringes the Asserted Patents.

### Second Defense:  Invalidity of the Asserted Patents

3.    On information and belief, the claims of the Asserted Patents are invalid for failing to comply with the provisions of the Patent Laws, Title 35 U.S.C., including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, and 112, and the doctrine of double patenting.

### Third Defense:  Prosecution History Estoppel

4.    IBM's alleged causes of action for patent infringement are barred under the doctrine of prosecution history estoppel, and IBM is estopped from claiming that one or more of the Asserted Patents covers or includes any accused PSI method, system, apparatus, and/or product.

### Fourth Defense:  Dedication to the Public

5.    IBM has dedicated to the public all methods, systems, apparatus, and/or products disclosed in the Asserted Patents, but not literally claimed therein, and is estopped from claiming infringement by any such public domain methods, systems, apparatus, and/or products.

**Fifth Defense: License**

6.    To the extent that any of IBM's allegations of infringement are premised on the alleged use, sale, or offer for sale of methods, systems, apparatus, and/or products that were developed by or for a licensee of IBM or its predecessors-in-interest and/or provided to PSI by or to a licensee of IBM or its predecessors-in-interest, such allegations are barred pursuant to license.

**Sixth Defense:  Acquiescence and Equitable Estoppel (Patent Infringement)**

7.    IBM's claims against PSI are barred by the doctrines of acquiescence and equitable estoppel.

**Seventh Defense:  Patent Unenforceability Due to Patent Misuse**

8.    The Asserted Patents are unenforceable due to patent misuse.  Plaintiff has sought to illegally extend its alleged patent rights by alleging that methods, systems, apparatus, and/or products having substantial non-infringing commercial uses contributorily infringe the patents and induce infringement of the patents.

9.    IBM has also sought to extend its patent rights by conditioning the license of its patents and/or the sale of its patented products on the acquisition of a license to rights in another patent or purchase of a separate product.  Specifically, IBM has sought to extend its patent rights by refusing to license its operating system to run on other suppliers mainframes unless those suppliers obtain a license to IBMs patents—which license IBM also refuses to grant.  In this way, IBM seeks to use its right to license its *operating system* to extend the reach of its *patents* to devices (i.e. other manufacturer's mainframes) that they do not cover.

10.    IBM has also sought to extend its patent rights by inducing customers, business partners, application developers and competitors to standardize on the standards and specifications comprising the IBM z/Architecture and its predecessor architectures through repeated representations that it will license its intellectual property and other interoperability information needed to make compatible products on fair, reasonable and non-discriminatory terms.  Now that the mainframe industry has conformed to the mainframe standards and specifications adopted by IBM, and now that IBM's installed

base of mainframe customers is locked in to the use of IBM-compatible mainframes and IBM operating systems, IBM is seeking to improperly seeking to enforce Asserted Patents that purport to read on standards and specifications for the IBM z/Architecture.

### Eighth Defense:  Covenant Not to Sue (Patent Infringement)

11.     To the extent that any of IBM's allegations of infringement are premised on the alleged use, sale, or offer for sale of methods, systems, apparatus, and/or products that were manufactured by or for a licensee of IBM or its predecessors-in-interest and/or provided to PSI by or from a licensee of IBM or its predecessors-in-interest, under a covenant not to sue, IBM's claims, individually and as a whole, are barred by said covenant.

### Ninth  Defense:  Unclean Hands (All Claims)

12.     IBM's purported claims, individually and as a whole, are barred by the doctrine of unclean hands, including its deceptive and misleading conduct in the standard setting process relating to the development of the z/Architecture standards and its mainframe and mainframe operating system monopolies, including through its repeated representations that it would engage in fair, reasonable and non-discriminatory licensing of interoperability information and related intellectual property.

### Tenth Defense: Inequitable Conduct (All Claims)

13.     IBM's purported claims, or some of them, are barred by inequitable conduct before the United States Patent and Trademark Office, including the failure to disclose relevant prior art, and by its deceptive and misleading conduct in the standard setting process relating to the development of the z/Architecture standards and its mainframe and mainframe operating system monopolies, including through its repeated representations that it would engage in fair, reasonable and non-discriminatory licensing of interoperability information and related intellectual property.

### Eleventh Defense: Failure to State a Claim (Breach of Contract)

14.     IBM has failed to sufficiently allege facts showing a breach of any contract by PSI.  As a matter of law, the terms of the contract alleged by IBM are not violated by the conduct alleged by IBM.

### Twelfth Defense: Equitable Estoppel, Waiver, Acquiescence (Breach of Contract, Trade Secret Misappropriation, Copyright Infringement, and Tortious Interference)

15.     IBM's claims are barred, in whole or in part, under the equitable doctrines of estoppel and acquiescence because, *inter alia*, IBM licensed its operating system and related software to PSI with knowledge of PSI's intended use of those products.

### Thirteenth Defense: Waiver (Breach of Contract)

16.     IBM's purported breach of contract claim is barred by the doctrine of waiver because, *inter alia*, IBM licensed its operating system and related software to PSI with knowledge of PSI's intended use of those products, and accepted payment for those licenses.

### Fourteenth Defense: Laches (Breach of Contract)

17.     IBM's purported breach of contract claim is barred by the doctrine of laches because, *inter alia*, IBM licensed its operating system and related software to PSI with knowledge of PSI's intended use of those products.  Further, IBM has long known that PSI had licensed IBM's operating systems for purposes of developing its own IBM-compatible mainframe computer products and has never previously claimed that PSI's conduct constituted a breach of any contract.

### Fifteenth Defense:  Void for Illegality and/or Violative of Public Policy (Breach of Contract)

18.     The contract, as interpreted by IBM, is void for illegality and is contrary to public policy.  Specifically, it seeks to enforce a tying agreement in contravention of state and federal antitrust laws and public policy.

### Seventeenth Defense: Self-Help (All Claims)

19.     PSI actions were excused by PSI's right to use self-help to avoid the consequences of IBM's unlawful actions.

### Eighteenth Defense: Lack of Subject Matter Jurisdiction (Declaratory Judgment Action)

20.     IBM has not sufficiently alleged facts showing an actual case or controversy as to the declaratory judgment action. Specifically, it has failed to allege

specific and concrete threats of litigation by PSI. The vague references to anticompetitive conduct alleged in the complaint are not sufficient.

21.   That PSI has counterclaimed for antitrust violations does not remedy these deficiencies. *See Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398 (Fed.Cir. 1984) ("A case or controversy must exist as of the date of the filing of the declaratory judgment action.").

22.   Although PSI will not be filing a separate motion to dismiss the declaratory judgment action, it urges this Court to dismiss IBM's declaratory judgment allegations and claims *sua sponte*. *See Soto v. United States*, 185 F.3d 48, 51 (2d Cir. 1999) (stating that federal courts have both the power and obligation to raise their lack of jurisdiction *sua sponte*).

### Nineteenth Defense: Mootness (Declaratory Judgment Action)

23.   IBM's purported declaratory judgment action has been rendered moot by PSI's counterclaims, as alleged herein.

### Twentieth Defense: Privilege (Tortious Interference with Contract)

24.   The actions alleged to support IBM's purported tortious interference claim are privileged and justified by fair competition.

### Twenty-first Defense: Fair Use (Copyright)

25.   PSI's alleged use, if any, of the work referred to in the complaint constitutes fair use.

### Twenty-second Defense: Authorization (Breach of Contract, Trade Secret Misappropriation and Tortious Interference with Contract)

26.   PSI's alleged actions were either expressly or impliedly authorized by IBM.

### Twenty-third Defense: Laches (Trade Secret Misappropriation and Tortious Interference with Contract)

27.   IBM's purported breach of contract claim is barred by the doctrine of laches. Among other things, IBM was aware in 2001 that PSI had licensed Amdahl's diagnostic Programs.

**Twenty-fourth Defense: Statute of Limitations (Trade Secret Misappropriation, Tortious Interference with Contract, Breach of Contract, Copyright Infringement)**

28.    IBM's claims are barred, in whole or in part, by the applicable statute of limitations.

**Twenty-fifth Defense: Independent Development (Trade Secret Misappropriation)**

29.    PSI independently developed the information alleged in the Amended Complaint to constitute a trade secret.

**Twenty-sixth Defense: Failure to Exercise Safeguards (Trade Secret Misappropriation)**

30.    IBM did not exercise reasonable safeguards in protecting the information alleged in the Amended Complaint to constitute a trade secret.

**Twenty-seventh Defense: Lack of a Trade Secret (Trade Secret Misappropriation)**

31.    The information underlying IBM's trade secret misappropriation claim either never was, or no longer was at the time of the alleged misappropriation, a trade secret.

**Twenty-eighth Defense: Copyright Misuse**

32.    IBM's claims are barred by the doctrine of copyright misuse.

**Twenty-ninth Defense: Failure to Mitigate (All Claims)**

33.    While denying each and every allegation by IBM that it has suffered any loss or damages, Defendants allege on information and belief that IBM failed to avoid, minimize, or mitigate the damages that IBM alleges and is barred from recovering for those losses avoidable by reasonable efforts.

**Thirtieth Defense: Offset and Recoupment (All Claims)**

34.    Plaintiff's claims asserted in the Amended Complaint are barred, in whole or in part, by the doctrines of offset and recoupment.

**Thirty-first Defense: Parol Evidence Rule and Statute of Frauds (Breach of Contract and Tortious Interference with Contract)**

35.    Plaintiff's claims are barred, in whole or in part, but the Parol Evidence Rule and Statute of Frauds.

## **AMENDED COUNTERCLAIMS**

Counterclaimant Platform Solutions, Inc., for its Amended Counterclaims against IBM, alleges as follows:

### **Nature of the Action**

1.      This case arises out of Counterclaim-Defendant IBM's unlawful and anticompetitive acts directed at PSI and its customers as part of IBM's efforts to continue to dominate the relevant product markets for large-scale computers, commonly known as "mainframe computers," that are compatible with the IBM operating systems needed to run these computers, called "mainframe operating systems."

2.      In an effort to eliminate consumer choice and destroy the only viable source of competition to its own mainframe computers, IBM is tying its mainframe computers to its mainframe operating systems by conditioning the licensing of its operating systems upon the purchase or continued use of an IBM mainframe computer. By doing so, and refusing to license its operating systems to customers who wish to use IBM's dominant operating systems on PSI's mainframe systems, IBM is depriving mainframe computer and operating system customers of the benefits of competition and forcing those customers to pay supracompetitive prices for its products and services.

3.      IBM is the dominant player in both the United States and worldwide markets for mainframe computers and mainframe operating systems, and it has held that position for decades. Mainframe computers and mainframe operating systems support the mission critical data processing needs of a wide range of businesses and other entities, including federal, state and local governments, banks and other financial institutions, airlines, and retailers. The markets for mainframe computers and mainframe operating systems are multi-billion dollar markets.

4.      Compatibility between operating system software, application software, and mainframe hardware is essential to the functionality of a mainframe computer system. Accordingly, IBM's dominance of these markets has created distinct product

32

markets for IBM-compatible mainframes and IBM-compatible software.[2]    Consumers have invested over a trillion dollars in IBM-compatible software and hardware. These are now "locked in" to using IBM-compatible software and hardware. Were they to change platforms, they would incur enormous switching costs. As evidence of this fact, IBM's profit margins for mainframe products are the highest of all products sold by IBM.

5.    IBM has historically faced competition from other manufacturers of IBM-compatible mainframes. For decades, IBM has licensed its mainframe operating systems to customers who have purchased IBM-compatible mainframe computers from other manufacturers, and has cooperated with competing developers of IBM-compatible mainframe computers by providing them with licenses, technical information, and technical support for IBM's mainframe operating systems and related software applications.

6.    This conduct was part of a deliberate campaign to encourage mainframe manufacturers, application developers, and customers to adopt the IBM architecture as the industry standard. This campaign was successful. To this day, the IBM architectural platform defines a "mainframe," and thousands of companies have invested billions of dollars into this industry-standard platform.

7.    When IBM's two primary remaining competitors, Amdahl and Hitachi, announced their exit from the market in 2000, however, IBM changed its policies and began exploiting its monopoly over the architectural platform that it has induced customers, programmers, and developers to adopt. As a result, according to a well known analyst and former member of IBM's senior management, prices of mainframes are now six times higher than they would have been under competitive conditions.

---

[2] For the purposes of these Counterclaims, computers that will run IBM's mainframe operating system software are referred to as "IBM-compatible," regardless of whether those computers are manufactured by IBM or a third party. Software application programs that run on IBM-compatible mainframes using the IBM mainframe operating system are also referred to as "IBM-compatible" or "IBM-mainframe-compatible" software programs, regardless of whether those applications are made by IBM.

8.    Today, PSI is the only remaining competitor marketing IBM-compatible mainframes.    PSI was started by former Amdahl employees, licensed Amdahl's mainframe computer technology, and seeks to practice Amdahl's former business model of marketing IBM-compatible mainframes in competition with IBM. In conjunction with its business partners, PSI has developed and is continuing to develop and market IBM-compatible mainframes capable of running IBM's mainframe operating system and thereby processing IBM-mainframe-compatible application software and data to compete with IBM's own mainframe computers.    In addition to providing consumers with an alternative to IBM's own mainframe computers, a PSI computer system provides consumers with the ability to run other types of operating system software, such as Linux, Microsoft Windows and UNIX, on a single machine.    The PSI mainframe computer system is thus the first open architecture mainframe computer system.

9.    Rather than compete with PSI on the merits, IBM has embarked on a campaign of unlawful, inequitable, deceptive, and anticompetitive conduct in an effort to maintain and expand its mainframe monopoly.    In particular, IBM has: (1) tied the licensing of its most current mainframe operating systems, z/OS, VSE, TSF and z/VM (collectively "z/OS"), to consumers' purchase or continued use of an IBM mainframe, thereby forcing customers of its operating system and applications to purchase or use IBM mainframes; (2) wrongfully interfered with the prospective sale of PSI to another large technology firm; (3) embarked on a campaign of systematic efforts to create "fear, uncertainty, and doubt" ("FUD") by falsely representing to customers that purchasing competing products will result in a loss of reliability, availability and serviceability ("RAS"); (4) implemented sales and support policies that effectively forced customers to "upgrade" to newer versions of its operating system and discontinued technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems; (5) refused to provide critical product interface information that IBM had previously provided to others and that was needed to develop a compatible mainframe operating system in order to hinder and delay PSI's ability to market its competing products; and (6) refused to

34

license allegedly applicable patents to PSI notwithstanding its (a) publicly disseminated and relied upon policy of reasonable, non-discriminatory licensing; (b) express assurances to PSI that it would license its OS/390-related patents to PSI; (c) past licensing to companies operating the same business model in the same market; and (d) thirty years of actions and statements made during the development of the standards and specifications comprising IBM's architectural platform that were designed to encourage and induce programmers, developers, customers and competitors to adopt and conform to those standards, followed by its recent campaign to exploit the monopoly it obtained through its standard setting activities to extend and prolong its mainframe monopoly at the expense of consumers and competition.

10.    IBM is thus using its monopoly power in the relevant markets to harm competition, suppress innovation, and interfere with free customer choice. IBM's actions have injured PSI by excluding PSI as a competitor and preventing PSI from selling its computer systems. IBM has also tortiously interfered with the sale of PSI to another company, and has thus caused PSI and its shareholders hundreds of millions of dollars in damages.

11.    The market-wide cost of IBM's exclusionary campaign to eliminate competition to its mainframe computers will be billions of dollars. These costs will ultimately be paid by consumers. By this action, PSI seeks to recover damages based on the lost profits and lost business opportunities that it has suffered and is suffering as a result of IBM's exclusionary conduct, and to restore free and open competition in the relevant markets so that future customers will have the opportunity to choose the best products at competitive prices.

### The Parties

12.    PSI is, and at all times mentioned herein has been, a corporation incorporated and existing under the laws of the State of California, with its principal place of business in Sunnyvale, California.

35

13.    IBM is, and at all times mentioned herein has been, a corporation incorporated and existing under the laws of the State of New York, with its principal place of business in Armonk, New York.

14.    Both parties transact business in interstate and foreign commerce, and the activities alleged herein have a substantial effect on interstate and foreign commerce.

### Jurisdiction

15.    This Court has subject matter over PSI's claims for declaratory judgment of non-infringement and invalidity pursuant to 28 U.S.C. §§ 1331, 1338, 2001, 2201 and 2201.

16.    This Court jurisdiction over PSI's claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and §§ 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14 and 15, pursuant to 28 U.S.C. § 1331.  The Court has jurisdiction over any claims not so arising based on 28 U.S.C. § 1367 because such claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy.

17.    This Court has jurisdiction over PSI's state law claims pursuant to 28 U.S. § 1367.

18.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because plaintiff and defendant are citizens of different states and the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $75,000.

### Venue

19.    Venue for these Counterclaims is proper in this District because IBM maintains its principal place of business in this District.

### Factual Allegations

### Relevant Markets

20.    The relevant markets in this case are the markets for IBM-compatible mainframe computers and IBM-compatible operating systems.

21.    Mainframe computers are large, expensive, powerful computers used for processing high volumes of information at very high speeds.  Most of the world's largest corporations and government entities rely on mainframe computers for their high volume

36

and mission-critical data processing needs, including matters such a billing, accounting, order entry, record keeping and transaction processing. Much of the work done on these mainframe computers uses software custom-written by or for the end-user organization for the specific needs of the user.

22.    Although IBM holds a dominant position in the broader market for all mainframe computers, the relevant antitrust market in this case is the market for mainframe computers that are compatible with IBM's mainframe operating systems and other IBM-compatible applications (the "IBM-compatible mainframe" market).

23.    While non-IBM-compatible mainframe computers may be reasonable substitutes for limited subcategories of mainframe customers—such as new purchasers with relatively low data processing demands or purchasers with limited needs for legacy applications written for IBM-compatible systems—there are no reasonable substitutes for IBM-compatible mainframes for a substantial and well-defined subset of mainframe customers who are "locked in" to the IBM platform based on their prior hardware/software purchasing decisions and their relatively high data processing demands. By IBM's own estimates, consumers have invested well over $1 trillion in software compatible with IBM's mainframe operating systems and hardware. Such enormous investment in IBM-compatible software has effectively locked in many consumers to IBM-compatible mainframe computer systems, because conversion or migration to non-IBM-compatible mainframe computer systems would be prohibitively expensive.

24.    To switch to a non-IBM-compatible mainframe computer system, locked in consumers would need to expend enormous amounts of time, money, and other resources to acquire new applications software and/or to translate, convert, or migrate their existing data and applications to a non-IBM-compatible mainframe computer system and to retrain employees and reconfigure operations to work with the new operating system. Many locked in consumers who use IBM-compatible mainframe software for mission critical functions, such as banking, insurance, or governmental functions, cannot risk catastrophic failures caused by switching to a non-IBM-compatible mainframe system.

37

Moreover, many large customers have more than one mainframe and their mainframes must be compatible to permit "coupling," which allows for substantially reduced software licensing fees, increases the amount of computing power that can be devoted to particular tasks, and creates other efficiencies. Thus, other than prematurely replacing hardware costing hundreds of thousands of dollars, these customers have no choice but to purchase IBM-compatible mainframes.

25.     Even if they had comparable data processing and other performance capabilities, computers that principally run UNIX, Linux, or Windows operating systems are not reasonable substitutes because "lock-in" effects prevent customers from choosing products that are not compatible with their existing mainframe operating systems and applications, and because mainframe software applications were not written for those operating systems.

26.     Cross-elasticity of demand supports defining IBM-compatible mainframes as a distinct antitrust market because consumers locked in to IBM-compatible mainframe applications would tolerate supracompetitive price increases for IBM-compatible mainframe operating systems or IBM-compatible mainframes if the price increases did not exceed the costs of abandoning their existing investments in IBM-compatible mainframe software.

27.     Other than PSI, whose efforts to market its IBM-compatible mainframes have been thwarted by IBM's actions as alleged herein, IBM is the sole current developer of IBM-compatible mainframe computers, and its share of IBM-compatible mainframe sales currently stands at almost 100 percent. However, until roughly 2001, other developers of IBM-compatible mainframes such as Amdahl and Hitachi competed with IBM in the relevant market, and the existence of that history of competition from IBM-compatible mainframe developers further demonstrates the existence of a relevant market for IBM-compatible mainframes. Indeed, following Amdahl's and Hitachi's exit from the market, prices for mainframe computers have been substantially higher than they would have been in a competitive market.

38

28.    There are substantial barriers to entry in the IBM-compatible mainframe market. Mainframes are extremely expensive to build, and it takes years to gain market acceptance. Even where a developer such as PSI uses existing hardware, it takes years to develop IBM-compatibility. Prior to PSI, no significant developer of IBM-compatible mainframes had entered the market in thirty years. IBM's last two remaining competitors, Amdahl and Hitachi, exited the market in 2000 instead of continuing to invest in the development of the mainframe technologies needed to market a mainframe computer in competition with IBM. IBM's market influence, including the types of anticompetitive conduct alleged herein, also creates additional barriers to entry.

29.    The relevant market in which IBM-compatible mainframes compete could alternately be defined to include the mainframe computers manufactured by companies such as Unisys and Bull that share "Reliability, Availability and Serviceability" and lock-in characteristics similar to IBM-compatible mainframes. However, these mainframes are marketed and supported as niche products, have very small market shares, and do not pose significant competition to IBM. As IBM has itself noted, other "servers" running Unix and Windows are not actual mainframes that are interchangeable with IBM mainframes. For example, according to IBM's own documents, the total cost of ownership for its flagship z/990 mainframe is 30 percent to 60 percent less than combining thirty Sun or Linux servers to perform the same functions.

30.    IBM also has monopoly and market power under this broader market definition, with a share in excess of 85 percent. All of the allegations made herein apply with equal force to this alternate market definition.

31.    The second relevant antitrust market in this case is the market for IBM-compatible mainframe operating systems. Operating systems are required for the mainframe to function; they control the operational resources of the computer and allow compatible application software to run on the computer. The dominant mainframe computer operating systems are IBM's OS/390 (distribution and support for which has been dropped) and z/OS operating systems (which includes z/OS, VSE, z/TSF and z/VM), with thousands of customers worldwide.

32.    As discussed above, the operating system has to be compatible with both the mainframe hardware and the software applications that run on the computer. To be viable, an operating system must be "backward compatible" with prior versions of that operating system and with the software applications written for those prior versions of the operating system so that customers can continue to access their existing applications and data.

33.    Due to its longstanding monopoly in mainframes and mainframe operating systems, IBM has an enormous, trillion dollar installed base of software and hardware. IBM-compatible mainframe operating systems are specifically designed to work with and exploit the technical complexities and capabilities of mainframe computers and must be compatible with the hardware architecture, specifications and interfaces to function properly. In addition, the operating system and its application program interfaces must be compatible with the existing installed base of IBM and third-party IBM-mainframe-compatible software.

34.    Locked in consumers with existing applications and software cannot as a practical matter switch to other operating systems such as Bull, Unisys, UNIX, Linux, or Windows, because of the prohibitive switching costs such consumers would incur in abandoning their installed base of IBM-compatible mainframe software. Application programs, data files, and other software designed to operate with only IBM-compatible mainframe operating systems are not compatible with other operating systems. Large customers also have employees specifically trained to operate IBM software and hardware. Accordingly, to switch to a non-IBM-compatible operating system, locked in consumers would either have to abandon their existing investment in IBM-compatible mainframe software or expend enormous amounts of money and other resources to retrain employees and to convert or replace their existing applications and data to work with a non-IBM-compatible mainframe operating systems. Thus, while Linux, Unix and Windows may be reasonable substitutes for limited subcategories of potential mainframe customers—such as new purchasers with relatively low data processing demands or purchasers with limited needs for legacy applications written for IBM-compatible

40

systems—there are no reasonable substitutes for z/OS for a substantial and well-defined subset of mainframe customers who are locked in to the IBM operating systems based on their prior hardware/software purchasing decisions and their relatively high data processing demands.

35.    Cross-elasticity of demand supports limitation of the market to IBM-compatible mainframe operating systems, because consumers locked in to IBM-compatible mainframe software would tolerate supracompetitive prices for IBM-compatible mainframe operating systems if the supracompetitive portion of the price did not exceed the cost of abandoning their existing investment in IBM-compatible mainframe software. According to IBM itself, the vast majority of core, back-office applications are still implemented as COBOL transactions running on IBM mainframes, and analysts have estimated that the value of COBOL lines in use (which number in the hundreds of billions) exceeds the value of the largest publicly traded companies. As IBM succinctly states on its web site, "[a]fter 20 years, and billions of dollars wasted on trying to migrate applications from mainframes, the largest and most robust enterprises continue to depend heavily on the mainframe."

36.    The primary IBM-compatible mainframe operating system currently marketed or supported by IBM is z/OS. Because IBM has withdrawn the OS/390 version and its predecessors from marketing, and no longer supports them, z/OS is the only IBM-compatible mainframe operating system available to either purchasers of new IBM-compatible mainframes or existing customers who wish to upgrade.   Thus, IBM has monopoly power in the market for IBM-compatible operating systems.

37.    There are significant barriers to entry in the market for mainframe operating systems. A new operating system for a mainframe computer is extraordinarily complex and takes many years to develop. Because of the mission-critical nature of the work performed on mainframe computers, it is extremely unlikely that a customer would choose an operating system that has not been thoroughly developed, tested and proven over many years. To the extent that any operating system conceivably could develop into a viable competing operating system for mainframe computers, that operating system

41

would require compatibility with customers' current operating systems and software applications so that customers could continue to access their existing programs and data. The existence of intellectual property rights in the relevant market also creates additional barriers to entry.

38.    The relevant market in which IBM mainframe operating systems compete could alternately be defined to include other mainframe operating systems, such as the proprietary operating systems used to run mainframe computers manufactured by Unisys and Bull.    IBM also has monopoly and market power under that broader market definition, with a share in excess of 85 percent.    As IBM has itself acknowledged, Linux, Unix or Windows are not true mainframe operating systems because they have neither the performance capabilities nor the dynamic functionality of a mainframe operating system.    Thus, for customers with high data processing needs, those operating systems are not reasonable substitutes.    All of the allegations made herein apply with equal force to this alternate market definition.

39.    The relevant geographic market in this case is worldwide.    IBM markets its mainframe computers and operating systems to customers throughout the world, and PSI is seeking to compete against IBM for customers throughout the world.    As a result of the exclusionary conduct alleged below, PSI has lost and is losing sales both in the United States and in export markets throughout the world.

### The History and Growth of the IBM-Compatible Mainframe Market

40.    IBM has long dominated competition in the relevant markets for mainframe computers and mainframe operating systems.    From the 1950s to the early 1970s, IBM achieved dominance in the market for mainframe computers.    Toward the end of this period, IBM achieved dominance in the market for mainframe operating systems as well.

41.    In 1956, IBM responded to antitrust claims brought by the United States Department of Justice by entering into a consent decree that put limits on its ability to exploit its monopoly in tabulating machines and electronic data processing machines.

42.    Beginning with IBM's introduction in 1964 of its S/360 line of mainframe computers and operating systems, and continuing with subsequent model lines, IBM freely and broadly disseminated the architecture specifications of its mainframe computers and operating systems. Customers, competitors, and other third-party software and hardware developers used the information disseminated by IBM to create software and hardware products designed specifically for use with IBM's mainframe computers and operating systems—resulting in the adoption of the IBM architectural platform and the standards and specifications embodied therein as the industry standards for complex computing.

43.    The profusion of new IBM-compatible mainframe software and hardware products vastly expanded the installed base of IBM-compatible mainframe operating systems. The resulting "network" effect provided additional incentive for consumers to adopt and to use IBM mainframe operating systems, which further expanded the installed base of IBM-compatible application software.

44.    The expansion in the installed base of IBM mainframe operating systems and other IBM-compatible mainframe software benefited IBM by making its mainframe operating systems more desirable and decreasing the viability of operating systems incompatible with that installed base. The development by customers and competitors of IBM-compatible mainframe hardware and application software benefited consumers by spurring innovation and decreasing prices for IBM-compatible mainframe hardware and software.

45.    IBM's policy of reasonable and non-discriminatory licensing and system openness was integral to its success, public image and reputation. IBM knew that such policies were integral to customer and developer acceptance and continued use of the IBM architectural platform as an industry standard.

46.    Since the 1970s, customers and programmers have adopted the IBM architectural standard with knowledge that IBM would face competition in IBM-compatible computers, and would not have a complete monopoly over the market. They

43

adopted the IBM architectural standard based on IBM's conduct and public statements that it would promote free competition.

47.    By 1976, competitors such as Amdahl Corporation were using the information disseminated by and licensed from IBM to develop competing IBM-compatible mainframe computers, on which consumers could run their IBM mainframe operating systems and IBM-compatible mainframe application software. For decades following the development of such IBM-compatible mainframe computers, IBM licensed its mainframe operating systems on nondiscriminatory terms to the purchasers of such IBM-compatible mainframe computers. The availability of competing IBM-compatible mainframe computers from Amdahl and from other vendors, such as Hitachi Data Systems, provided additional incentives for consumers to use IBM mainframe operating systems and to develop or use other IBM-compatible mainframe application software. Nonetheless, IBM always retained a competitive advantage because there was a "lag" in the development of compatible products, and because it has always enjoyed a lucrative monopoly over the operating systems run on mainframe computers.

48.    By the late-1990s, Amdahl and Hitachi collectively attained over a twenty percent market share in the IBM-compatible market. However, in 2000, Amdahl and Hitachi announced that they were exiting the mainframe computer market, leaving IBM as the only developer of IBM-compatible mainframes.

49.    At approximately the same time, the United States Department of Justice joined IBM in a motion to eliminate all remaining provisions of the 1956 Consent Decree, which imposed some limits on IBM's ability to exploit its dominant position in the markets for operating systems and mainframe computers. The government concluded that, although IBM still had substantial market power in the S/390 operating systems market and mainframe market, the decree should be dissolved because: (1) IBM had confirmed that it instituted and maintained a policy of "system openness," making its computer systems more compatible with those of other developers and that this policy derived from considerations independent of the Decree and would continue after the Decree terminated; (2) IBM faced competition in the market for IBM-compatible

mainframes from companies such as Amdahl and Hitachi. The court approved the dissolution of the decree on May 1, 1997 and it was phased out by July 2, 2001.

50.     The Department of Justice, in agreeing to dissolve the decree, explicitly stated that any attempt by IBM to return to its tying practices would be unlawful:

> If, after the Decree terminates, IBM engages in any anticompetitive activity that would violate the antitrust laws, it would immediately be liable to suit. For example, should IBM engage in *anticompetitive tying—be it to parts or operating systems*—the United States could bring an action for injunctive relief both to stop the illegal conduct and to get other, broader prophylactic relief. [citations omitted]. Also, IBM would be liable to a host of potential private treble damage actions. [citations omitted].

(Emphasis added).

### IBM's Mainframe Monopoly Has Resulted in Higher Costs for Consumers Since 2000

51.     As discussed further below, once Amdahl and Hitachi exited the market for IBM-compatible mainframes, IBM reversed its practice of system openness and reasonable non-discriminatory licensing and embarked on a strategy of monopolizing the market for mainframe computers.

52.     IBM's post-2000 dominance has allowed it to resist the downward pricing pressures that competition and innovation should have created. IBM measures mainframe performance by reference to a measurement known as millions of instructions per second or "MIPS." IBM has tracked the "price per MIPS" of its mainframe systems over more than forty (40) years. The price per MIPS has precipitously fallen over this period of time, from nearly $10,000,000 U.S. in 1960 to approximately $2,000 in 2000. This general trend of decreasing prices has been observed throughout the computer industry and is attributable in large part to advances in processor design and manufacturing techniques.

53.     When competition for IBM-compatible mainframes disappeared, IBM was able to significantly resist the downward trend in price per MIP. Amdahl and Hitachi, left the market for IBM-compatible mainframes in 2000. If the downward trend in price per

MIPS between 1960 and 2000 had continued from 2000 to 2006, the price per MIPS should now be approximately $165—but today it is more than six times that amount at approximately $1,000. As a result, the largest systems today cost closer to $18 million rather than the $3 million they would have cost based on the price trends that were followed throughout most of the mainframe's history. This is the inevitable result when competition is eliminated.

54.    The documents that IBM has produced in this case illustrate just how insulated IBM's mainframe prices and profits are from competition. In its internal documents, IBM itself has acknowledged that ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████. Thus, IBM is well aware that the PSI system offers mainframe customers both a competitive choice they want and the opportunity for substantial cost savings vis-à-vis the IBM systems that they would be forced to purchase or maintain if IBM could succeed in its campaign to exclude PSI from the market.

### IBM's Evolving Mainframe Operating System

55.    From 1996 to 2000, the leading operating system marketed by IBM was OS/390. OS/390 was compatible with the version of IBM's mainframe operating system it superseded and with the huge installed base of IBM-compatible mainframe application software and data.

56.    Initially, and for several years following the release of IBM's OS/390, consumers could also run the IBM OS/390 operating system and their installed base of other IBM-compatible mainframe software on IBM-compatible mainframe computers supplied by other computer developers such as Amdahl and Hitachi Data Systems, which combined to account for roughly 21 percent of the mainframe computer market by 1999. In 2000, however, both Amdahl and Hitachi Data Systems announced that they would stop manufacturing IBM-compatible mainframe computers, leaving IBM as the sole developer.

46

57. In October 2000, IBM upgraded its OS/390 operating system to the z/OS operating system and made it available for shipment in January of 2001. z/OS was compatible with existing IBM-compatible mainframe software, including the installed base of OS/390-compatible mainframe software. z/OS also included additional features and capabilities over the previous version of IBM's operating system, OS/390.

58. In December 2002, IBM withdrew marketing of the superseded OS/390 version of its operating system and announced that it would discontinue service for OS/390 by September 30, 2004, leaving z/OS as the only version of the IBM-compatible mainframe operating system in production and serviced or supported by IBM.

59. In September of 2004, IBM announced that, as of March 2007, it will discontinue supporting z/OS versions that run on anything other than 64-bit hardware. Accordingly, IBM will no longer support the use of z/OS on Amdahl's and Hitachi's IBM-compatible mainframes, which are 31-bit.

## PSI Develops a Superior and Less Expensive Product To Compete in the IBM-Compatible Mainframe Computer Market

60. PSI was founded in 1999—shortly before Amdahl and Hitachi left the IBM-compatible mainframe computer market—with the goal of developing its competitive computer system. In particular, PSI sought to develop a computer system that (i) would include less expensive hardware than IBM's mainframe computers, and (ii) not only would run the IBM mainframe operating system (so that consumers could continue to run their IBM-compatible applications software), but also would run other, non-IBM operating systems (such as UNIX, Linux or Windows) in order to accommodate consumers' desires to utilize additional, non-IBM-compatible applications software and provide consumers with greater flexibility in the future paths of their informational technology purchasing decisions.

61. PSI initially chose to utilize equipment manufactured by Hewlett Packard ("HP"). HP provides the hardware, while PSI, an authorized reseller of the hardware, implements binary compatibility with IBM's machine architecture through specialized

47

firmware that runs on Intel 64-bit Itanium processors used in the HP equipment. PSI additionally provides hardware for data transfer.

62.    PSI implements guest-to-host compatibility of the IBM z/Architecture and the Intel Itanium architecture through firmware which executes directly on the Itanium processor. In this way PSI is distinguished from so-called "emulators," which are typically higher level software applications running on top of an operating system. Thus, the PSI mainframe is designed to operate far more efficiently than emulator applications. The mainframes marketed by PSI also can run open operating systems such as Linux, HP-UX and Open VMS. This enables the entire hardware system to present both open and IBM-compatible machine architectures to the end-user.

63.    Because of IBM's monopoly in the market for mainframe operating systems and the vast base of consumers locked in to IBM-compatible mainframe software, PSI could not compete in the mainframe computer market if its computers were not compatible with IBM's mainframe operating systems. More specifically, PSI could not compete if its computer systems were not compatible with IBM's most recent and currently supported version of its mainframe operating system. Accordingly, to develop and test its technology for IBM-mainframe-compatible computers, PSI needed to license the IBM mainframe operating system. Moreover, customers who wish to purchase a PSI computer system must be assured that they will be able to license IBM's mainframe operating system for use on that computer—otherwise, they would not be able to continue to run their IBM-compatible application software.

**IBM Adopts a Policy of Discriminating in its Software Licensing Based upon Whether or Not the Customer Has Chosen to Use an IBM Machine or a PSI Machine**

64.    In December 2000, PSI began negotiations to ensure that IBM would license operating systems and associated intellectual property for use on PSI mainframes, as it had in the past for customers of mainframe computers developed by Amdahl and others. IBM, which had apparently adopted a new strategy of exploiting its entrenched

operating system monopoly to reinforce its mainframe computer monopoly, was resistant and offered conflicting reasons for refusing to license its operating systems for use on PSI mainframes. With respect to OS/390, IBM stated that it would continue licensing that version of its operating system as it had in the past. Then it asserted that it would license neither z/OS, its latest operating system, nor OS/390, for use on a Intel 64-bit system, but it offered no reason for not doing so. At the time, IBM was licensing OS/390 on its own 64-bit systems, and also had licensed OS/390 and VSE for use on emulator systems marketed by a company called Fundamental Software, Inc. ("FunSoft").

65.    PSI sought further assurances that IBM would not discriminate against PSI's consumers in its software and intellectual property licensing. IBM, however, delayed responding to PSI's requests. By January 2003, IBM had still refused to reach an agreement with respect to licensing. However, it denied that it had rejected PSI's request and instead stated that it had not yet decided whether to license z/OS and OS/390 for use by PSI on a 64-bit platform, in part because it had not yet determined an appropriate price for the license.

66.    In late February 2003, PSI wrote to IBM making "a final plea for a timely resolution to this issue" and reiterating the details of its request. PSI sought an agreement in principle from IBM not to deny licenses for its operating systems to customers of PSI's computer systems. PSI emphasized that, as a company in the process of closing its first round of venture financing, PSI likely would be irreparably harmed if IBM's delay in resolving these issues resulted in PSI's inability to close on its financing in a timely fashion. PSI also wrote that "[a] simple letter confirming that IBM intends to pursue the same non-discriminatory licensing policy as in the past, or something to that effect, should suffice for our immediate purposes."

67.    In response, IBM represented that it would permit customers of PSI to license IBM's mainframe operating system for use on PSI computer systems under IBM's then-current licensing terms, based on performance and functionality, provided that PSI's computer systems did not infringe IBM intellectual property rights. IBM further stated: "[W]e believe the system described by you will have needs under IBM's

49

patents. Under our current practice, IBM would be willing to enter into a patent license with PSI."

68.    Having been assured that IBM would not discriminate in its licensing and that any patent conflicts could be avoided though a licensing agreement, PSI proceeded with its development plan.

69.    On or about May 14, 2003, PSI and IBM entered into a development license agreement for OS/390. OS/390 had already been withdrawn from marketing and, undisclosed to PSI at the time of the agreement, IBM withdrew the OS/390 from service and support in September 2004, leaving z/OS as the only supported mainframe operating system.

70.    In March 2004, PSI ordered and subsequently received two licenses to run z/OS on PSI mainframes. These orders were processed through PSI's IBM account representatives at IBM's Atlanta and Dallas offices. They were aware that the software was ordered for use on the PSI platform. Since issuing those initial licenses to PSI, however, IBM has reversed course and now refuses to grant further licenses of the current version of its mainframe operating system to PSI or to license its mainframe operating system to PSI customers.

71.    In a May 24, 2006 letter, IBM definitively stated that it would refuse to license its mainframe operating system to any customer of PSI's competing mainframe computer system.

**IBM Promises, Then Refuses, To License Any Applicable Patents to PSI**

72.    IBM has widely represented, on its website and elsewhere, that it is committed to openness and that it licenses its patents on a nondiscriminatory basis. Product developers such as PSI have consistently relied on this policy over the years in the event there was any concern over infringement of IBM patents. The link to this page on the website was http://www.ibm.com/ibm/licensing/patents/practices.shtml, which was taken down without any statement or explanation sometime in 2006. Consumers

have relied on similar assurances of system openness in choosing to purchase IBM products.

73.     In 2001, IBM represented to PSI that it would make available OS/390 interfaces and architectures that had been made available to other competitors. In March 2003, IBM also represented that it would be willing to enter into a patent license with PSI.

74.     In 2004, IBM engaged in patent license discussions with PSI. In those discussions, IBM represented to PSI that IBM would provide a nondiscriminatory patent license to PSI on standard terms and conditions. In particular, IBM represented that it would license patents required for IBM mainframe compatibility for a running royalty rate of 1 percent of net sales of licensed products, up to a maximum cumulative royalty rate of 5 percent for a license of five or more patents. In the course of those discussions, PSI provided IBM with substantial technical information about its product under development. PSI requested that IBM identify any of its patents that IBM believed might be implicated by PSI's proposed product. IBM did not do so.

75.     IBM thereafter refused to continue patent license discussions with PSI unless PSI: (i) disclosed specific technical information about its product currently under development; (ii) executed an agreement stating that any information PSI disclosed to IBM in the course of those discussions would be treated as non-confidential and would be fully usable by IBM, including in its business activities in competition with PSI; and (iii) agreed that IBM was not obligated to enter into any license agreement. Accordingly, as a condition of even entering into licensing negotiations, IBM required PSI to disclose confidential, proprietary information, while simultaneously signing an agreement stating that PSI was not revealing confidential, proprietary information.

76.     In August 2005, IBM sent PSI a list of some 150 patents which it characterized as a "representative list" of IBM patents that "may" be infringed by the PSI system, without linking them to any PSI product. IBM stated that this was "not an exhaustive list," and requested PSI to demonstrate—but again without agreeing to

51

maintain the confidentiality of PSI's product information—that PSI's system did not infringe any of the claims in any of these patents.

77.    Because of the extensiveness of the list of "representative" patents that IBM had asserted "may" be infringed by PSI's product, and the fact that it would have been prohibitively expensive for PSI to analyze every IBM patent claim even on that "representative" list in order to make a non-infringement demonstration to IBM, PSI suggested the parties simply resume their patent licensing discussions.    In this connection, PSI offered to provide whatever technical information about its products that would be needed by IBM, without requiring IBM to agree to keep PSI's technical product information confidential.

78.    In February 2006, representatives of PSI and of IBM met again to discuss the patent licensing issues.  The IBM personnel at the meeting stated that, with respect to a patent license, there would be substantial resistance from IBM's business side. Specifically, an IBM representative stated something to the effect of: "No one on the zSeries hardware team wants to see z/OS on an HP machine."

79.    More than three months later, on May 24, 2006, IBM wrote to PSI stating that it would refuse to license any IBM patents to PSI or PSI customers.  IBM thus reneged on its express promises made to PSI in 2001 through 2004 concerning its willingness to license its patents to PSI and to continue its decades-long practice of licensing its patents to third parties engaged in the development of IBM-compatible mainframe computers.

80.    As IBM's limited production in this case to date confirms, IBM's decisions and conduct were motivated solely by its desire to eliminate a competitor that threatens its highest margin business, and not by a desire to protect the intellectual property that it has freely licensed to others.

### IBM's Tying, Exclusionary and Unlawful Conduct Results in the Cancellation of the Sale of PSI

81.    In 2005, PSI began considering a potential acquisition of its business by a major technology company, which, on information and belief, has a patent cross-licensing agreement with IBM—and is thus insulated from IBM's pretextual allegations of patent infringement.  Following the completion of that transaction, PSI's mainframes would have been marketed by the acquiring company and encompassed within that company's cross-license.

82.    In October 2006, PSI was on the verge of finalizing the acquisition.

83.    In November 2006, after learning of IBM's refusal to sell its operating systems and software applications for use on PSI mainframes, the would-be acquiring company refused to complete the acquisition.

84.    Upon information and belief, that company was deterred by IBM's refusal to license z/OS on a PSI mainframe.

85.    Upon information and belief, IBM also threatened the would-be acquiring company with other adverse economic consequences were it to purchase PSI or market its products.

86.    The abandonment of the potential acquisition has destroyed a substantial business opportunity for PSI, causing PSI hundreds of millions of dollars in damages.

### IBM Launches a Campaign to Destroy PSI's Reputation and Business

87.    IBM has also been contacting PSI's customers and potential customers to instill "Fear, Uncertainty, and Doubt" regarding PSI and its products.  IBM has told PSI's customers and potential customers, without any basis, that PSI's products will not work as PSI asserts.

88.    IBM has told PSI's customers and potential customers that it will refuse to license its operating systems for use on PSI mainframes and that it is "committed to putting PSI out of business."

89.    IBM has further threatened PSI's business partners with lawsuits to dissuade them from working with PSI. In fact, even since IBM's Amended Complaint was filed, a senior IBM executive contacted a PSI business partner and threatened that company with litigation if it continued to do business with PSI.

### The PSI Mainframe Does Not Infringe IBM's Patents, Does Not "Reverse Assemble, Reverse Compile, or Otherwise Translate," Did Not Misappropriate IBM Trade Secrets, and was Developed Using IBM's Publicly Available Principles of Operation.

90.    The PSI mainframe's IBM-compatibility was implemented through the use of IBM's Principles of Operation, which reflect a set of standards and specifications for the IBM z/Architecture that are in the public domain. Many of the architectural standards and specifications of IBM's operating systems are also in the public domain. PSI licensed IBM's operating system solely to test the product, and it did not run the program in any manner materially different than any other end user would.

91.    IBM's trade secret misappropriation claims are without merit. PSI received a license to Amdahl's diagnostics, a fact of which IBM was aware as early as 2001.. This transfer was entirely proper. PSI believes these programs were freely licensable as any other program written to run on an IBM or Amdahl processor, such as IBM's OS/390 or Amdahl's former UTS operating systems. Moreover, PSI believes that, at a maximum, less than ten percent of these diagnostics related to so-called TIDA/TILA information. PSI acknowledges that it inadvertently received source code listings from Fujitsu related to some of these diagnostics which the parties had intended to be excluded from the scope of the license. But PSI can readily demonstrate, even assuming for the sake of argument that this source code would disclose some relevant information, that the functions to which the subject diagnostics relate were publicly available at the time these materials were received by PSI. Finally, PSI can further demonstrate in every case the information sources used for its product design and that these sources did not include any diagnostic source materials or any other purported IBM confidential information.

92.    PSI did not need to—and did not—"reverse assemble, reverse compile, or otherwise translate" the operating system software that IBM licensed to PSI. Contrary to IBM's assertion that "otherwise translate" has a boundless definition and applies to the implementation of a particular computer's instruction set (architecture) in a computer with a different architecture, the term "otherwise translate" in the context of the licensing agreement clearly refers to the reverse engineering of software, which PSI does not—and has no need to—practice.

93.    IBM never accused PSI of breaching these provisions of its licensing agreement prior to initiating suit and IBM's own practices are inconsistent with such a strained interpretation. In 2003 IBM willingly licensed its OS/390 operating system to PSI under the terms of the ICA knowing full well that PSI was developing an IBM-compatible system based on machine instruction translation. Further, IBM readily licensed its software products to run on emulator systems developed and marketed by Fundamental Software, in the broadest sense a technology similar to that developed by PSI.

94.    Assuming *arguendo* that IBM's construction of the licensing agreement is correct—which it is not—the agreement would require that IBM's operating system be run on only on mainframes with IBM architecture, which only IBM sells. IBM cannot identify any legitimate, non-pretextual, pro-competitive justification for requiring customers to agree to such an exclusive dealing provision.

95.    IBM's assertions that it is motivated by a desire to preserve the reputation of its product and enhance "reliability, availability and serviceability" lack any basis in fact. Lack of RAS is simply another slur that IBM uses to denigrate competitors and instill "Fear, Uncertainty and Doubt" in consumers. The performance of Amdahl and other competitors' compatible mainframes demonstrates that non-IBM mainframes can work equally as well as IBM mainframes, and that the market (which consists of highly sophisticated consumers) are able to judge for themselves which mainframes can reliably utilize IBM's operating systems.

96.    Although PSI at all times expected to obtain a license to IBM's patents and intellectual property on fair, reasonable and non-discriminatory terms similar to those provided to Amdahl and Hitachi, and relied on IBM's representations that it would license them on that basis, PSI was at all times, and remains, unaware of any valid IBM patents that are infringed by the PSI mainframe. Rather, PSI believed that it was more cost-efficient to obtain a license from IBM to avoid potential litigation (such as the instant suit) and to prevent IBM from using the lack of a patent licensing agreement as a pretext to deny software licenses to PSI's customers.

97.    IBM's patents, including those asserted in this action, relate to the standards and specifications of minor functions such as rounding modes and determining types of floating point data that are not central to the functionality of either the operating system or the hardware. Moreover, they purport to claim discrete functionalities that IBM has historically licensed, and continues to license, to end users and software developers for little or nothing, and that IBM has historically licensed to competing manufacturers of IBM-compatible mainframes on reasonable and non-discriminatory terms.

98.    Licensees of IBM's mainframe operating systems have an implied license to perform the functions described in these patents—without such a license, the operating software would be valueless. Regardless of how IBM's operating system license is phrased, it is not permitted to write its license in such a manner that requires a consumer to also purchase an IBM mainframe in order to perform the functions dictated by the operating system, and IBM may not collect a double royalty. Thus, IBM's patents cannot be infringed though the use of IBM's operating system on any mainframe, including a PSI mainframe.

99.    Moreover, upon information and belief, PSI and/or its customers cannot be held liable for infringement because HP and NEC, PSI's business partners, and Intel, the manufacturer of the Itanium processors in which some of the facilities IBM asserts are infringing reside, have patent cross-licenses with IBM that apply to PSI's mainframes.

100.   Finally, even assuming *arguendo* that IBM has valid patents that are infringed by certain uses of PSI's mainframe, there are substantial non-infringing uses of those mainframes. IBM's accusations of infringement are therefore inaccurate.

101.   PSI cannot yet fully assess whether IBM brought its patent infringement claims based on a good faith belief in their merits, or instead is pursuing this litigation as a competitive weapon to drive PSI from the market without regard to the merits of its claims or lack thereof. If further investigation and discovery establish that IBM's patent infringement claims are part of its exclusionary campaign to foreclose competition in the market for mainframe computers, PSI reserves to right to include that conduct as among the grounds for its monopolization claim.

**If IBM's Patents are Infringed by any Mainframe that is Compatible with IBM's Operating Systems, IBM's Refusal to License is an Anticompetitive Competitive Abuse of the Standard Setting Process and of the Essential Facilities Embodied in its Patents**

102.   Assuming *arguendo* that PSI's system infringes IBM's patents because it is capable of performing the functions dictated by IBM's operating system software when a licensed copy is installed on a PSI system by a consumer—which PSI denies—IBM's current efforts to enforce those patents against PSI constitutes an abuse of IBM's monopoly power.

103.   For decades, IBM has actively encouraged customers, developers, programmers, business partners and competitors to standardize on its mainframe architecture by repeatedly representing that it engages in fair, reasonable and non-discriminatory licensing of interoperability information needed to manufacture compatible products and related intellectual property. IBM postures itself as a champion of "open systems and standards," arguing that competitors must have reasonable and non-discriminatory access to interoperability information and related intellectual property is essential to competitive development and innovation in information technology industries, such as the mainframe industry.

104.    Customers, developers, programmers, business partners and competitors have relied on IBM's position of reasonable and non-discriminatory licensing of interoperability information and related intellectual property throughout the development of the standards and specifications embodied in the IBM mainframe architectures.  IBM customers are now locked in to the use of IBM-compatible mainframes and operating systems as the result of these standards and specifications.  It is a blatant abuse of that standard setting process for IBM to now seek to enforce patents it claims read on those standards and specifications to exclude PSI from the mainframe market and thereby extract higher prices and higher profits from its customers.  Yet, that is exactly what IBM is seeking to do through this litigation and through its refusal to provide its mainframe operating system to PSI customers.

105.    To the extent that use of the functionalities claimed by IBM's patents is necessary to manufacture any IBM-compatible mainframe, those patents also are essential facilities.  IBM's refusal to provide access to these essential facilities, when considered in light of IBM's market power, previous policy, practice, representations,, and inducement of customers, developers, and programmers to adopt IBM's architectural platform as an industry standard, is independently, and in combination with IBM's tying and other wrongful conduct, anticompetitive.  IBM's sole intent in changing its policy is to maintain and expand its monopoly; it does not have a legitimate pro-competitive interest in protecting the same intellectual property that it has freely licensed to others.

### IBM's Tying and Exclusionary Conduct Injure
### Competition, Competitors, and Consumers in the Relevant Markets

106.    IBM's z/OS operating system is the only operating system currently available to run on IBM-compatible mainframes and that is compatible with the application software written for IBM-compatible mainframes.  By refusing to license z/OS to customers for use on PSI's competing mainframe, IBM has made itself the only supplier of IBM-compatible mainframes.  Accordingly, all consumers locked in to IBM-compatible mainframe operating systems must purchase IBM mainframe computers.

107.    Mainframe operating systems and mainframe computers are separate products that could be sold separately by IBM, as demonstrated by IBM's past practice for several decades of licensing IBM mainframe operating systems to consumers for use with IBM-compatible mainframe computers developed by Amdahl or Hitachi Data Systems. In fact, IBM has historically published software licensing terms for OS/390 and z/OS stating that the operating system will run on the then currently supported IBM servers "or equivalent." This included the 64-bit only versions of z/OS, version 1.6 and version 1.7. On August 8th, 2006, IBM announced the terms for its latest version of z/OS, version 1.8, which dropped the term "or equivalent," referencing only System z servers.

108.    By changing its historic practices of (i) providing nondiscriminatory licenses to its mainframe operating systems to developers of compatible mainframes and software, (ii) licensing its mainframe operating systems to purchasers of competitors' mainframe computers, and (iii) freely licensing its interoperability information and related intellectual property on reasonable and non-discriminatory terms, among other things, IBM has engaged in exclusionary conduct injuring competition in the relevant market for IBM-compatible mainframe computers.

109.    Locked in consumers could not have known at the time of their initial investment in applications requiring IBM mainframe operating systems that IBM would discontinue its longstanding policy of licensing its mainframe operating systems to run on competing IBM-compatible mainframe computers.

110.    IBM is seeking to extend and prolong its longstanding monopoly over IBM-compatible mainframe computers and mainframe operating systems and ensure that rival hardware and software platforms do not become viable alternatives to IBM's proprietary mainframe systems. IBM's conduct in the mainframe operating systems market significantly harms and threatens continuing harm to competition, offends established public policy as set forth in federal and state antitrust laws, is oppressive, and is substantially injurious to consumers. IBM has created insurmountable barriers to entry in the market for IBM-compatible mainframe computers and excluded competitors such

as PSI from that market. The resulting elimination of competition in the market for IBM-compatible mainframe computers harms consumers by giving IBM monopoly pricing power and reducing innovation. The harm to such consumers from IBM's conduct outweighs any utility it might have.

111.   By discriminating in its software licensing based on whether or not the customer has chosen to use an IBM machine or a PSI machine, IBM has injured PSI as a competitor in the market for IBM-compatible mainframe computers. IBM's unlawful conduct has (a) prevented PSI from marketing and selling its competing computer system; (b) jeopardized PSI's funding and its relationship with prospective customers; (c) delayed PSI's entry into the market; and (d) allowed IBM to reap hundreds of millions of dollars in additional profits that otherwise would have been realized as cost savings by the governmental institutions, corporations, and academic institutions that would have purchased PSI's lower-priced products. Moreover, in addition to preventing PSI from selling its mainframes, IBM's unlawful conduct has prevented PSI from selling related applications and services, such as storage, technical support, maintenance and consulting services.

112.   IBM itself has recognized that conduct such as that in which it is now engaging is anticompetitive and unlawful. As part of the United States Department of Justice's antitrust action against Microsoft, IBM testified that Microsoft had engaged in exclusionary conduct by discriminating against IBM with respect to the terms on which it made its Windows operating system available to IBM in retaliation against IBM's efforts to develop a competing operating system, OS/2. IBM subsequently pursued private antitrust claims against Microsoft, and obtained a $775 million settlement of those claims without even filing a complaint. IBM's prior antitrust claims against Microsoft in the markets for PC operating systems and personal computers are very similar to PSI's current claims based on IBM's exclusionary conduct in the markets for mainframe computers and mainframe operating systems. Indeed, PSI's claims are based on conduct that is even more blatantly exclusionary because IBM has expressly tied sales of its operating system to the purchase or continued use of an IBM mainframe and has refused

to make its operating systems available at all to purchasers of PSI's mainframe computer products.

113.    And in the European Union, IBM, through its trade organization ECIS, has taken legal positions completely contrary to its arguments in this case. For example, IBM currently contends, through its trade organization, that Microsoft should be compelled to timely supply full interoperability information to competitors for various products, including Microsoft Office, Windows, and Exchange programs, and that such information constitutes an essential facility.    Again, IBM's conduct here is even more blatantly exclusionary than Microsoft's.    Microsoft never disclosed interoperability information to expand the market and encourage the adoption of a Microsoft standard. IBM, by contrast, did just that: promoting a policy of reasonable, non-discriminatory licensing to help expand the market for its operating systems, applications, and mainframes.

## FIRST COUNTERCLAIM: Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

114.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 113 of its Amended Counterclaims.

115.    IBM's (i) tying, (ii) leveraging of its monopoly over mainframe operating systems to maintain and prolong its monopoly over IBM-compatible mainframes, (iii) changing of its historic practices and course of dealing with respect to the develop of the standards and specifications embodied in the z/Architecture and its practice of reasonable and non-discriminatory licensing of intellectual property to maintain its monopoly power, (iv) denial of access to an essential facility, (v) interference with a prospective contractual relationship, (vi) forcing customers to "upgrade" to newer versions of its operating system and discontinuing technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on competing mainframe computer systems, (vii) denial of critical information regarding product interface information needed to develop mainframe computer systems that are

compatible with those products in order to hinder and delay PSI's ability to market its competing products, (viii) and/or other wrongful conduct as alleged hereinabove, individually and collectively constitute monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

116.    IBM has a monopoly and exercises market power in the relevant markets for IBM-compatible mainframe computers and mainframe operating systems.

117.    IBM's conduct as alleged herein has enabled it to unlawfully maintain, extend and prolong its monopoly in the market for IBM-compatible mainframes.

118.    IBM's purported bases for the anticompetitive acts alleged herein are pretextual and any pro-competitive benefits of such acts are outweighed by the harm to competition and consumers.

119.    As a direct and proximate result of IBM's tying, denial of access to an essential facility, interference with the potential sale of PSI, and other anticompetitive acts as alleged herein, PSI and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured.  If not enjoined, IBM's conduct will cause further injury to the business and property of PSI and consumers in the affected markets.

## SECOND COUNTERCLAIM:   Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

120.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 119 of its Amended Counterclaims.

121.    IBM's (i) tying, (ii) leveraging of its monopoly over mainframe operating systems to maintain and prolong its monopoly over IBM-compatible mainframes, (iii) changing of its historic practices and course of dealing to maintain its monopoly power, (iv) denial of access to an essential facility, (v) interference with a prospective contractual relationship, (vi) forcing customers to "upgrade" to newer versions of its operating system and discontinuing technical support of prior versions of its operating system in order to prevent those customers from using prior versions of its operating system on

competing mainframe computer systems, (vii) denial of critical information regarding the development path for IBM's operating system products and the technical information needed to develop mainframe computer systems that are compatible with those products in order to hinder and delay PSI's ability to market its competing products, (viii) and/or other wrongful conduct as alleged hereinabove, individually and collectively constitute attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

122.   IBM has undertaken these acts with the specific intent of monopolizing the market for IBM-compatible mainframes.

123.   There is a dangerous probability that IBM, unless it is restrained, will succeed in monopolizing the market for IBM-compatible mainframe computers.

124.   There are no legitimate business justifications for IBM's anticompetitive practices, and IBM's purported bases for tying its operating system to its mainframe and refusing to enter into a patent license with PSI on IBM's standard terms and conditions are pretextual.

125.   As a direct and proximate result of IBM's tying, monopoly leveraging, interference with a prospective contractual relationship, denial of access to an essential facility, and other anticompetitive acts as alleged herein, PSI and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured.  If not enjoined, IBM's conduct will cause further injury to the business and property of PSI and of consumers in the affected markets.

### THIRD COUNTERCLAIM:  Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

126.   PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 125 of its Amended Counterclaims.

127.   IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and its refusal to license those operating systems for use on PSI mainframes, as alleged hereinabove, constitutes a

tying arrangement and an unreasonable restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

128.    Alternatively, IBM's conditioning of the license and sale of its mainframe operating systems on the purchase or continued use of an IBM mainframe, and its refusal to license those operating systems for use on PSI mainframes, as alleged hereinabove, constitutes a tying arrangement and an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under the rule of reason.

129.    Mainframe operating systems and mainframe computers are separate products in separate markets, not substitutable for one another, can be sold or licensed separately, and are subject to separate consumer demand.  Moreover, the licensing of a mainframe operating system necessarily implies a license to perform all of the functions required by the operating system, including any that may be validly patented.

130.    By discriminating in its software licensing based on whether or not the customer has chosen to use an IBM machine or a PSI machine, IBM coerces consumers to purchase IBM's mainframe computers.

131.    IBM has monopoly power in the market for IBM-compatible mainframe operating systems enabling it to appreciably restrain trade in the market for IBM-compatible mainframes, and to coerce the purchase of IBM's mainframe computers.

132.    IBM's tying has affected and will continue to affect a not insubstantial volume of interstate commerce in the relevant markets.

133.    PSI has been injured in its business and has suffered pecuniary harm as a consequence of IBM's tying and will continue to suffer such harm so long as IBM's tying persists.

134.    As a direct and proximate result of IBM's tying, PSI and consumers in the affected markets have suffered injuries, and competition in the affected markets has been suppressed and injured.  If not enjoined, IBM's conduct will cause further injury to the business and property of PSI and of consumers in the affected markets.

## FOURTH COUNTERCLAIM: Violation of Section 3 of the Clayton Act, 14 U.S.C. § 15

135.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 134 of its Amended Counterclaims.

136.    As alleged above, IBM conditions the license of its mainframe operating systems on the use of an IBM mainframe, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 15.    The effect of these arrangements has been to substantially lessen competition in the relevant markets for mainframe computers.

137.    There is no legitimate business justification for IBM's anti-competitive practices and any purported legitimate business justifications are mere pretexts.

138.    IBM's anticompetitive practices have proximately caused damage to PSI in an amount to be proven at trial.

## FIFTH COUNTERCLAIM: Violation of California Business and Professions Code §§ 17200 et seq. (Anticompetitive Practices)

139.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 138 of its Amended Counterclaims.

140.    IBM has engaged in unlawful or unfair business acts and practices within the meaning of California Business and Professions Code §§ 17200 et seq. by, among other things, its tying arrangements, denial of access to an essential facility, exclusionary conduct, monopolization, attempted monopolization, and/or other anticompetitive acts as alleged herein.

141.    IBM's conduct as alleged hereinabove threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law.

142.    PSI and consumers in the affected markets, including in California, have suffered and will continue to suffer injury and loss of money or property as a result of IBM's acts of unfair competition as alleged herein.  If not enjoined, IBM's conduct will cause further injury to PSI and consumers.

## SIXTH COUNTERCLAIM: Violation of California Business and Professions Code §§ 17200 et seq. (Other Unfair and Fraudulent Acts)

143.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 142 of its Amended Counterclaims.

144.    IBM has engaged in unfair or fraudulent business acts and practices within the meaning of California Business and Professions Code § 17200 by, among other things, (i) misrepresenting to PSI and the public that it practices reasonable non-discriminatory licensing; (ii) representing to PSI in 2001, 2003 and 2004 that it would enter into a patent license with respect to the OS/390 patents on a nondiscriminatory basis and on standard terms and conditions, (iii) using pretext of purported patent infringement to renege on its promises made over a number of years as alleged above, (iv) requiring that PSI disclose confidential, proprietary information on a non-confidential basis before licensing negotiations could begin, (v) intentionally delaying responses to licensing requests, (vi) changing its products and support without need or notice in order to exclude PSI, and (vii) other false and misleading statements and unfair conduct, all of which IBM knew PSI and consumers were relying on to its detriment.

145.    IBM's conduct as alleged hereinabove is oppressive, offends public policy, and/or is injurious to consumers.

146.    PSI and consumers in the affected markets, including in California, have suffered and will continue to suffer injury and loss of money or property as a result of IBM's unfair or fraudulent business acts and practices as alleged herein.  If not enjoined, IBM's conduct will cause further injury to PSI and consumers.

## SEVENTH COUNTERCLAIM: Violation of Section 349-50 of New York General Business Law

147.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 146 of its Amended Counterclaims.

148.    IBM has engaged in deceptive acts and practices within the meaning of Sections 349-50 of New York General Business Law by, among other things, (i)

misrepresenting to PSI and the public that it practices reasonable non-discriminatory licensing; (ii) representing to PSI in 2001, 2003 and 2004 that it would enter into a patent license with respect to the OS/390 patents on a nondiscriminatory basis and on standard terms and conditions, (iii) using pretext of purported patent infringement to justify tying, (iv) changing its products and support without need or notice in order to exclude PSI and harm consumers without disclosing this to customers, (vi) denigrating PSI and its products to consumers; and (vii) other false and misleading statements.

149.    IBM's conduct as alleged hereinabove causes consumer injury and harm to the public interest because (a) consumers have been deceived into purchasing IBM's products based on its reputation and representations of openness and fairness, and (b) IBM's conduct has fomented its monopoly and caused higher prices in the mainframe computers by hindering and delaying PSI's entry into the market.

150.    PSI and consumers in the New York have suffered and will continue to suffer injury and loss of money or property as a result of IBM's unfair or fraudulent business acts and practices as alleged herein.  If not enjoined, IBM's conduct will cause further injury to PSI and consumers.

## EIGHTH COUNTERCLAIM: Tortious Interference with a Prospective Economic Advantage

151.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 150 of its Amended Counterclaims.

152.    In 2005 and 2006, PSI had a legitimate prospective contractual relationship with a large technology firm, which was interested in purchasing PSI for millions of dollars.

153.    In October 2006, that company signed a letter of intent to purchase PSI for millions of dollars.

154.    Because of IBM's unlawful policy of conditioning the sale of its mainframe operating systems to the purchase of an IBM mainframe, and/or the refusal to license its product on an HP/PSI mainframe, the would-be purchaser backed out of the deal.

155.    Upon information and belief, IBM wrongfully exerted economic pressure on the would-be purchaser and acted with intent to suppress competition in the IBM-compatible mainframe market, thus creating an unlawful restraint of trade.

156.    IBM was aware of the prospective economic relationship when it interfered with PSI's prospective contractual relationship and acted with the intent to destroy that relationship as a means to preserve its monopoly power.

157.    As a direct and proximate result of IBM's tortious comment, PSI suffered injury and loss of money.

## NINTH COUNTERCLAIM: Promissory Estoppel

158.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 157 of its Amended Counterclaims.

159.    Until 2006, IBM had a publicly announced policy of reasonable, non-discriminatory patent licensing on its website.

160.    In letters dated January 12, 2001, February 15, 2001, and March 9, 2001, IBM represented that it would license intellectual property that had previously been licensed to Amdahl and others on similar terms.

161.    In March 2003, after being informed by PSI that it needed assurances regarding licensing, IBM represented to PSI that, "[u]nder our current practice, IBM would be willing to enter into a patent license with PSI."

162.    In 2004, IBM engaged in patent license discussions with PSI. In those discussions, IBM again represented to PSI that IBM would provide a nondiscriminatory patent license to PSI on standard terms and conditions.

163.    IBM was aware of the importance to PSI's business of licensing patents, and IBM made the promises and representations alleged above with the knowledge that PSI was relying on them.

164.    PSI reasonably, foreseeably, justifiably, and to its detriment, relied on IBM's representations and promises, within the past two years, by, among other things, obtaining more than $20 million in venture capital financing and expending that money

on development of its computer system, which PSI is now unable to market and sell as a result of IBM's actions as alleged herein.

165.    IBM has failed and refused to perform its promises alleged above.

166.    PSI will perform, or is excused from performing as a result of IBM's breaches, all of its obligations under the contract.

167.    Particularly in light of the other behavior alleged herein, it would be unconscionable not to enforce IBM's promises.  IBM, with sole control over what it considers to be essential facilities, made promises and delayed definitive responses while aware that PSI was building a business model and obtaining financing based on those promises.  Ultimately, it attempted to force PSI to disclose confidential, proprietary information—while signing an unconscionable and nonsensical agreement that such information was not confidential and could be used by IBM in any manner that it pleased—as a precondition to further negotiations.  After PSI eventually acquiesced to that agreement, IBM revealed its true intent not to license any patents to PSI.

168.    The terms of the promise were and are just and reasonable, and provide for adequate consideration, in that PSI will undertake the same terms and conditions as IBM has accepted from other parties to its license agreements and patent licenses.

169.    PSI has no adequate remedy at law, in that IBM's continuing breach and its failure to perform in the future cannot be adequately compensated for in money damages.  Accordingly, PSI is entitled to specific performance of the contract as alleged herein.  In the alternative, IBM is estopped from asserting infringement of intellectual property that IBM represented that it would license.

## TENTH COUNTERCLAIM: Declaratory Judgment of Patent Non-infringement

170.    PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 169 of its Amended Counterclaims.

171.    Plaintiff purports to be the owner of the U.S. Patent No. 6,009,261 ("the '261 patent"), U.S. Patent No. 5,953,520 ("the '520 patent"), U.S. Patent No. 5,696,709 ("the '709 patent"), U.S. Patent No. 5,825,678 ("the '678 patent"), U.S. Patent No.

5,687,106 ("the '106 patent"), U.S. Patent No. 5,987,495 ("the '495 patent"), U.S. Patent No. 6,775,789 ("the '789 patent"), U.S. Patent No. 5,414,851 ("the '851 patent"), U.S. Patent No. 6,971,002 ("the '002 patent") and U.S. Patent No. 6,654,812 ("the '812 patent")—collectively, the "Asserted Patents."

172.    Plaintiff has alleged that PSI has infringed the Asserted Patents.

173.    An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, exists between Plaintiff, on the one hand, and PSI, on the other hand, as to the non-infringement of the Asserted Patents.

174.    PSI has not infringed, contributed to the infringement of, or induced the infringement of any valid claim of the Asserted Patents, and is not liable for infringement thereof.

175.    All PSI methods, systems, apparatus, and/or products that are accused of infringement have substantial uses that do not infringe and therefore cannot induce or contribute to the infringement of the Asserted Patents.  Moreover, PSI does not intend or have knowledge that its customers will use its products in a manner that infringes the Asserted Patents.

176.    PSI has not directly infringed any valid claim of the '261 patent.

177.    PSI has not directly infringed any valid claim of the '520 patent.

178.    PSI has not directly infringed any valid claim of the '709 patent.

179.    PSI has not directly infringed any valid claim of the '678 patent.

180.    PSI has not directly infringed any valid claim of the '106 patent.

181.    PSI has not directly infringed any valid claim of the '495 patent.

182.    PSI has not directly infringed any valid claim of the '789 patent.

183.    PSI has not directly infringed any valid claim of the '851 patent.

184.    PSI has not directly infringed any valid claim of the '002 patent.

185.    PSI has not directly infringed any valid claim of the '812 patent.

186.    PSI has not induced infringement of any valid claim of the '261 patent.

187.    PSI has not induced infringement of any valid claim of the '520 patent.

188.    PSI has not induced infringement of any valid claim of the '709 patent.

189.    PSI has not induced infringement of any valid claim of the '678 patent.

190.    PSI has not induced infringement of any valid claim of the '106 patent.

191.    PSI has not induced infringement of any valid claim of the '495 patent.

192.    PSI has not induced infringement of any valid claim of the '789 patent.

193.    PSI has not induced infringement of any valid claim of the '851 patent.

194.    PSI has not induced infringement of any valid claim of the '002 patent.

195.    PSI has not induced infringement of any valid claim of the '812 patent.

196.    PSI has not contributed to infringement of any valid claim of the '261 patent.

197.    PSI has not contributed to infringement of any valid claim of the '520 patent.

198.    PSI has not contributed to infringement of any valid claim of the '709 patent.

199.    PSI has not contributed to infringement of any valid claim of the '678 patent.

200.    PSI has not contributed to infringement of any valid claim of the '106 patent.

201.    PSI has not contributed to infringement of any valid claim of the '495 patent.

202.    PSI has not contributed to infringement of any valid claim of the '789 patent.

203.    PSI has not contributed to infringement of any valid claim of the '851 patent.

204.    PSI has not contributed to infringement of any valid claim of the '002 patent.

205.    PSI has not contributed to infringement of any valid claim of the '812 patent.

### ELEVENTH COUNTERCLAIM:  Declaratory Judgment of Patent Invalidity

206.   PSI realleges and incorporates by reference the allegations of paragraphs 1 through and including 205 of its Amended Counterclaims.

207.   An actual controversy, within the meaning of 28 U.S. C. §§ 2201 and 2202, exists between plaintiff, on the one hand, and PSI, on the other hand, as to the invalidity of the Asserted Patents.

208.   On information and belief, the claims of the Asserted Patents are invalid for failing to comply with the provisions of the Patent Laws, Title 35 U.S.C., including without limitation one or more of 35 U.S.C. §§ 101, 102, 103, and 112 and the doctrine of double patenting.

### JURY DEMAND

PSI demands a jury on all issues triable to a jury.

### PRAYER FOR RELIEF

Wherefore, PSI prays:

(1) That the Court enter a judgment that PSI has not infringed, contributorily infringed or induced the infringement of any claim of the Asserted Patents;

(2) That the Court enter a judgment that the Asserted Patents are invalid;

(3) That the Court enter a judgment that IBM take nothing by reason of its claims against PSI;

(4) That the Court enter a judgment that IBM has violated sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act, Section 17200 of the California Business and Professions Code, Section 349-50 of New York General Business Law;

(5) That the Court award PSI treble damages and attorneys' fees under the Sherman Act and section 4 of the Clayton Act, 15 U.S.C. § 15;

(6) That, should the Court determine any claims of the patents-in-suit are infringed, the Court award injunctive relief to PSI directing IBM to (a) license its

72

operating systems for use on PSI/HP mainframes on nondiscriminatory terms; and (b) enter into a reasonable, non-discriminatory patent licensing agreement with PSI;

(7) That the Court award PSI specific performance of IBM's promise to license its OS/390 related patents on the same terms as extended to others;

(8) That the Court award PSI damages for IBM's tortious interference with prospective contractual relations;

(9) That the Court declare this an exceptional case under 35 U.S.C. §285 and award PSI it reasonable attorneys' fees; and

(10) That the Court award PSI such other and further relief which the Court deems proper.

Dated:  September 21, 2007

SUSMAN GODFREY L.L.P.

By:  _____ /s/ Stephen D. Susman _____
      Stephen D. Susman
      Jacob W. Buchdahl
      Tibor L. Nagy
      SUSMAN GODFREY L.L.P.
      654 Madison Ave., 5th Floor
      New York, NY 10022
      (212) 336-8330

      Stephen Morrissey (SM-2952) (*Pro Hac Vice*)
      Ryan Kirkpatrick (RK-2281) (*Pro Hac Vice*)
      SUSMAN GODFREY L.L.P.
      1901 Avenue of the Stars, Suite 950
      Los Angeles, CA 90069
      (310) 789-3100