GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS, SBN 106409
JTthomas@gibsondunn.com
4 Park Plaza, Suite 1400
Irvine, California 92614-8557
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

ANGELIQUE KAOUNIS, SBN 209833
AKaounis@gibsondunn.com
333 South Grand Ave.
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Nonparty
HEWLETT-PACKARD COMPANY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| *In re* IBM 30(b)(6) Deposition Subpoena in the matter of:<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>      Plaintiff and Counterclaim Defendant,<br><br>    v.<br><br>PLATFORM SOLUTIONS, INC.,<br><br>      Defendant and Counterclaimant. | CASE NO. C07-80174 RMW (PVT)<br><br>Underlying action pending in the United States District Court for the Southern District of New York, CASE NO. CV 06-13565 SCR<br><br>**DECLARATION OF ALEXANDER S. KLEIN III IN SUPPORT OF HP'S ADMINISTRATIVE MOTION TO FILE UNDER SEAL UNREDACTED PAGES OF ITS MOTION TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER AND DECLARATIONS IN SUPPORT THEREOF**<br><br>Date:      June 3, 2008<br>Time:     10:00 a. m.<br>Place:    Courtroom 5<br>Before:  The Honorable Patricia V. Trumbull |

I, ALEXANDER S. KLEIN III, hereby declare as follows:

1.    I am an attorney licensed to practice before the courts of this State, and I am a Senior Counsel in the Legal Department of Nonparty Hewlett-Packard Company ("HP") currently providing legal counsel to HP's Imaging and Printing Group.  I make this declaration in support of HP's Administrative Motion to File Under Seal Unredacted Pages of its Motion to Modify Subpoena and for a Protective Order and Declarations in support thereof ("HP's Motion to Seal"), and specifically to provide the Court with an explanation as to the confidential nature of the particular material HP seeks to maintain under seal.  All matters stated herein are of my own personal knowledge, and if called as a witness, I could and would competently testify thereto.

2.    This matter arises out of IBM's issuance of a March 10, 2008 deposition subpoena (the "Subpoena") to nonparty HP, in the underlying action entitled *International Business Machines v. Platform Solutions Inc.* (S.D.N.Y. Case No. CV 06-13565 SCR) ("*IBM v. PSI*").  HP has ongoing business relationships with both parties to the *IBM v. PSI* lawsuit, but is not a party to the underlying litigation. Additionally, IBM and HP are competitors in the markets for desktop and laptop computers, server hardware, and related services and products.

3.    I have worked at HP since January, 1998.  From the Spring of 2002 until the Fall of 2007, I worked in HP's Business Critical Systems ("BCS") global business unit.  During my tenure at HP, I have supervised and worked on various corporate legal matters involving HP's commercial and technology transactions, intellectual property licensing, sales, Original Equipment Manufacturer ("OEM") relationships (including distribution agreements), and antitrust and e-commerce matters.  In the course of my duties in BCS, I regularly interacted with HP engineering, marketing, and senior staff personnel in its BCS global business unit, and other HP functions including the Sales, Corporate Development, Legal,

Technology, Finance, and Marketing Departments.  In many cases, I was the lead Legal Department contact for the negotiation of prospective BCS business relationships that HP had under consideration, whether it be for licensing, sales, acquisition or otherwise.  In the context of such proposed business relationships, I was responsible for limiting and tracking the flow of commercially sensitive information regarding select proposed business relationships, and for protecting such material from public disclosure.  I am thus readily familiar with how HP maintains the confidentiality of this type of information, and with which matters, as a general policy, warrant confidential treatment.

4.     HP is a technology company whose stock is publicly traded on the New York Stock Exchange.  HP invests a significant amount of capital in research and development each year.  In the last two fiscal years alone, the company invested roughly $3.5 billion annually in research and development.  *See* Exhibit 1.  Attached hereto as Exhibit 1 are true and correct copies of select pages from HP's Form 10-K for fiscal year ending Oct. 31, 2007, including its *Consolidated Statement of Earnings*, downloaded from HP's website at http://media.corporate-ir.net/media_files/irol/71/71087/FY0710K_AsFiled.pdf on April 28, 2008.

5.     Because of HP's status as a public company, and because of the enormous investment that HP makes in R&D and other business initiatives, HP takes extensive measures to protect its intellectual property and confidential proprietary materials.  Among other things, as a general practice, HP: (a) limits the internal HP distribution of information regarding certain future business initiatives and relationships (such as the one at issue here) to persons on a "need-to-know" basis; (b) enters into non-disclosure agreements with third parties regarding future initiatives; and/or (c) includes confidentiality clauses in its contracts with all third parties regarding future initiatives.  These types of confidentiality measures are necessary to

2

prevent certain confidential business information from becoming public knowledge and potentially affecting HP's competitive interests and/or its stock price.

6.    The material that HP seeks to maintain under seal in relation to HP's Motion to Seal is limited to select references to one of HP's proposed business transactions.  The references to this information can be found in the redacted portions of HP's: (a) Motion to Modify Subpoena and for a Protective Order; and (b) the Declaration of Steven Howard in Support of HP's Motion to Modify Subpoena and for a Protective Order; and (c) certain exhibits attached to the Declaration of Angelique Kaounis in Support of HP's Motion to Modify Subpoena and for a Protective Order.

7.    For ease of the Court's reference and pursuant to the requirements of Civil Local Rule 79-5, the documents listed above in No. 6 are attached hereto in redacted form as Exhibits 2-4, respectively.  The nature of the proposed business relationship referenced in the above-listed documents, as well as the potential consummation of the relationship, are confidential matters about which only a limited number of people at HP have knowledge.  The team that worked on the particular business matter at issue here was limited to a core group of individuals, which consisted primarily of select HP executives of certain business units that would be directly impacted by the proposed business relationship (and their administrative assistants), select Corporate Development personnel, and a few HP Legal Department personnel required to assist in the negotiations of the proposed relationship.  Within HP, certain proposed business transactions such as the one at issue here are referred to by the use of code names, which is a precautionary measure that HP takes to prevent inadvertent disclosure of such matters to unauthorized personnel.  Thus, the fact that HP even considered the proposed business relationship at issue here is confidential.

**KLEIN DECLARATION IN SUPPORT OF**
**ADMINISTRATIVE MOTION TO**
**FILE DOCUMENTS UNDER SEAL**

**CASE NO. C 07-80174-RMW (PVT)**

8.      Permitting disclosure of this type of information to competitors and the public would cause serious competitive injury to HP because competitors could use this otherwise confidential and valuable information to ascertain (1) where HP contemplates potential growth in certain markets; and (2) HP's business strategies in relation to these areas of technology and business.  This type of material is clearly of value to a competitor because a competitor can use this information to preempt certain HP business efforts, and/or can concentrate its own efforts on areas where it learns of HP's perceived concern or focus.  The disclosure of this information could damage not only HP's competitive interests vis-à-vis another competitor, but could also affect HP's stock price on the open market, because, if certain confidential business initiatives were made public, such information could prompt investors or potential investors to buy or sell HP stock when they otherwise might not do so, thereby interrupting the ordinary market forces that affect HP's stock price.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 28 th day of April 2008 at Palo Alto, California.

By: _____
Alexander S Klein III

4

KLEIN DECLARATION IN SUPPORT OF
ADMINISTRATIVE MOTION TO
FILE DOCUMENTS UNDER SEAL

CASE NO. C 07-80174-RMW (PVT)

Gibson, Dunn &
Crutcher LLP

# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

#### For the fiscal year ended: October 31, 2007

#### Or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

#### For the transition period from     to

#### Commission file number 1-4423

# HEWLETT-PACKARD COMPANY
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-1081436** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification no.) |
| **3000 Hanover Street, Palo Alto, California** | **94304** |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(650) 857-1501**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common stock, par value $0.01 per share<br>Liquid Yield Option™ Notes due 2017 | New York Stock Exchange |

#### Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act") during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

    Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was $109,938,540,000 based on the last sale price of common stock on April 30, 2007.

The number of shares of HP common stock outstanding as of November 30, 2007 was 2,573,868,626 shares.

**DOCUMENTS INCORPORATED BY REFERENCE**

| DOCUMENT DESCRIPTION | 10-K PART |
|---|---|
| Portions of the Registrant's notice of annual meeting of stockholders and proxy statement to be filed pursuant to Regulation 14A within 120 days after Registrant's fiscal year end of October 31, 2007 are incorporated by reference into Part III of this Report. | III |

**Hewlett-Packard Company**

**Form 10-K**

**For the Fiscal Year Ended October 31, 2007**

**Table of Contents**

Page

PART I

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 15 |
| Item 1B. | Unresolved Staff Comments | 30 |
| Item 2. | Properties | 30 |
| Item 3. | Legal Proceedings | 31 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 31 |

PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity and Related Stockholder Matters | 32 |
| Item 6. | Selected Financial Data | 34 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 69 |
| Item 8. | Financial Statements and Supplementary Data | 71 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosures | 151 |
| Item 9A. | Controls and Procedures | 151 |
| Item 9B. | Other Information | 151 |

PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance of the Registrant | 152 |
| Item 11. | Executive Compensation | 152 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 152 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 152 |
| Item 14. | Principal Accountant Fees and Services | 153 |

PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 154 |

**ITEM 8. Financial Statements and Supplementary Data.**

### Table of Contents

Reports of Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    72

Management's Report on Internal Control Over Financial Reporting . . . . . . . . . . . . . . . . . . . . . .    74

Consolidated Statements of Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    75

Consolidated Balance Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    76

Consolidated Statements of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    77

Consolidated Statements of Stockholders' Equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    78

Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    79

   Note 1: Summary of Significant Accounting Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    79

   Note 2: Stock-Based Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    88

   Note 3: Net Earnings Per Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    95

   Note 4: Balance Sheet Details . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    96

   Note 5: Supplemental Cash Flow Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    98

   Note 6: Acquisitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    98

   Note 7: Goodwill and Purchased Intangible Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    101

   Note 8: Restructuring Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    103

   Note 9: Financial Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    105

   Note 10: Financing Receivables and Operating Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    110

   Note 11: Guarantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    111

   Note 12: Borrowings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    112

   Note 13: Taxes on Earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    115

   Note 14: Stockholders' Equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    120

   Note 15: Retirement and Post-Retirement Benefit Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    122

   Note 16: Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    132

   Note 17: Litigation and Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    133

   Note 18: Segment Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    142

Quarterly Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    150

**HEWLETT-PACKARD COMPANY AND SUBSIDIARIES**

**Consolidated Statements of Earnings**

| | For the fiscal years ended October 31 | | |
| --- | --- | --- | --- |
| | **2007** | **2006** | **2005** |
| | **In millions, except per share amounts** | | |
| Net revenue: | | | |
| Products | $ 84,229 | $73,557 | $68,945 |
| Services | 19,699 | 17,773 | 17,380 |
| Financing income | 358 | 328 | 371 |
| Total net revenue | 104,286 | 91,658 | 86,696 |
| Costs and expenses: | | | |
| Cost of products | 63,435 | 55,248 | 52,550 |
| Cost of services | 15,163 | 13,930 | 13,674 |
| Financing interest | 289 | 249 | 216 |
| Research and development | 3,611 | 3,591 | 3,490 |
| Selling, general and administrative | 12,226 | 11,266 | 11,184 |
| Amortization of purchased intangible assets | 783 | 604 | 622 |
| In-process research and development charges | 190 | 52 | 2 |
| Restructuring charges | 387 | 158 | 1,684 |
| Pension curtailments and pension settlements, net | (517) | — | (199) |
| Total operating expenses | 95,567 | 85,098 | 83,223 |
| Earnings from operations | 8,719 | 6,560 | 3,473 |
| Interest and other, net | 444 | 606 | 83 |
| Gains (losses) on investments | 14 | 25 | (13) |
| Earnings before taxes | 9,177 | 7,191 | 3,543 |
| Provision for taxes | 1,913 | 993 | 1,145 |
| Net earnings | $ 7,264 | $ 6,198 | $ 2,398 |
| Net earnings per share: | | | |
| Basic | $ 2.76 | $ 2.23 | $ 0.83 |
| Diluted | $ 2.68 | $ 2.18 | $ 0.82 |
| Weighted-average shares used to compute net earnings per share: | | | |
| Basic | 2,630 | 2,782 | 2,879 |
| Diluted | 2,716 | 2,852 | 2,909 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

Exhibit 31.1

## CERTIFICATION

I, Mark V. Hurd, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Hewlett-Packard Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 14, 2007

/s/ MARK V. HURD
_____
Mark V. Hurd
*Chairman, Chief Executive Officer and President*
*(Principal Executive Officer)*

Exhibit 31.2

## CERTIFICATION

I, Catherine A. Lesjak, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Hewlett-Packard Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures, and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: December 14, 2007

/s/  CATHERINE A. LESJAK

Catherine A. Lesjak,
*Executive Vice President and*
*Chief Financial Officer*
*(Principal Financial Officer)*

<b>Exhibit 32</b>

**CERTIFICATION**
**OF**
**CHIEF EXECUTIVE OFFICER**
**AND**
**CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Mark V. Hurd, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of Hewlett-Packard Company for the fiscal year ended October 31, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Hewlett-Packard Company.

December 14, 2007                    By: /s/  MARK V. HURD
                                         ─────────────────────────────
                                         Mark V. Hurd
                                         *Chairman, Chief Executive Officer and President*

I, Catherine A. Lesjak, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of Hewlett-Packard Company for the fiscal year ended October 31, 2007 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Hewlett-Packard Company.

December 14, 2007                    By: /s/  CATHERINE A. LESJAK
                                         ─────────────────────────────
                                         Catherine A. Lesjak
                                         *Executive Vice President and*
                                         *Chief Financial Officer*

A signed original of this written statement required by Section 906 has been provided to Hewlett-Packard Company and will be retained by Hewlett-Packard Company and furnished to the Securities and Exchange Commission or its staff upon request.

# EXHIBIT 2

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS, SBN 106409
JTthomas@gibsondunn.com
3161 Michelson Dr.
Irvine, California 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

ANGELIQUE KAOUNIS, SBN 209833
AKaounis@gibsondunn.com
333 South Grand Ave.
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Nonparty
HEWLETT-PACKARD COMPANY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| *In re* IBM 30(b)(6) Deposition Subpoena in the matter of:<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>        Plaintiff and Counterclaim Defendant,<br><br>        v.<br><br>PLATFORM SOLUTIONS, INC.,<br><br>        Defendant and Counterclaimant. | CASE NO. C07-80174 RMW (PVT)<br>The Hon. Patricia V. Trumbull<br><br>Underlying action pending in the United States District Court for the Southern District of New York, CASE NO. CV 06-13565 SCR<br><br>**NONPARTY HEWLETT-PACKARD COMPANY'S NOTICE OF MOTION AND MOTION TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER; MEMO. OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; AND [PROPOSED] ORDER GRANTING MOTION**<br>**[REDACTED VERSION PURSUANT TO L.R. 79-5]**<br><br>[Declarations of Angelique Kaounis, Stephen Howard, and John Pickett and Request for Judicial Notice in Support hereof filed concurrently herewith]<br><br>Date:   June 3, 2008<br>Time:  10:00 a.m.<br>Place:  Courtroom 5 |

Gibson, Dunn &
Crutcher LLP

NOTICE IS HEREBY GIVEN that on June 3, 2008, at 10:00 a.m., or as soon thereafter as counsel may be heard by the above-titled Court, located at 280 South 1st Street, San Jose, CA 95113, Nonparty Hewlett-Packard Company ("HP") will, and hereby does move the Court to limit the scope of the Subpoena for the Deposition of HP served by IBM pursuant to Federal Rules of Civil Procedure 30(b)(6) and 45 in connection with the underlying action (the "Subpoena").

HP hereby moves this Court, pursuant to Federal Rules of Civil Procedure 26 and 45, for an order modifying the scope of the Subpoena served by IBM on HP in this action, on the grounds that the Subpoena: (1) seeks information which is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;" (2) subjects HP to undue burden; and (3) requires disclosure of HP's trade secret, and/or other confidential research, development, or commercial information (where equally probative information is available to IBM from public sources).  For these reasons, and because good cause exists, HP moves this Court for an order that that the discovery be had subject to its objections and only on the specified terms and conditions as set forth in *HP's April 17 and 24, 2008 Compromise Offers* (*see infra*, Memo of Ps. & As., at pp. 4-5 & Exhibits O & Q to the Declaration of Angelique Kaounis ("Kaounis Decl."), filed concurrently herewith).

This Motion is based on this Notice of Motion and Motion and accompanying Memorandum of Points and Authorities, the Declarations of Angelique Kaounis, John Pickett, and Stephen Howard (filed concurrently herewith), HP's Request for Judicial Notice (filed concurrently herewith), and on all pleadings and papers on file in this action, and upon such other evidence and arguments as may be presented to the Court at the time of the hearing.

HP hereby certifies that this Motion has been filed after extensive meet and confer efforts between HP and IBM, which resulted in a significant narrowing of the scope of the Subpoena from its

//

//

Gibson, Dunn & Crutcher LLP

**NONPARTY HEWLETT-PACKARD COMPANY'S NOTICE OF MOTION AND MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

1  original form, but unfortunately did not conclude with a resolution of all outstanding issues.  Kaounis

2  Decl. ¶¶ 18-28.

3  DATED:  April 29, 2008                JEFFREY T. THOMAS

4                                        ANGELIQUE KAOUNIS
                                         GIBSON, DUNN & CRUTCHER LLP

5                                        By:  _Angelique Kaounis / BMG_

6                                              Angelique Kaounis

7                                        Attorneys for Nonparty

8                                        HEWLETT-PACKARD COMPANY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

3

# TABLE OF CONTENTS

I. JURISDICTION ........................................................................................................... 1

II. STATEMENT OF ISSUES ......................................................................................... 1

III. STATEMENT OF FACTS ......................................................................................... 2

IV. ARGUMENT: THE COURT SHOULD MODIFY THE SUBPOENA OR GRANT A
     PROTECTIVE ORDER ............................................................................................. 6

    A.    IBM's Subpoena is Overly Broad and Unduly Burdensome ....................................... 7

        1.    The Subpoena reaches well beyond the relevant aspects of HP's
            relationship with PSI and the subject matter of the underlying litigation.
            ........................................................................................................ 8

            a.    Post-2006 information regarding PSI. ................................................. 9

            b.    Post-2006 information regarding HP's mainframe alternative
               solutions, migration strategies, and efforts to compete against
               IBM. ................................................................................................ 10

    B.    The Subpoena Seeks Testimony Regarding Information that is Available from
        Less Burdensome Sources. .......................................................................................... 13

        1.    The Subpoena seeks disclosure of HP's trade secrets and/or
            confidential, proprietary information where *equally probative
            information* is available from a public source ................................................. 13

        2.    The Subpoena seeks improper expert testimony where such information
            is available from a less burdensome source. ................................................. 16

V. CONCLUSION .......................................................................................................... 18

Gibson, Dunn &
Crutcher LLP

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

# TABLE OF AUTHORITIES

## Cases

*ACT, Inc. v. Sylvan Learning Sys., Inc.*,
    1999-1 Trade Cas. (CCH) P72,527, 1999 U.S. Dist. Lexis 7055, *8-9 (E.D.P.A. May
    14, 1999) ........................................................................................................ 12, 15, 16, 18

*Allen v. Leibinger*,
    190 F.R.D. 518 (W.D. Tenn. 1999) ........................................................................ 15

*Am. Elec. Power Co.*,
    191 F.R.D 132 (S.D. Oh. 1999) ............................................................................... 8

*Cacique, Inc. v. Robert Reiser & Co.*,
    169 F.3d 619 (9th Cir. 1999) ................................................................................. 13

*Concord Boat Corp. v. Brunswick Corp.*,
    169 F.R.D. 44 (S.D.N.Y. 1996) ...................................................................... 7, 8, 12

*Dart Indus. Co. v. Westwood Chem. Co.*,
    649 F.2d 646 (9th Cir. 1980) ................................................................................... 8

*Exxon Shipping Co. v. U.S. Dept. of Interior*,
    34 F.3d 774 (9th Cir. 1994) ..................................................................................... 6

*Garner Constr. Inc., v. Int'l Union of Operating Engineers*,
    2007 U.S. Dist. LEXIS 92522 at *5 (W.D. Wash. Dec. 4, 2007) ........................... 12

*Google v. Gonzales*,
    234 F.R.D. 674 (N.D. Cal. 2006) ......................................................................... 6, 9

*Haworth v. Miller*,
    998 F.2d 975 (Fed. Cir. 1993) ............................................................................... 13

*In re Vitamins Antitrust Litig.*,
    267 F. Supp. 2d 738 (D. Ohio 2003) ..................................................................... 14

*Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*,
    227 F.R.D. 421 (M.D.N.C. 2005) ..................................................................... 17, 18

*Innomed Labs, LLC v. Alza Corp.*,
    211 F.R.D. 237 (S.D.N.Y. 2002) ............................................................................. 8

*Insulate America v. Masco Corp.*,
    227 F.R.D. 427  (W.D.N.C. 2005) .................................................................. 13, 14, 16

*Mattel Inc. v. Walking Mtn. Products*,
    353 F.3d 792 (9th Cir. 2003) ...................................................................... 7, 12, 13

*Micro Motion, Inc. v. Kane Steel Co., Inc.*,
    894 F.2d 1318 (Fed. Cir. 1990) ....................................................................... 10, 13

*Moon v. SCP Pool Corp.*,
    232 F.R.D. 633 (C.D. Cal. 2005) ........................................................................ 6, 8

*WM High Yield v. O'Hanlon*,
    460 F. Supp. 2d 891 (S.D. Ind. 2006) ................................................................ 8, 13

## Statutes

Fed. R. Civ. P. 26(b)(2)(C)(i).................................................................................... 6

Fed. R. Civ. P. 26(c)................................................................................................... 6

Fed. R. Civ. P. 26(c)(1)(A-D, G)............................................................................... 7

ii

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

Gibson, Dunn &
Crutcher LLP

Fed. R. Civ. P. 30(b)(6) ........................................................................................... 8

Fed. R. Civ. P. 45 .................................................................................................... 13

Fed. R. Civ. P. 45(c) ............................................................................................ 6, 8

Fed. R. Civ. P. 45(c)(1) ............................................................................................ 6

Fed. R. Civ. P. 45(c)(3)(A)(iv) ................................................................................. 6

Fed. R. Civ. P. 45(c)(3)(B)(i) ................................................................................... 7

Fed. R. Civ. P. 45(c)(3)(C)(i) ................................................................................. 16

Fed. R. Evid. 704 ................................................................................................... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

# I.    JURISDICTION

This matter arises out of the issuance of a March 10, 2008 subpoena (the "Subpoena") to nonparty Hewlett-Packard Company ("HP"), in the underlying action entitled *International Business Machines v. Platform Solutions Inc.,* CASE NO. CV 06-13565 SCR (S.D.N.Y.).  HP is headquartered at 3000 Hanover St., Palo Alto, CA, and thus, the Subpoena in dispute issued from this Court. Declaration of Angelique Kaounis ("Kaounis Decl."), ¶ 5 & Exh. A.

# II.    STATEMENT OF ISSUES

Pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, nonparty HP requests that the Court issue an order limiting the scope of Plaintiff and Counterclaim Defendant International Business Machines' ("IBM") Subpoena in the above-titled matter.[1]  Specifically, HP requests that the Court modify the Subpoena and/or enter a protective order limiting the scope of the Subpoena to the specific terms, conditions, and by the method set forth in *HP's April 17 and 24, 2008 Meet and Confer Offers* and as explained more fully herein.  Kaounis Decl. ¶¶ 23 & 27, Exhs. O & Q; *see infra*, at pp. 4-5.

This Court should modify IBM's Subpoena and/or issue a protective order for several reasons. *First*, the Subpoena is unduly burdensome because the deposition topics set forth in the Exhibit thereto are (a) not adequately tailored to the subject matter of the underlying litigation; and (b) "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive. . . ."  *Second*, the Subpoena requires the disclosure of trade secret or other confidential research, development, or commercial information without a sufficient showing of the relevance or need for this information (particularly in light of the fact that there is publicly available information that more than adequately satisfies IBM's purported need to demonstrate that competition exists between HP and IBM).  *Third*, Topic No. 7 of the Subpoena calls for improper expert testimony on an ultimate issue in the case, where equally probative information is available

---

[1]  All references to "Rules" herein are to the Federal Rules of Civil Procedure unless otherwise noted.

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

1    from less burdensome sources.  For these reasons, the Court should modify the Subpoena and/or grant

2    HP's request for a protective order.

3                               **III.     STATEMENT OF FACTS**

4              This discovery dispute arises out of an action between IBM and Platform Solutions Inc.

5    ("PSI"), currently pending before the District Court for the Southern District of New York.  Kaounis

6    Decl., Exhs. B & C; Request for Judicial Notice (filed concurrently herewith ("RJN").  In that action,

7    IBM contends that PSI uses IBM's software in a manner that breaches an agreement between the

8    parties and infringes several patents held by IBM.  Kaounis Decl., Exh. B, ¶¶ 5-6.  Specifically, IBM

9    alleges that "PSI has developed and is . . . offering for sale computer systems ('emulator systems')

10   that seek to imitate IBM's computers."  *Id.* at Exh. B, ¶ 2.  IBM claims that PSI's emulator systems

11   "translate IBM's object code and [] store the object code translations for execution on a computer

12   using an Itanium processor" in a manner that violates IBM's Customer Agreement ("ICA") with PSI

13   and also infringes IBM's patents.  *See, e.g.*, *id.* at Exh. B, ¶¶ 70, 74-79.

14             In response to these allegations, PSI has asserted counterclaims alleging that IBM's software

15   licensing practices violate sections 1 and 2 of the Sherman Act and section 3 of the Clayton Act, and

16   further, that IBM has allegedly interfered with PSI's prospective economic relationship(s).  *Id.* at

17   Exh. C, *Counterclaims*, ¶¶ 114-138; 152-57.  PSI claims that the "relevant markets in th[e] case are

18   the markets for IBM-compatible mainframe computers and IBM-compatible operating systems."  *Id.*

19   at ¶ 20.

20             HP has ongoing business relationships with both parties to the lawsuit, but is <u>not a party</u> to the

21   underlying litigation.  Kaounis Decl., ¶ 7.  Among other things, PSI is an authorized reseller of HP

22   Integrity Servers, and HP and IBM are parties to a patent cross-licensing agreement.  *Id.*  In light of

23   its nonparty status, and in recognition of these relationships, HP has continuously cooperated with

24   both IBM and PSI throughout their litigation.  Indeed, over the last year, *HP has been served with*

25   *seven separate subpoenas for documents and testimony*, and has produced nearly 25,000 pages of

26   documents, as well as an extensive privilege log.  Kaounis Decl., ¶ 8.

27             On February 14, 2008, HP received a letter from IBM stating that it intended to seek the

28   30(b)(6) deposition of HP and providing a proposed list of deposition topics.  Kaounis Decl., ¶ 9,

Gibson, Dunn &
Crutcher LLP

2

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

Exh. D. Immediately upon receipt of the letter, HP began investigating who would be appropriate person(s) to provide testimony on the various proposed topics outlined in the letter. *Id.* at ¶ 10. Shortly thereafter, on February 19, 2008, HP replied to IBM's letter and indicated that HP found a number of the topics outlined in IBM's proposal to be overbroad and otherwise objectionable. *Id.* at ¶ 11, Exh. E. HP requested that IBM tailor its Subpoena as narrowly as possible, keeping in mind that HP is a nonparty that already produced substantial documentation in the case. *Id.*

In response, on February 21, 2008, IBM requested that *HP provide IBM* with "HP's proposed narrowing of the scope of the Subpoena, so that IBM has a starting point from which to consider re-tailoring our proposed list of topics." Kaounis Decl., ¶ 12, Exh. F. HP declined to undertake this burden in an email dated February 26, 2008, pointing out that "[g]iven [HP's] lack of familiarity with what others already have produced, and the depositions that IBM has already taken, [HP] think[s] it would be more efficient if IBM would articulate the specific categories of testimony *it believes it needs from HP*." *Id.* at ¶ 13, Exh. G. (emphasis added).

Despite HP's request, IBM again tried to foist the burden of narrowing the scope of its Subpoena onto nonparty HP, arguing in a February 29, 2008 letter that "HP is clearly in the best position to assess what information it possesses. . . ." and requesting "that HP propose[] what it believes is a list of topics that is not 'overbroad.'" Kaounis Decl., ¶ 14, Exh. H. Then, on March 5, 2008 HP again requested, given IBM's familiarity with its own case, that IBM tailor its proposed list of topics and once again offered to meet and confer about the scope of the revised categories. *Id.* at ¶ 15, Exh. I. IBM responded on March 7, 2008 reasserting its position that it was HP's burden to revise IBM's proposed topics. *Id.* at ¶ 16, Exh. J.

On March 10, 2008, IBM served HP with its Rule 30(b)(6) Subpoena. Kaounis Decl., ¶ 17 & Exh. A. Rather than narrowing the scope of the Subpoena topics pursuant to HP's repeated requests, IBM issued a Subpoena that contained the exact same set of 13 categories set forth in IBM's letter of February 14, 2008. *Id.* at ¶ 17 & Exhs. A & D. Additionally, the Subpoena did not have any temporal or geographic limitations, despite the fact that HP had notified IBM of this deficiency in its prior letters. *Id.* at ¶ 17 & Exh. A. Nevertheless, HP promptly contacted IBM on March 17, 2008 and proposed that the parties work together "to negotiate the scope of HP's response to the

Gibson, Dunn & Crutcher LLP

3

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

subpoena." *Id.* at ¶ 18, Exh. K.  After over a month of meeting and conferring, the parties were able to agree (with the exception of the temporal scope of the topics and Topic No. 7) to the below set of compromises:

1. [IBM's Initial Request]:  HP's relationship with PSI, including but not limited to HP's communications and/or dealings with PSI, HP's objectives in communicating and/or dealing with PSI, HP's technical assistance to PSI, and any partnership, whether formal or informal, between HP and PSI.

2. [IBM's Initial Request] REDACTED    REDACTED ithout limitation, the reasons I [Compromise for Topic Nos. 1 and 2 (proposal is for testimony unless other noted)]:
   - The general REDACTED  REDACTED  REDACTED  REDACTED
   - At a general level (not client-by-client), the extent to which HP provided technical support and/or marketing in support of PSI's solution, if at all, during 2003-2006.
   - HP's overall strategy, if any, regarding the use of PSI's solution to enhance HP's competitive position against IBM in marketing mainframe alternatives in 2003-2006.
   - A declaration regarding the technical assistance that HP provided to PSI during the development of its solution.

3. [IBM's Initial Request]:  HP microprocessors sold for use in servers that compete with IBM's zSeries servers and S/390 servers, including, without limitation, the processing power, cost and capabilities of such microprocessors and the customers that use such microprocessors.[2]

4. [IBM's Initial Request]:  HP's Mainframe Alternative Consolidation solutions.

5. [IBM's Initial Request]:  HP's marketing of and participation in mainframe migration strategies.

6. [IBM's Initial Request]:  Actual or potential competition for customers and workloads between IBM z/Series and/or S/390 computer servers and computer servers incorporating HP microprocessors.

7. [IBM's Initial Request]:  Whether and to what extent HP believes that end-users of IBM mainframes are "locked-in" to continued use of IBM mainframes, including, without limitation, the reason(s) any such lock-in exists; the specific end users whom HP believes are "locked-in;" and HP's response to claims that end users of IBM mainframes are "locked-in."[3]

---

[2] Because HP does not manufacture microprocessors, Topic No. 3 (as well as Nos. 6 and 8), calls for information that should be obtained from the manufacturers of the microprocessors at issue. In recognition of this fact, during the meet and confer process, IBM "clarified" this request to instead seek ""testimony regarding actual or potential competition faced by HP's servers, particularly insofar as they compete with IBM's zSeries and S/390 servers." Kaounis Decl., Exh. M.  As re-worded, this topic covers the same subject matter as Topic No. 6.

[3] With regard to Topic No. 7, HP continues to believe that this is an inappropriate Topic because it essentially asks HP to give expert testimony on an ultimate issue in this case.  This topic is more fully discussed *infra* at pp. 16-18.

Gibson, Dunn & Crutcher LLP

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

8.  [IBM's Initial Request]:  The success of HP and OEMs in marketing servers incorporating HP microprocessors to enable partial or total migration of workloads off of IBM mainframes.[4] [Compromise for Topic Nos. 3, 4, 5, 6, 7, and 8]:[5]

   - The general purpose and operation of HP's mainframe alternative solutions program during 2003-2006, including a general discussion of whether HP believes it competes or does not compete with IBM's z/series and s/390 servers.
   - HP's general understanding of the conditions during 2003-2006 that made migration off of IBM mainframes more or less challenging.

9.  [IBM's Initial Request]:  HP's present and past use of IBM and/or IBM-compatible mainframes; the extent to which HP has moved its workloads off of IBM and/or IBM-compatible mainframes to other platforms, and whether and to what extent HP concluded that it was incapable of migrating any workloads that it was running on IBM mainframes or IBM-compatible mainframes to other platforms.
   [Final Compromise]: IBM has agreed to table this topic.

10. [IBM's Initial Request]:  The Itanium Solutions Alliance ("ISA"), including, without limitation, the objectives of the ISA and HP's role in founding, promoting, and/or participating in the ISA.
   [Final Compromise]: HP will produce a written response that describes HP's role in promoting, and/or participating in the ISA in 2005-2006.

11. [IBM's Initial Request]:  The Mainframe Migration Alliance ("MMA"), including, without limitation, the activities or objectives of the MMA and HP's role in founding, promoting and or participating in the MMA.
   [Final Compromise]: IBM has withdrawn this topic.

12. [IBM's Initial Request]:  Any documents relating to this action.
   [Final Compromise]:  HP has agreed to assist with the authentication of a reasonable number of documents.

13. [IBM's Initial Request]:  The five persons at HP most knowledgeable concerning each of the foregoing topics.
   [Final Compromise]: IBM has withdrawn this topic.

---

[4] Topic No. 8, in part, pertains to information from wholly separate legal entities, and thus, IBM rightfully should seek discovery from those parties rather than HP.  In apparent recognition of this fact, IBM has withdrawn the portion of Topic No. 8 that relates to other OEMs.  Kaounis Decl., Exh. M, at 4.

[5] In light of the extreme overbreadth of Topic Nos. 4-6, the parties specifically agreed that an HP witness would not testify as to the granular or specific client-related details of these topics, and would not be expected to discuss specific communications, documents, components of HP's mainframe alternative solutions, or client or ISV relationships.  Rather, HP's witness might be asked to comment on whether a particular communication, document, component, or relationship would be consistent or inconsistent with HP's understanding and strategy at a broader level. Kaounis Decl., ¶ 23, Exh. O.

Kaounis Decl., Exhs. O, P & Q.

Though HP and IBM have agreed to the general subject matter scope of the above-listed topics (with the exception of No. 7 as noted and discussed herein), IBM would not agree to narrow the temporal scope of the Subpoena to a reasonable and relevant time period (2003-2006) as requested by HP.  *Id*. at ¶¶ 24-28; Exhs. O, P, Q, & R.   Accordingly, HP was forced to bring this motion to seek the Court's assistance.

## IV.    ARGUMENT: THE COURT SHOULD MODIFY THE SUBPOENA OR GRANT A PROTECTIVE ORDER

Because the Current Motion addresses a 30(b)(6) deposition subpoena, this Court should evaluate the propriety of that Subpoena under Rules 26, 30, and 45 of the Federal Rules of Civil Procedure.  Under these Rules, it is clear from the face of the Subpoena that as issued, it was overly broad and subjected HP to an undue burden.  Indeed, rather than taking "reasonable steps to avoid imposing undue burden or expense" on HP, as required by Rule 45, IBM instead issued a Subpoena that was so overbroad that it took over a month to narrow its scope to an *almost* manageable set of topics.  Fed. R. Civ. P. 45(c)(1).

Under circumstances such as those here, Rules 26 and 45 require relief.  For example, pursuant to Rule 45, the Court "must quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iv); *see Moon v. SCP Pool Corp*., 232 F.R.D. 633, 636-38 (C.D. Cal. 2005) (quashing Rule 45 subpoena because it "impose[d] an 'undue burden' on nonparty KSA"); *Google v. Gonzales*, 234 F.R.D. 674, 680 (N.D. Cal. 2006).  Similarly, Rule 26 provides that "the court *must* limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive. . . ." Fed. R. Civ. P. 26(b)(2)(C)(i) (emphasis added).

Even assuming however, that the Court does not find that Subpoena is so overbroad as to *mandate* modification, Rules 26 and 45 still provide the Court with broad discretion to modify a subpoena or to issue a protective order limiting the requested discovery.  Fed. R. Civ. P. 45(c); Fed. R. Civ. P. 26(c); *see Exxon Shipping Co. v. U.S. Dept. of Interior*, 34 F.3d 774, 779 (9th Cir. 1994)

Gibson, Dunn & Crutcher LLP

("Rule 26(c) and Rule 45(c)(3) give ample discretion to district courts to quash or modify subpoenas

causing "undue burden."). For instance, Rule 45 authorizes a court to modify a subpoena "if it

requires . . . disclosing a trade secret or other confidential research, development, or commercial

information." Fed. R. Civ. P. 45(c)(3)(B)(i); *Mattel Inc. v. Walking Mtn. Products*, 353 F.3d 792,

813-14 (9th Cir. 2003) (upholding District Court's quashing of an unduly burdensome nonparty

30(b)(6) subpoena that sought information about the nonparty's intellectual property). In addition,

upon a showing of "good cause" Federal Rule of Civil Procedure 26(c)(1) provides that the court

may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or

undue burden or expense," including by way of:

> (A) forbidding the discovery or disclosure;

> (B) specifying terms . . . for the disclosure or discovery;

> (C) prescribing a discovery method other than the one selected by the party seeking

> discovery;

> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or

> discovery to certain matters; . . .[and]

> (G) requiring that a trade secret or other confidential research, development, or

> commercial information not be revealed or be revealed only in a specified way[.]

Fed. R. Civ. P. 26(c)(1)(A-D, G).

Here, as set forth below, this Court should modify IBM's Subpoena or issue a protective order

and limit the Subpoena to: (1) the time period 2003-2006; and (2) the topics set forth in HP's

[Proposed] Order (*see also supra*, pp. 4-5, *Compromises*), because the Subpoena is unduly

burdensome, seeks information that is readily available from more convenient sources, and would

require disclosure of HP's trade secret or other confidential research, development, or commercial

information without a sufficient showing of the relevance of or need for this information (particularly

in light of the fact that equally probative information is available from public sources).

## A.    IBM's Subpoena is Overly Broad and Unduly Burdensome

Generally, "what constitutes an undue burden in a given instance is a case specific inquiry."

*Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996). However, under Rule

Gibson, Dunn &
Crutcher LLP

7

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

45, "non-party status is a significant factor a court must consider when assessing undue burden for the purpose of a Rule 45 motion." *WM High Yield v. O'Hanlon*, 460 F. Supp. 2d 891, 895-96 (S.D. Ind. 2006). Indeed, "the status of a person as a non-party is a factor that weighs <u>against</u> disclosure." *Am. Elec. Power Co.*, 191 F.R.D 132, 136 (S.D. Oh. 1999) (emphasis added); *see Dart Indus. Co. v. Westwood Chem. Co.,* 649 F.2d 646, 649 (9th Cir. 1980) (noting that discovery restrictions "may be broader when a nonparty is the target of discovery"); *Concord Boat Corp.*, 169 F.R.D. at 49 ("[T]he status of a witness as a non-party to the underlying litigation 'entitles [the witness] to consideration regarding expense and inconvenience.'") (citing Fed. R. Civ. P. 45(c)). In recognition of this, the Ninth Circuit has noted that "(t)here appear to be quite strong considerations indicating that discovery would be more limited to protect third parties from harassment, inconvenience, or disclosure of confidential documents." *Dart Indus. Co.,* 649 F.2d at 649 ("[T]he word nonparty serves as a constant reminder of the reasons for the limitations that characterize 'third-party' discovery.") (citations omitted).

1. **The Subpoena reaches well beyond the relevant aspects of HP's relationship with PSI and the subject matter of the underlying litigation.**

Rule 30(b)(6) squarely places the burden on the party seeking testimony to identify "with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6); *see Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237, 240 (S.D.N.Y. 2002). Despite this plain requirement, even a cursory review of IBM's Subpoena reveals that none of the topics are stated with sufficient particularity to satisfy Rule 30(b)(6), because they: (1) contain no geographic or temporal limitations (and even as narrowed to the time period 2003 to the present are overbroad); and (2) are so broadly worded that they reach well beyond the permissible scope of discovery in the underlying action. *See, e.g., Moon*, 232 F.R.D. at 637-38 (finding four of the seven requests at issue "overbroad on [their] face and exceed[ing] the bounds of fair discovery" where they sought "(a) information over a ten year or greater period and (b)…information regarding *all* pool winter covers, not only those 'within the Far East Region'"); *see also WM High Yield*, 460 F. Supp. 2d at 896 (holding that the requests were "overly broad" where, among other things, they sought "information over either an unlimited period of time or, when limited, over seven years"). Because these topics are overbroad and seek irrelevant

Gibson, Dunn &
Crutcher LLP

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

1  information and/or information that can be more easily obtained from other sources, they impose an

2  undue burden on HP and must be narrowed.  *Google*, 234 F.R.D. at 680 ("Overbroad subpoenas

3  seeking irrelevant information may be quashed or modified.").

4         **a.**       **Post-2006 information regarding PSI.**

5         Without any reasonable justification for its overly expansive requests, IBM has sought

6  deposition testimony on a series of topics that go well beyond the relevant aspects of HP's

7  relationship with PSI.  For example, Topic No. 1 seeks testimony from *2003 to the present* regarding

8  "HP's relationship with PSI, including but not limited to HP's communications and/or dealings with

9  PSI, HP's objectives in communicating and/or dealing with PSI, HP's technical assistance to PSI, and

10  any partnership, whether formal or informal, between HP and PSI."  Kaounis Decl., Exh. A.  This,

11  despite the facts that: (1) in October 2006, HP    REDACTED    (2) after October 2006, PSI

12  only acted as an authorized reseller of HP hardware and member of HP's Developer & Solution

13  Partner Program (DSPP) (Declaration of Stephen Howard ("Howard Decl."), ¶¶ 4-5); (3) PSI's

14  counterclaims were filed in January 2007 and thus relate to conduct that occurred prior to that time

15  (Kaounis Decl., Exh. U); and (4) in late 2007, PSI entered into a reseller agreement for "Mainframe

16  Class" servers with a different technology company—NEC (*Id.*, Exh. T).

17         Neither PSI's current status as an authorized reseller of HP's server products, nor its status as

18  a DSPP member elevate it to any heightened level of strategic significance in connection with HP's

19  mainframe alternative offerings or its potential competition with IBM.  Howard Decl., ¶¶ 5, 8; Pickett

20  Decl., ¶ 5.  Rather, PSI's reseller status simply means that it has a contractual agreement with HP to

21  sell certain HP products and services in a particular geographic area for a specified period of time.

22  Howard Decl., ¶ 6.  HP's reseller agreement with PSI *does not establish a franchise, partnership,*

23  *joint venture, or agency relationship between HP and PSI in connection with the agreement.  Id.*

24  Likewise, HP's DSPP program—by which it offers resources to software vendors and software

25  developers seeking to develop and demonstrate their software on HP hardware—also contains similar

26

27

28

9

1  limitations.  *Id.* at ¶ 7.[6]  And, DSPP membership status does mean that a particular company is part of

2  any strategic HP initiative.  *Id.* at ¶ 8.  In fact, once   REDACTED REDACTED

3  PSI just as it would any other authorized reseller of HP servers.  *Id.* at ¶ 5.

4        Despite this, IBM insists that it is entitled to testimony regarding HP's relationship with PSI

5  for the time period 2007-2008.  But *IBM has made no showing why any post-2006 information is*

6  *relevant in light of HP's current relationship with PSI.*  For example, IBM has not demonstrated how

7  this limited relationship might speak to PSI's or HP's competitive strength vis-à-vis IBM—because it

8  cannot.  Indeed, in light of the fact that PSI has now teamed up with a third party (NEC) to market

9  and sell a mainframe alternative solution, any post-2006 testimony regarding this subject is more

10  appropriately directed at those companies.  Accordingly, HP should not be required to prepare a

11  witness regarding its post-2006 relationship with PSI.  *Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894

12  F.2d 1318, 1328 (Fed. Cir. 1990) (affirming District Court's quashing of a 30(b)(6) deposition

13  subpoena for requesting discovery on irrelevant topics and noting that "[a] litigant may not engage in

14  merely speculative inquiries in the guise of relevant discovery").

15                  **b.**     **Post-2006 information regarding HP's mainframe alternative solutions,**

16                          **migration strategies, and efforts to compete against IBM.**

17        Many of IBM's Subpoena topics also reach well beyond the subject matter of the underlying

18  litigation.  For example, Topic Nos. 4, 5, and 6 appear to be a fishing expedition aimed at probing the

19  entirety of: (1) HP's mainframe alternative consolidation solutions; (2) HP's mainframe migration

20  strategies; and (3) HP's efforts to compete for customers who use the IBM z/Series and/or S/390

21  computer servers, *without regard to whether this information relates to PSI or the claims in the*

22  *underlying litigation.*  But, as discussed herein, HP's mainframe alternative business encompasses a

23  myriad of different solutions, of which PSI was only a very small part.  Pickett Decl., ¶¶ 3-5.

24

25

---

26  [6] During the time period 2006 to the present, HP has been a party to channel partner agreements
27  with thousand of companies.  Howard Decl., ¶ 4.  Similarly, HP has DSPP agreements with
    companies in close to 100 countries in numerous industries and has thousands of partners that
28  provide server-related technologies.  *Id.* at ¶ 8.

Gibson, Dunn &
Crutcher LLP

10

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

HP markets a wide range of mainframe alternative solutions that encompass several different types of servers, dozens of other hardware and software components, and are coupled with services and/or offerings from one or more of its many Independent Software Vendor (ISV) partners (*of which PSI is not listed as one*). Pickett Decl., ¶ 3; Exh. B, at 10. HP markets these solutions to suit the needs of its various customers by offering to (1) augment existing mainframe solutions; (2) modernize clients' infrastructures; and/or (3) modernize clients' applications. Pickett Decl., at ¶ 3. Similarly, HP's mainframe migration strategy is a multi-faceted program that encompasses numerous HP offerings such as servers, storage, HP's BladeSystem, and HP IT services, and includes migration services from pre-planning and assessment to post-migration follow-up, porting, application modernization services, and virtualization services. Pickett Decl., ¶ 4 & Exh. B. Because these services are so customized, and by necessity, will vary depending on the type of system from which data is being migrated—*e.g.*, Sun or IBM—often experts for each of the various components must work with the sales personnel who are responsible for the particular client relationship to tailor an offering best suited to that client's needs. Pickett Decl., at ¶¶ 3-4.[7]

PSI is an authorized reseller of HP Integrity Servers, which is only one of the many different types of servers sold by HP in connection with its mainframe alternative offerings. Pickett Decl., ¶¶ 3, 5. Throughout PSI's and HP's relationship, PSI has only sold its solution on HP hardware to fewer than five customers, and all of these sales occurred prior to the end of 2006. *Id.* at ¶ 5. **More importantly, however,** because PSI was HP's last connection to any mainframe alternative solution which ran in connection with an IBM operating system, **any mainframe alternative solution offered on HP hardware since the end of 2006 has been on *an HP operating system*.** *Id.* Thus, HP's post-2006 solutions *fall outside the definition of the relevant market as defined by PSI*—*i.e.*, the "IBM-compatible mainframe computers and mainframe operating systems." *See* Kaounis Decl., Exh. C, at *Amended Counterclaims*, ¶ 20. On this record, IBM simply cannot demonstrate that all of HP's mainframe alternative solutions and mainframe migration strategies **from 2003 to the present**

---

[7] The general topic of competition with IBM z/series mainframes and z/OS is interrelated with both Topic Nos. 4 and 5, so it is not discussed separately in this Motion.

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

are relevant to the instant litigation.[8]  *See Garner Constr. Inc., v. Int'l Union of Operating Engineers*, 2007 U.S. Dist. LEXIS 92522 at *5 (W.D. Wash. Dec. 4, 2007) (denying motion to compel documents that related only to the subpoenaed non-party's business operations apart from any connection to the parties to the underlying litigation); *Mattel*, 353 F.3d at 813 (upholding district court's quashing of a non-party subpoena where "no attempt had been made to try to tailor the information request to the immediate needs of the case").

Even assuming, *arguendo*, that all of HP's mainframe alternative solutions and migration strategy programs were relevant (which HP does not concede), it would be excessively burdensome for HP—a nonparty—to prepare a 30(b)(6) witness to address every aspect of these programs from 2003 to the present because these topics are so broad.  *Compare* Pickett Decl., ¶¶ 2-5 (referencing the dozens of teams associated with HP's *worldwide* mainframe alternative solutions program and the numerous aspects of the program), *with Concord*, 169 F.R.D. at 53 (holding that Subpoena was unduly burdensome because compliance with its terms "would subject numerous Merrill Lynch employees and managers in several branch offices to countless hours of research, analysis, and compilation").  Accordingly, as a reasonable compromise, HP agreed to provide a witness (or witnesses) regarding:

- The general purpose and operation of HP's mainframe alternative solutions program during 2003-2006, including a general discussion of whether HP believes it competes or does not compete with IBM's z/series and s/390 servers.
- HP's general understanding of the conditions during 2003-2006 that made migration off of IBM mainframes more or less challenging.

Kaounis Decl., Exhs. O & Q.  Any further deposition testimony on these subjects should be denied.

---

[8]  IBM's own documents show that it focuses its competitive efforts against HP's Integrity server, the types of machines that PSI resells in connection with its mainframe alternative solution. Kaounis Decl., ¶ 29, Exh. S.  What could be better evidence of competition in the antitrust case against IBM than its own materials acknowledging the same and providing detailed comparisons of allegedly relevant products?  *See generally, ACT, Inc. v. Sylvan Learning Sys., Inc.*, 1999-1 Trade Cas. (CCH) P72,527, 1999 U.S. Dist. Lexis 7055, *8-9 (E.D.P.A. May 14, 1999).

Gibson, Dunn &
Crutcher LLP

12

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

**B.    The Subpoena Seeks Testimony Regarding Information that is Available from Less Burdensome Sources.**

Rule 26(b)(2)(C)(i) requires a court to limit discovery when it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive… ." *Id;. see WM High Yield*, 460 F. Supp. 2d at 896 (quashing nonparty subpoena because subpoenaing party failed to show that the information it sought was unavailable from other sources); *see also Haworth v. Miller*, 998 F.2d 975, 978 (Fed. Cir. 1993) ("[T]his court has noted that the need for discovery in an ancillary proceeding 'is diminished when the information is available elsewhere.'") (internal citation omitted).  Here, IBM seeks two types of information—highly confidential proprietary HP product and strategy information from 2007-2008, and information that is tantamount to expert testimony—which is more readily available through other less burdensome sources.  Thus, the Court should quash these portions of IBM's Subpoena.

**1.    The Subpoena seeks disclosure of HP's trade secrets and/or confidential, proprietary information where *equally probative information* is available from a public source.**

Federal Rule of Civil Procedure 45(c)(3)(B) was intended to provide protection for the intellectual property of nonparties.  *See Mattel,* 353 F.3d at 814 (citing Rule 45's Advisory Committee Notes (1991)); *see also Micro Motion*, 894 F.2d at 1323 ("Confidential commercial information warrants special protection under Rule 26(c)(7)").  Here, even though the parties have negotiated a protective order (Kaounis Decl., ¶ 6), IBM should still be required to make the requisite Rule 45(c) showing of "substantial need" that cannot be met without "undue hardship" in order to discover HP's confidential, proprietary and/or trade secret material regarding its post-2006: (1) mainframe alternative solutions program; (2) migration strategies; and (3) competitive efforts against IBM.  *Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 622-23 (9th Cir. 1999) (noting that a protective order does not dispense with the requirement to establish relevance or need—its purpose "is to prevent harm by limiting disclosure of *relevant* and *necessary* information"); *Insulate America v. Masco Corp.*, 227 F.R.D. 427, 434  (W.D.N.C. 2005); *see also* Fed. R. Civ. P. 45, Advisory Committee Notes, 1991 Amendment ("In instances where a subpoena requires disclosure of a trade secret or other confidential or commercially sensitive information it 'should be quashed unless the

13

Gibson, Dunn & Crutcher LLP

1   party serving the subpoena shows a substantial need and the court can devise an appropriate

2   accommodation to protect the interests of the' party opposing such potentially harmful disclosure.").

3   Indeed, "[t]here is a constant danger inherent in disclosure of confidential information pursuant to a

4   Protective Order. Therefore, the party requesting disclosure must make a strong showing of need,

5   especially when confidential information from a non-party is sought." *Insulate Am.,* 227 F.R.D. at

6   434 (citation omitted).

7          IBM cannot demonstrate a substantial need for HP's *current* (2007-2008) *confidential* market

8   and strategy-related information relating to its mainframe alternative solutions, migration strategies,

9   and competitive efforts against IBM. *First*, requiring disclosure of this type of valuable confidential,

10  proprietary and/or trade secret information to a formidable competitor such as IBM could cause

11  serious competitive injury to HP, because if IBM were to learn what HP's current and future

12  mainframe alternatives and migration strategies entail, it could alter its own strategies to preempt

13  solutions that HP has or will offer in the market.  Pickett Decl., ¶¶8-9; *see In re Vitamins Antitrust*

14  *Litig.*, 267 F. Supp. 2d 738, 741-42 (D. Ohio 2003) (granting motion to quash where: (1) it seemed

15  clear that Aventis was requesting trade secrets—"the lifeblood of [the nonparty's] financial well

16  being[;]" (2) certain of the defendants in the antitrust litigation were nonparty's "direct competitors,

17  [which] only heighten[ed] the Court's first concern[;]" (3) the Court had "no enforcement power over

18  the extant protective order, and thus would be unable to protect [the nonparty's] interests were its

19  terms to be breached[;]" and (4) there was a possibility that the records would be irrelevant if certain

20  motions in the underlying case were granted).

21          *Second*, the non-confidential aspects of these subjects are plainly described on HP's website,

22  and thus, if IBM needs to demonstrate: (1) that HP attempts to compete with IBM by providing

23  mainframe alternative solutions; or (2) that HP attempts to migrate customers off of IBM mainframes

24  and onto HP hardware, that information is publicly available. *See* Pickett Dec., ¶ 7 & Exh. B,

25  http://h71028.www7.hp.com/enterprise/cache/151824-0-0-225-121.html?jumpid=reg_R1002_USEN

26  (noting that "the mainframe is now oftentimes viewed as a costly and inflexible solution that can no

27  longer support the needs of organizations that must adapt quickly to the ever-changing

28  marketplace"); Exh. C, http://h71028.www7.hp.com/enterprise/cache/564549-0-0-225-121.html

Gibson, Dunn &
Crutcher LLP

14

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

(entitled "Migrate from IBM mainframes to HP"); Exh. A, http://www.hp.com/go/offmainframes

(providing links to numerous articles and interviews with HP personnel on a series of topics related

to HP's mainframe alternative solutions and HP's migration strategies, including a general discussion

of the advantages of migrating to HP and case studies of migration).  HP offered to provide a witness

who could speak to this publicly available information, and also offered to authenticate these web

pages.  Kaounis Decl., ¶ 27, Exh. Q.  IBM refused this offer, yet it has not articulated why *HP's*

*confidential information* is relevant and necessary to defend against PSI's claims, and *why the*

*publicly available information is insufficient to serve this purpose.*[9]  *Id.* at ¶ 27, Exh. R .

Accordingly, "in the absence of some showing by [IBM] that the publicly available information . . . is

inadequate, the burden that production would place on [HP] is unreasonable, particularly in light of

[HP's] nonparty status."  *Allen v. Leibinger*, 190 F.R.D. 518, 525 (W.D. Tenn. 1999).

Additionally, on these points, the case of *ACT, Inc. v. Sylvan Learning Sys., Inc.*, 1999-1

Trade Cas. (CCH) P72,527, 1999 U.S. Dist. Lexis 7055 (E.D.P.A. May 14, 1999), is also instructive.

In *ACT*, a plaintiff in an antitrust case (in which violations of Section 2 of the Sherman Act had been

alleged) sought discovery from a non-party, ASI, which was the third largest player in the market

behind the plaintiff (ACT) and defendant (Sylvan) in that case.  *ACT* contained allegations strikingly

similar to this case—ACT claimed, among other things, that "Sylvan, by far the largest player in this

alleged . . . market, has tortiously interfered with several existing or prospective contractual

relationships between ACT and potential clients and business partners that would have helped ACT

establish itself in this market."  *Id.* at *1-2.  ACT accordingly sought discovery from ASI relating to

its "efforts to enter the computer-based testing market, perspectives of the players in that market,

assessment of potential and existing competitors, evaluations of competitive conditions, discussions

of the risks of entering into the market, and analyses of the barriers to entering that market…."  *Id.* at

*2.  In response, ASI, while acknowledging that the subpoenaed information was "'marginally'

_____

[9]  IBM states that "given the topics we have identified and the level of specificity that IBM will
pursue" IBM strongly suspects that "disputes regarding confidentiality will not arise."  Kaounis
Decl., ¶ 26, Exh. P.  Despite this hollow assurance, IBM is unwilling to limit the scope of its
2007-2008 inquiries to public information.  *Id.*

15

Gibson, Dunn &
Crutcher LLP

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

relevant," argued that it was "confidential commercial information," and that "disclos[ure of] this information to its much larger competitors would cause it serious commercial harm and allow its direct competitors to free ride on its own investment in assessing the CBT market." *Id.* at *7-8. The court quashed the subpoena in large part because ACT was unable to demonstrate a "substantial need" for the information where it did "not deny that similar market assessment information [wa]s available from its own resources," from the defendant, and from other third party researchers. *Id.* at *8-9.

In light of *ACT*, and considering: (1) the highly confidential nature of HP's strategies and technology (*see* Pickett Decl., ¶¶8-9); (2) the dubious relevance of the information sought by IBM's Subpoena topics; (3) the fact that there is ample information on HP's website which speaks to these subjects (and HP's offer to authenticate this material for IBM); and (4) HP's offer to produce a witness on the general topics to the extent that IBM limited its inquiry to public information, IBM has not made—and cannot make—the requisite showing that it has ***"a substantial need for the testimony or material that cannot be otherwise met without undue hardship."*** Fed. R. Civ. P. 45(c)(3)(C)(i) (emphasis added); *Insulate America*, 227 F.R.D. at 432 (quashing subpoena requests which sought information from a competitor and noting that "[e]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit").

### 2. The Subpoena seeks improper expert testimony where such information is available from a less burdensome source.

Topic No. 7 of IBM's Subpoena calls for testimony regarding ultimate issues in the underlying case and seeks to elicit what should be classified as expert testimony. Specifically, Topic No. 7 seeks an HP witness to testify regarding:

> Whether and to what extent HP believes that end-users of IBM mainframes are 'locked-in' to continued use of IBM mainframes, including, without limitation, the reason(s) any such lock-in exists; the specific end users whom HP believes are 'locked-in' and HP's response to claims that end users of IBM mainframes are 'locked-in.'

Kaounis Decl., Exh. A, at No. 7. This topic is improper and unduly burdensome because (1) it runs afoul of Rule 26's prohibition on contention-related depositions; and (2) it attempts to convert a

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

30(b)(6) witness into a testifying expert under Rule 26. *See generally, Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 426-27 (M.D.N.C. 2005) (suggesting that a court should "give extra consideration to the objections of a non-party, non-fact witness in weighing burdensomeness versus relevance").

In fact, this Topic simply lifts allegations straight out of PSI's counterclaims, which allege:

- "Consumers have invested over a trillion dollars in IBM-compatible software and hardware [and] are ***now "locked in" to using IBM-compatible software and hardware*.**" Kaounis Decl., Exh. C, at *Amended Counterclaims*, ¶ 4 (emphasis added).

- "[T]here are no reasonable substitutes for IBM-compatible mainframes for a substantial and ***well-defined subset of mainframe customers who are "locked in" to the IBM platform*** based on their prior hardware/software purchasing decisions and their relatively high data processing demands. . . . Such enormous investment in IBM-compatible software has effectively ***locked in*** many consumers to IBM-compatible mainframe computer systems . . . ." *Id.* at ¶ 23 (emphasis added).

- "To switch to a non-IBM-compatible mainframe computer system, ***locked in consumers would need to expend enormous amounts of time, money***, and other resources." *Id.* at ¶ 24 (emphasis added).

- "Even if they had comparable data processing and other performance capabilities, ***computers that principally run UNIX, Linux, or Windows operating systems are not reasonable substitutes because "lock-in" effects prevent customers from choosing products that are not compatible with their existing mainframe operating systems and applications***. . . ." *Id.* at ¶ 25 (emphasis added).

By phrasing Topic No. 7 in the exact language of PSI's allegations, IBM is asking HP, as a corporation (and a competitor), to opine on an ultimate issue in the antitrust case between IBM and PSI—*i.e.*, whether "end-users of IBM mainframes are 'locked-in' to continued use of IBM mainframes." This is an improper question for *any* lay witness, let alone a 30(b)(6) witness testifying on behalf of an antitrust defendant's non-party competitor, because it requires the witness to reach a conclusion based on specialized knowledge of the factors that prevent certain entities from switching from one computer system to another. *See* Fed. R. Evid. 704 Commentary ("Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions."); *see also Indem. Ins. Co. of N. Am.*, 227 F.R.D. at 426 (noting the potential impropriety of calling on a "non-party to formulate opinions or contentions regarding the cause of the accident…").

Furthermore, for HP to properly prepare a witness on this topic, it would be required to investigate whether any of the *hundreds of clients or potential clients* to which it has marketed a mainframe alternative solution in 2003-2008 has ever complained of being locked-in to an IBM mainframe.[10]  Rather than impose this burden on HP, IBM can simply elicit the information it needs *for its experts to answer this question* by asking HP (and others): (1) general questions related to the ease of migration; and (2) whether HP (or others) believe that they are capable of competing for certain types of workloads or applications that run on IBM mainframes. *See ACT, Inc.*, 1999 U.S. Dist. Lexis 7055 at *9 (noting in response to plaintiff's antitrust expert's statements that "that the information sought is the type of information upon which experts such as himself rely in analyzing antitrust issues such as those [] raise[d]," that "similar market assessment information [wa]s available from [the requesting party's] own resources, from [the defendant], and from third parties"). Moreover, because IBM has made no showing that the available information is inadequate for its needs, the Court should not require HP to answer questions on this specific topic.

## V.    CONCLUSION

HP respectfully requests that the Court grant its Motion and modify the scope of IBM's Subpoena and/or enter a protective order that is consistent with *HP's April 17 and 24, 2008 Meet and Confer Compromise Offers* (as set forth on pp. 4-5) and HP's [Proposed] Order (filed concurrently herewith).

DATED:  April 29, 2008

JEFFREY T. THOMAS
ANGELIQUE KAOUNIS
GIBSON, DUNN & CRUTCHER LLP

By: *Angelique Kaounis / BMG*
       Angelique Kaounis

Attorneys for Nonparty
HEWLETT-PACKARD COMPANY

---

[10]  In recognition of this burden, IBM has stated that it does not expect HP's witnesses to have client-by-client knowledge regarding this topic, but at the same time it has not agreed to withdraw this specific request. Kaounis Decl., ¶ 23 & Exh. O.

18

**NONPARTY HEWLETT-PACKARD COMPANY'S MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO MODIFY SUBPOENA AND FOR PROTECTIVE ORDER**

# EXHIBIT 3

GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS, SBN 106409
JTthomas@gibsondunn.com
3161 Michelson Dr.
Irvine, California 92612-4412
Telephone: (949) 451-3800
Facsimile: (949) 451-4220

ANGELIQUE KAOUNIS, SBN 209833
AKaounis@gibsondunn.com
333 South Grand Ave.
Los Angeles, California 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Nonparty
HEWLETT-PACKARD COMPANY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| *In re* IBM 30(b)(6) Deposition Subpoena in the matter of:<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>         Plaintiff and Counterclaim Defendant,<br><br>    v.<br><br>PLATFORM SOLUTIONS, INC.,<br><br>         Defendant and Counterclaimant. | CASE NO. C07-80174 RMW (PVT)<br><br>Underlying action pending in the United States District Court for the Southern District of New York, CASE NO. CV 06-13565 SCR<br><br>**DECLARATION OF STEPHEN HOWARD IN SUPPORT OF HP'S MOTION TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER [LODGED UNDER SEAL PURSUANT TO L.R. 79-5]**<br><br>[Notice of Motion, Motion, Memo. of Points and Authorities; Declarations of Angelique Kaounis and John Pickett; Request for Judicial Notice in Support hereof; and [Proposed] Order filed concurrently herewith]<br><br>Hearing Date: June 3, 2008<br>Hearing Time: 10:00 a.m.<br>Place:   Courtroom 5<br>Before: Hon. Patricia V. Trumbull |

I, STEPHEN HOWARD, hereby declare as follows:

1.      I am a Business Development Manager currently employed by Hewlett-Packard Company ("HP") in its High Performance Computing Division ("HPCD"). I make this declaration in support of HP's Motion to Modify Subpoena and for a Protective Order ("HP's Current Motion"), and specifically to provide the Court with an explanation as to the nature HP's business relationship (since the fall of 2006) with the Defendant and Counterclaim Plaintiff in the underlying action, Platform Solutions Inc. ("PSI"). All matters stated herein are of my own personal knowledge, and if called as a witness, I could and would competently testify thereto.

2.      I have worked at HP since the company acquired Compaq (my previous employer) in approximately 2002. During my tenure at HP, I have worked in various capacities in connection with HP's Business Critical Systems ("BCS") global business unit. BCS is part of HP's Enterprise System Solutions group ("ESS"), which is a subgroup of the Technology Systems Group ("TSG"). TSG is one of HP's three major businesses, which provides business products including storage and servers, as well as managed services and software.

3.      In my current position, I develop business programs for HP's channel partners—*i.e.*, entities that sell or resell HP computing systems. I have been in that position since approximately July, 2007. Prior to occupying my current position, I was employed as a Partner Program Manager for HP's Enterprise Solutions Alliances (ESA), which was also part of TSG. The primary alliance that I managed from the time I joined HP through June 2007 was with Intel. The alliance related to joint marketing activity between HP and Intel around the Itanium architecture and HP's Integrity server products.

4.      During my tenure in the Enterprise Solutions Alliances group, I came to learn that PSI had been developing microcode to enable users of Itanium-based servers (such as HP's Integrity servers) to run an IBM Operating System ("OS") and

Gibson, Dunn &
Crutcher LLP

**HOWARD DECLARATION IN SUPPORT OF**                    **CASE NO. C 07-80174-RMW (PVT)**
**MOTION TO MODIFY SUBPOENA /**
**FOR PROTECTIVE ORDER**

IBM applications on those servers.  Through my work in ESA, I also came to learn in approximately 2006, that PSI was a standard authorized reseller of select HP products (including HP Integrity servers), and, that in approximately October 2006, REDACTED REDACTED    REDACTED    REDACTED  An authorized reseller of HP products is only one of the several different types of channel partners that HP utilizes to sell products to various customer groups.  HP also works with:  (1) retailers; (2) distribution partners that supply HP solutions to smaller resellers with which we do not have direct relationships; (3) independent distributors that sell HP products into geographies or customer segments in which HP has little or no presence; (4) original equipment manufacturers ("OEMs") that integrate HP products with their own hardware or software and sell the integrated products; (5) independent software vendors ("ISVs") that provide their clients with specialized software products; and (6) systems integrators that provide various levels and kinds of expertise in designing and implementing custom IT solutions.  During the time period 2006 to the present, HP has been a party to channel partner agreements with thousand of companies.

5.    During part of the time that I worked as a Partner Program Manager (from the fall of 2006 thought mid-2007), I was a regular HP point of contact for the PSI relationship, and thus, I interacted on an as-needed basis with representatives from PSI.  PSI came under my purview in the fall of 2006, at which time I was specifically introduced to PSI as the HP Partner Manager who was tasked with assuring that all of HP's standard reseller support mechanisms and channels of contact were properly set up and maintained for PSI.  Based on my experience during that time, REDACTED    REDACTED REDACTED  it treated PSI just as it would any other authorized reseller of HP servers.

**HOWARD DECLARATION IN SUPPORT OF**                                    **CASE NO. C 07-80174-RMW (PVT)**
**MOTION TO MODIFY SUBPOENA /**
**FOR PROTECTIVE ORDER**

6.      During part of the time that I worked as a Partner Program Manager, PSI's status as an authorized reseller of HP's server products meant that PSI had a contractual agreement with HP to sell certain HP products and services in a particular geographic area for a specified period of time.  Pursuant to its reseller agreement with PSI, HP provides a warranty for its own HP-branded hardware and services, but does not provide one for non-HP branded products and services separately developed and/or provided by PSI, nor does HP otherwise make representations as to the validity, performance, etc. of such products or services.  In fact, pursuant to its standard reseller agreements, HP specifically does not warrant any third party products, services or support even if they are included with an HP branded product. Additionally, HP's reseller agreement with PSI expressly provides that it does not establish a franchise, partnership, joint venture, or agency relationship between HP and PSI in connection with the agreement.

7.      PSI is also currently a member of HP's Developer & Solution Partner Program (DSPP).  DSPP is HP's worldwide program for independent software vendors, software developers, system integrators, and consultants, by which it provides support—*e.g.*, training, courses, technical support (such as access to an email box for partners to ask an HP agent support questions), webinars, mailings, etc.—for entities seeking to develop and demonstrate their software on HP hardware. DSPP membership requirements (for companies) include:  (a) the provision of a company profile information, current email and phone number of one primary contact and acceptance of the program terms in the DSPP contracts; (b) having at least one product or service commercially available on, or a plan on porting to an HP platform;  (c) maintenance of all current company and contact information and entries within the partner product catalog; and (d) having a product, or service, that supports HP.  HP's agreements with DSPP partners do not obligate either party to use or market products developed by the other party and also expressly provide that

Gibson, Dunn &
Crutcher LLP

**HOWARD DECLARATION IN SUPPORT OF**                                                     **CASE NO. C 07-80174-RMW (PVT)**
**MOTION TO MODIFY SUBPOENA /**
**FOR PROTECTIVE ORDER**

1  no relationship of agency, partnership, joint venture, legal representation or other

2  form of association with HP or HP's products is intended by or may be claimed by

3  the partners in connection with the agreements.

4      8.    HP has DSPP agreements with companies in close to 100 countries in

5  numerous industries and has thousands of partners that provide server-related

6  technologies.  Thus, PSI's status as a DSPP member does not elevate it to any

7  heightened level of strategic significance in connection with HP's products or in

8  comparison to any other partner offerings that could be used as an alternative to a

9  mainframe solution.

10

11     I declare under penalty of perjury under the laws of the State of California and

12  the United States of America that the foregoing is true and correct.  Executed this

13  28 th day of April 2008 at Sudbury, Massachusetts.

14                              By: _____

15                                   Stephen Howard

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**HOWARD DECLARATION IN SUPPORT OF**
**MOTION TO MODIFY SUBPOENA /**
**FOR PROTECTIVE ORDER**

**CASE NO. C 07-80174-RMW (PVT)**

# EXHIBIT 4

1
GIBSON, DUNN & CRUTCHER LLP
JEFFREY T. THOMAS, SBN 106409
2
JTthomas@gibsondunn.com
3
3161 Michelson Dr.
Irvine, California 92612-4412
4
Telephone: (949) 451-3800
Facsimile: (949) 451-4220
5

6
ANGELIQUE KAOUNIS, SBN 209833
AKaounis@gibsondunn.com
7
333 South Grand Ave.
Los Angeles, California 90071-3197
8
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
9

10
Attorneys for Nonparty
HEWLETT-PACKARD COMPANY

11

UNITED STATES DISTRICT COURT
12

FOR THE NORTHERN DISTRICT OF CALIFORNIA
13

SAN JOSE DIVISION
14

15
| | |
|---|---|
| *In re* IBM 30(b)(6) Deposition Subpoena in the matter of: | CASE NO. C07-80174 RMW (PVT) |
| | Underlying action pending in the United States District Court for the Southern District of New York, CASE NO. CV 06-13565 SCR |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Plaintiff and Counterclaim Defendant, | **DECLARATION OF ANGELIQUE KAOUNIS IN SUPPORT OF NONPARTY HEWLETT-PACKARD COMPANY'S MOTION TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER [WITH REDACTED EXHIBITS FOR FILING PURSUANT TO L.R. 79-5]** |
| v. | |
| PLATFORM SOLUTIONS, INC., | |
| Defendant and Counterclaimant. | [Notice of Motion, Motion, Memo. of Points and Authorities; Declarations of Stephen Howard and John Pickett; Request for Judicial Notice in Support hereof; and [Proposed] Order filed concurrently herewith] |
| | Date:     June 3, 2008<br>Time:     10:00 a. m.<br>Place:     Courtroom 5<br>Before:     The Honorable Patricia V. Trumbull |

28

**KAOUNIS DECLARATION IN SUPPORT OF NONPARTY HEWLETT-PACKARD COMPANY'S MOTION TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER**

I, ANGELIQUE KAOUNIS, hereby declare as follows:

1.      I am an attorney licensed to practice in the State of California and before this Court, and I am an associate at the law firm of Gibson, Dunn, & Crutcher LLP ("Gibson Dunn"), attorneys of record for Nonparty Hewlett-Packard Company ("HP").  I make this declaration in support of *HP's Motion to Modify Subpoena and for a Protective Order* ("HP's Motion"), filed concurrently herewith.  All matters stated herein are of my own personal knowledge and, if called as a witness, I could and would competently testify thereto.

2.      This matter arises out of International Business Machines' ("IBM") March 10, 2008 issuance of a 30(b)(6) deposition subpoena (the "Subpoena") to nonparty HP in the underlying action entitled *International Business Machines v. Platform Solutions Inc*. (S.D.N.Y. CASE NO. CV 06-13565 SCR) ("*IBM v. PSI*").  Attached hereto as Exhibit A is a true and correct copy of IBM's March 10, 2008 Subpoena.

3.      Attached hereto as Exhibit B is a true and correct copy of the *Redacted Amended Civil Complaint* (without exhibits) filed by IBM against Platform Solutions, Inc. ("PSI") on August 17, 2007, in the matter entitled *IBM v. PSI*.

4.      Attached hereto as Exhibit C is a true and correct copy of *Platform Solutions, Inc.'s Redacted Amended Counterclaims to International Business Machines Corporation's Complaint* filed by PSI against IBM on February 8, 2008, in the matter entitled *IBM v. PSI*.

5.      I have worked as outside counsel for HP on several matters during my employment at Gibson Dunn and am familiar with the locations of many of the HP offices throughout the United States.  HP is headquartered at 3000 Hanover St., Palo Alto, California.

6.      During Gibson, Dunn's representation of HP, I have had the opportunity to work with numerous people in different areas of HP's business, including the Imaging and Printing Group and the Technology Solutions Group (the group that oversees the portion of HP's business that includes products such as storage and servers, managed services and software).  I have dealt with hardware and software engineers, and individuals who work in departments such marketing, human factors engineering, strategy and corporate development, finance, legal and IT.  I have also

1

**KAOUNIS DECLARATION IN SUPPORT OF NONPARTY HEWLETT-PACKARD COMPANY'S MOTION TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER**

reviewed thousands of HP documents in my work for the company.  I am thus familiar with how HP maintains the confidentiality of certain types of materials, and which materials, as a general policy, warrant confidential treatment.  HP protects its intellectual property and confidential proprietary materials in part because it invests a significant amount of capital in research and development each year.  Because HP is a technology company, and because it invests a significant amount of capital in research and development each year, it is the company's policy when involved in litigation to use a strict Protective Order that has a confidentiality designation of "outside counsels' eyes only" for highly confidential proprietary or trade secret information.  In this case, I personally negotiated Protective Orders with IBM, PSI and T3T (the parties to the underlying litigation), and all three Protective Orders provide for this type of "two-tiered" confidentiality designations.  In the case of the Protective Orders with PSI and T3T, there is no provision which allows any PSI or T3T employee to see documents marked "OUTSIDE COUNSEL'S EYES ONLY."  In the case of the Protective Order negotiated with IBM, IBM may disclose HP's Confidential Information designated "OUTSIDE COUNSEL'S EYES ONLY" to two (2) identified in-house legal counsel, provided that those in-house counsel have no involvement in competitive decision-making or patent prosecution, and agree to abide by the Protective Order.

7.      HP has ongoing business relationships with the parties to the *IBM v. PSI* lawsuit, but is not a party to the underlying litigation.  Among other things, PSI is an authorized reseller of HP Integrity servers, and HP and IBM are parties to a patent cross-licensing agreement.  IBM and HP are also competitors in the markets for desktop and laptop computers, server hardware, and related services and products.

8.      Over the last year, HP has been served with seven separate subpoenas for documents and testimony in this case, and has produced approximately 25,000 pages of documents, as well as an extensive privilege log in connection with this production.

9.      On February 14, 2008, I received a letter from Katherine Weall, counsel for IBM, stating that IBM intended to seek the 30(b)(6) deposition of witness(es) from HP on 13 proposed deposition topics.  Attached hereto as Exhibit D is a true and correct copy of Ms. Weall's February 14, 2008 letter.

KAOUNIS DECLARATION IN SUPPORT OF NONPARTY HEWLETT-PACKARD COMPANY'S MOTION
TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER

10.     Immediately upon receipt of the February 14, 2008 letter, I began investigating if and how HP could respond to the proposed 30(b)(6) topics and who, if anyone, would be an appropriate person to provide testimony on the various proposed topics outlined in the letter.

11.     On February 19, 2008, I sent Ms. Weall an email to confirm that I would accept service on behalf of HP, but also to alert her that HP considered a number of the topics outlined in IBM's proposal to be overbroad and otherwise objectionable.  I requested that IBM narrow its proposed topics (keeping in mind that HP is a nonparty).  Attached hereto as Exhibit E is a true and correct copy of the email I sent to Ms. Weall on February 19, 2008.  Exhibits E, F, G, N, O, P, Q, and R (discussed herein) are portions of longer email chains.  For the Court's ease of reference, these emails have been broken out into separate exhibits.

12.     Two days later, on February 21, 2008, Ms. Weall responded to my February 19, 2008 request and again asked nonparty HP to narrow the scope of IBM's proposed subpoena topics. Attached hereto as Exhibit F is a true and correct copy of the email I received from Ms. Weall on February 21, 2008.

13.     On February 26, 2008, I sent Ms. Weall an email indicating that HP would not undertake the burden of narrowing IBM's proposed topics for IBM's own subpoena.  Attached hereto as Exhibit G is a true and correct copy of the email I sent to Ms. Weall on February 26, 2008.

14.     Ms. Weall responded to my February 26, 2008 email with a letter on February 29, 2008, which reiterated IBM's request that HP rewrite IBM's proposed subpoena topics.  Attached hereto as Exhibit H is a true and correct copy of the letter I received from Ms. Weall on February 29, 2008.

15.     On March 5, 2008, Eric Raines, a Gibson Dunn associate and outside counsel for HP (who is working on this case with me), sent Ms. Weall a letter again requesting that IBM tailor its proposed list of subpoena topics, rather than imposing this burden on HP.  The letter also reiterated that HP was willing to meet and confer about the scope of the proposed 30(b)(6) subpoena topics once IBM had made such revisions.  Attached hereto as Exhibit I is a true and correct copy of the letter from Mr. Raines to Ms. Weall dated March 5, 2008.

Gibson, Dunn &
Crutcher LLP

3

KAOUNIS DECLARATION IN SUPPORT OF NONPARTY HEWLETT-PACKARD COMPANY'S MOTION
TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER

16.    On March 7, 2008, Ms. Weall sent a letter to Mr. Raines rejecting his proposal and once again implying that it was HP's burden to revise IBM's proposed 30(b)(6) subpoena topics. Attached hereto as Exhibit J is a true and correct copy of the letter Mr. Raines and I received from Ms. Weall on March 7, 2008.

17.    On March 10, 2008, IBM served HP with its Subpoena. The Subpoena contains the exact same set of proposed topics set forth in Ms. Weall's February 14, 2008 letter. In addition, the Subpoena does not contain any temporal or geographic limitations, despite the fact that HP had previously notified IBM of this deficiency in connection with IBM's proposed 30(b)(6) topics.

18.    In response to IBM's Subpoena, HP continued to investigate the information it would be able to provide in response to the Subpoena and who might be the appropriate person(s) to testify as to each topic. Mr. Raines contacted Ms. Weall on March 17, 2008 via letter to propose that the parties work together to negotiate the scope of HP's response to the Subpoena. Attached hereto as Exhibit K is a true and correct copy of the letter Mr. Raines sent to Ms. Weall on March 17, 2008, on which I was copied.

19.    IBM responded via email on March 18, 2008 agreeing to meet and confer, and the parties thereafter scheduled a conference call to discuss the scope of the deposition topics in IBM's Subpoena. The parties (including myself and Mr. Raines on HP's behalf) held that meet and confer discussion via telephone on March 21, 2008, during which the parties' counsel discussed each proposed category of testimony. For the majority of topics in IBM's Subpoena, HP proposed either to provide a written response, documentation or a witness.

20.    In accordance with IBM's request during the March 21, 2008 meet and confer telephone call, and in a good faith effort to reach an agreement concerning the Subpoena, HP sent IBM a letter on March 28, 2008 formalizing its proposals, and also including information on certain topics about which it had discovered further information that was not available prior to the March 21, 2008 telephone call. Attached hereto as Exhibit L is a true and correct copy of the letter I sent to Ms. Weall on March 28, 2008.

21.    On April 9, 2008, Ms. Weall sent a further meet and confer letter in which she stated, with regard to Topic Nos. 3, 6, and 8, that IBM sought "testimony regarding actual or

1  potential competition faced by HP's servers, particularly insofar as they compete with IBM's

2  zSeries and S/390 servers."  In this same letter, IBM withdrew its request for testimony on the

3  portion of Topic No. 8 relating to OEMs.  Attached hereto as Exhibit M is a true and correct copy

4  of the letter I received from Ms. Weall on April 9, 2008.

5        22.    The parties (including myself and Mr. Raines on HP's behalf) held another

6  telephonic meet and confer discussion on April 9, 2008, during which the parties' counsel further

7  clarified the scope of each requested topic.  On April 10, 2008, I sent an email to Ms. Weall

8  summarizing that conversation and setting forth HP's position as to each topic.  Attached hereto as

9  Exhibit N is a true and correct copy of that April 10, 2008 email.

10       23.    The parties (including myself and Mr. Raines on HP's behalf) held an additional

11 telephonic meet and confer discussion on April 15, 2008, during which each of the proposed topics

12 was further discussed.  As a result of that discussion, the parties came to an agreement that an HP

13 witness would not be required to testify as to the granular or specific client-related details of Topic

14 Nos. 1-8, and would not be expected to discuss specific communications, documents, components

15 of HP's mainframe alternative solutions, or client or ISV relationships.  Rather, HP's witness might

16 be asked to comment on whether a particular communication, document, component, or

17 relationship would be consistent or inconsistent with HP's understanding and strategy at a broader

18 level.  *See* Exhibit O *infra*.

19       24.    On April 17, 2008, I sent Jonathan Oblak, counsel for IBM, an email summarizing

20 our April 15, 2008 discussion and setting forth HP's position with respect to each topic.  Attached

21 hereto as Exhibit O is a true and correct copy of that April 17, 2008 email, which Mr. Oblak

22 responded to on April 22, 2008 (as set forth in Exhibit O).

23       25.    The parties held another meet and confer discussion on Monday, April 21, 2008,

24 during which it became apparent that the parties disagreed as to the appropriate timeframe with

25 respect to the deposition topics, as well as to the scope of deposition Topic No. 7.  HP took the

26 position that the relevant time period is 2004-2006, whereas IBM stated that the relevant time

27 period should extend from 2003 through 2008.

28

Gibson, Dunn &
Crutcher LLP

5

26.     On April 23, 2008, Mr. Oblak emailed me and indicated that IBM was unable to agree to HP's time period limitations.  Attached hereto as Exhibit P is a true and correct copy of that April 23, 2008 email.

27.     On April 24, 2008, I emailed Mr. Oblak with HP's final offer.  HP offered to proceed with the depositions limited to the 2003-2006 time period, with an exception for testimony on publicly available information that post-dated 2006 for several of the topics.  Specifically, I offered on HP's behalf, to provide a witness who could testify regarding current publicly available information reflecting HP's provision of mainframe alternative solutions and HP's attempts to migrate customers off of IBM mainframes and onto HP hardware.  HP has also offered to provide a witness who can authenticate the web pages containing this publicly available information.  Attached hereto as Exhibit Q is a true and correct copy of that April 24, 2008 email.

28.     On April 25, 2008, Mr. Oblak emailed me and indicated that HP's offer was not acceptable, but did not specifically articulate why HP's confidential information is relevant and necessary to defend against PSI's claims, and why the publicly available information is insufficient to serve this purpose.   He also stated that IBM is unwilling to limit the scope of its 2007-2008 inquiries to public information.  Attached hereto as Exhibit R is a true and correct copy of that April 25, 2008 email.  The non-public 2007-2008 information regarding HP's provision of mainframe alternative solutions and HP's attempts to migrate customers off of IBM mainframes and onto HP hardware reflects highly sensitive competitive information such as current strategic planning information and analyses of market dynamics, that HP, as a rule, would not willingly disclose to a competitor or potential competitor.

29.     IBM's own documents show that it focuses its competitive efforts against HP's Integrity server, the same family of hardware that PSI sold in connection with its mainframe alternative solution.  Attached hereto as Exhibit S is a true and correct copy of a PowerPoint presentation entitled *z9 Enterprise Class and HP Integrity Superdome - Features Overview and Comparison, IBM, July 2007,* which I downloaded from IBM's website at http://www-07.ibm.com/systems/includes/content/z/about/HPSuperdome_vs_z9EC_07272007.pdf on April 9, 2008.

Gibson, Dunn &
Crutcher LLP

**KAOUNIS DECLARATION IN SUPPORT OF NONPARTY HEWLETT-PACKARD COMPANY'S MOTION
TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER**

30.    Attached hereto as Exhibit T is a true and correct copy of a December 17, 2007 press release issued by PSI entitled *Platform Solutions Inc. Announces Reseller Agreement with NEC for Mainframe-Class Itanium 2 Servers*, which I downloaded from PSI's website at http://www.platform-solutions.com/news/PSI_NEC_Announcement_Final.pdf on April 28, 2008.

31.    Attached hereto as Exhibit U is a true and correct copy of the docket report in *International Business Machines Corporation v. Platform Solutions, Inc.*, Case No. CV 06-13565 SCR (S.D.N.Y), which I downloaded from the PACER website serving the U.S. District Court for the Southern District of New York at https://ecf.nysd.uscourts.gov/cgi-bin/login.plon on June 1, 2007.

I declare under penalty of perjury under the laws of the United States and the state of California that the foregoing is true and correct.  Executed this 29th day of April 2008 at Los Angeles, California.

By: _____
Angelique Kaounis

100422866_1.DOC

**KAOUNIS DECLARATION IN SUPPORT OF NONPARTY HEWLETT-PACKARD COMPANY'S MOTION TO MODIFY SUBPOENA AND FOR A PROTECTIVE ORDER**

Gibson, Dunn & Crutcher LLP

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

INTERNATIONAL BUSINESS
MACHINES CORPORATION,

        Plaintiff,

    -vs.-

PLATFORM SOLUTIONS, INC., and
T3 TECHNOLOGIES, INC.,

        Defendants.

Civil Action No. 06 CV 13565 (CLB)

### IBM'S RULE 30(b)(6) DEPOSITION NOTICE TO HP

PLEASE TAKE NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Plaintiff International Business Machines Corporation ("IBM") will depose Hewlett-

Packard Development Company, LP ("HP") on April 12, 2008 or such other date agreed to by

the parties.  The deposition shall take place at the offices of Quinn Emanuel Urquhart Oliver &

Hedges, LLP, 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065, or according to

alternative arrangements upon which the parties jointly agree.  The deposition shall be recorded

by videotape, audiotape, and stenographic recording.

HP shall designate one or more of its officers, directors, managing agents, or other

persons who consent to testify on HP's behalf as to all matters known or reasonably available to

HP with respect to the Topics of Examination set forth in the attached Exhibit.

1

DATED:    New York, New York
          March 10, 2008

                          QUINN EMANUEL URQUHART OLIVER &
                              HEDGES, LLP


                          By _____


                          Richard I. Werder, Jr. (RW-5601)
                          Philippe Z. Selendy (PS-6972)
                          Jonathan B. Oblak (JO-5340)
                          Katherine J. Weall (KW-7389)
                          51 Madison Avenue
                          22nd Floor
                          New York, New York  10010-1601
                          (212) 849-7000

                          Frederick A. Lorig
                          865 S. Figueroa Street
                          Los Angeles, California  90017
                          (213) 443-3000

                          Attorneys for Plaintiff
                          International Business Machines Corporation

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### Northern District of California

International Business Machines Corporation

V.

Platform Solutions, Inc., T3 Technologies, Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  06-CV-13565 (CLB) (SDNY)

TO:  Hewlett Packard Develpoment Company, LP, C/O Angelique
Kaounis, Gibson, Dunn & Crutcher, LLP, 333 South Grand
Avenue, Los Angeles, CA 90071 (213) 229-7000

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  Quinn Emanuel Urquhart Oliver & Hedges, LLP, 555 Twin Dolphin Drive, Suite 560, Redwood Shores, CA 94065 | DATE AND TIME  4/15/2008 9:30 am |
|---|---|

☐  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]* | 3/10/2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Katherine Weall, Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, (212) 849-7000 Attorneys for Plaintiff International Business Machines Corporation

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO 88  (Rev.  12/07) Subpoena in a Civil Case (Page 2)

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____       _____
                          DATE                                        SIGNATURE OF SERVER

                                                  _____
                                                  ADDRESS OF SERVER

---

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.
    (1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
    (2) Command to Produce Materials or Permit Inspection.
        (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
        (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
            (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
            (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
    (3) Quashing or Modifying a Subpoena.
        (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
            (i) fails to allow a reasonable time to comply;
            (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
            (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
            (iv) subjects a person to undue burden.
        (B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify a subpoena if it requires:
            (i) disclosing a trade secret or other confidential research, development, or commercial information;
            (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
            (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
        (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

            (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
            (ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.
    (1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
        (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
        (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
        (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
        (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
    (2) Claiming Privilege or Protection.
        (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
            (i) expressly make the claim; and
            (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
        (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.
    The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey may be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# EXHIBIT

## DEFINITIONS AND INSTRUCTIONS

A.    "HP" shall refer to Hewlett-Packard Company, and its officers, directors, employees, agents, associates, parents, subsidiaries, affiliates, predecessors, successors, and persons or entities acting for or on its behalf or at its direction.

B.    "HP Personnel" shall mean any present or past agent, attorney, employee, employer, officer, director, consultant, subcontractor, or any other person acting on behalf of or purporting to act on behalf of HP at any time.  This term is not limited to persons working directly for HP, but shall encompass persons working for, without limitation, HP's business partners, subsidiaries, predecessors, technology providers and other similar entities.

C.    "PSI" shall refer to Platform Solutions, Inc. and its officers, directors, employees, agents, associates, parents, subsidiaries, affiliates, predecessors, successors, and persons or entities acting for or on its behalf or at its direction.

D.    "PSI Personnel" shall mean any present or past agent, attorney, employee, employer, officer, director, consultant, subcontractor, or any other person acting on behalf of or purporting to act on behalf of PSI at any time.  This term is not limited to persons working directly for PSI, but shall encompass persons working for, without limitation, PSI's business partners, subsidiaries, predecessors, technology providers and other similar entities.

E.    HP's "Mainframe Alternative Consolidation solutions" shall have the meaning imputed to it on HP's website.[1]

---

[1]    *See, e.g.,* http://h71028.www7.hp.com/enterprise/cache/151824-0-0-225-121.html?jumpid=reg_R1002_USEN, and related areas of HP's website, last visited January 3, 2008.

F.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

G.    "Concerning" means relating to or referring to.

H.    "Referring to," "relating to," or "regarding" means concerning, containing, describing, discussing, embodying, commenting upon, identifying, incorporating, summarizing, constituting, comprising or otherwise pertinent to the matter or any aspect thereof.

I.    The terms "all" and "each" shall be construed as "all and each."

J.    The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

K.    The use of the singular form of any word includes the plural and vice versa.

4

## TOPICS OF EXAMINATION

1.      HP's relationship with PSI, including but not limited to HP's communications and/or dealings with PSI, HP's objectives in communicating and/or dealing with PSI, HP's technical assistance to PSI, and any partnership, whether formal or informal, between HP and PSI.

2.      HP's **REDACTED**   **REDACTED**   including, without limitation, the r

3.      HP microprocessors sold for use in servers that compete with IBM's zSeries servers and S/390 servers, including, without limitation, the processing power, cost and capabilities of such microprocessors and the customers that use such microprocessors.

4.      HP's Mainframe Alternative Consolidation solutions.

5.      HP's marketing of and participation in mainframe migration strategies.

6.      Actual or potential competition for customers and workloads between IBM z/Series and/or S/390 computer servers and computer servers incorporating HP microprocessors.

7.      Whether and to what extent HP believes that end-users of IBM mainframes are "locked-in" to continued use of IBM mainframes, including, without limitation, the reason(s) any such lock-in exists; the specific end users whom HP believes are "locked-in;" and HP's response to claims that end users of IBM mainframes are "locked-in."

8.      The success of HP and OEMs in marketing servers incorporating HP microprocessors to enable partial or total migration of workloads off of IBM mainframes.

9.      HP's present and past use of IBM and/or IBM-compatible mainframes; the extent to which HP has moved its workloads off of IBM and/or IBM-compatible mainframes to other platforms, and whether and to what extent HP concluded that it was incapable of migrating any workloads that it was running on IBM mainframes or IBM-compatible mainframes to other platforms.

10.     The Itanium Solutions Alliance ("ISA"), including, without limitation, the objectives of the ISA and HP's role in founding, promoting, and/or participating in the ISA.

11.     The Mainframe Migration Alliance ("MMA"), including, without limitation, the activities or objectives of the MMA and HP's role in founding, promoting and or participating in the MMA.

5

12.      Any documents relating to this action.

13.      The five persons at HP most knowledgeable concerning each of the foregoing topics.

# EXHIBIT D

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7197**

WRITER'S INTERNET ADDRESS
**katherineweall@quinnemanuel.com**

February 14, 2008

<u>VIA EMAIL AND UNITED STATES POSTAL SERVICE</u>

Angelique Kaounis
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071-3197

Re:    <u>International Business Machines Corporation v. Platform Solutions, Inc.</u>
       Civil Action No. 06 CV 13565

Dear Angelique:

I write to advise that International Business Machines Corporation ("IBM") intends to seek the 30(b)(6) deposition of a witness or witnesses from Hewlett-Packard Corporation ("HP"), and to request your assistance in scheduling a mutually convenient time and place for that deposition.

We envision the deposition covering the following topics, with the relevant timeframe being 1999 to the present:

1.     HP's relationship with PSI, including but not limited to HP's communications and/or dealings with PSI, HP's objectives communicating and/or dealing with PSI, HP's technical assistance to PSI, and any partnership, whether formal or informal, between HP and PSI.

2.     REDACTED    REDACTED

3.     HP microprocessors sold for use in servers that compete with IBM's zSeries servers and S/390 servers, including, without limitation, the processing power, cost and capabilities of such microprocessors and the customers that use such microprocessors.

4.     HP's Mainframe Alternative Consolidation solutions.

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

5.      HP's marketing of and participation in mainframe migration strategies.

6.      Actual or potential competition for customers and workloads between IBM z/Series and/or S/390 computer servers and computer servers incorporating HP microprocessors.

7.      Whether and to what extent HP believes that end users of IBM mainframes are "locked-in" to continued use of IBM mainframes, including, without limitation, the reason(s) any such lock-in exists; the specific end users whom HP believes are "locked in;" and HP's response to claims that end users of IBM mainframes are "locked in."

8.      The success of HP and OEMs in marketing servers incorporating HP microprocessors to enable partial or total migration of workloads off of IBM mainframes.

9.      HP's present and past use of IBM and/or IBM-compatible mainframes; the extent to which HP has moved its workloads off of IBM and/or IBM-compatible mainframes to other platforms and whether and to what extent HP concluded that it was incapable of migrating any workloads that it was running on IBM mainframes or IBM-compatible mainframes to other platforms.

10.     The Itanium Solutions Alliance ("ISA"), including, without limitation, the objectives of the ISA and HP's role in founding, promoting, and/or participating in the ISA.

11.     The Mainframe Migration Alliance, including without limitation the activities and objectives of the MMA and HP's role in founding, promoting, and/or participating in the MMA.

12.     Any documents relating to this action.

13.     The identity of the five persons at HP most knowledgeable concerning each of the foregoing topics.

Please call me at your earliest convenience so that we can discuss a suitable witness, time, and place for the deposition. In addition, please confirm that you will accept service of a 30(b)(6) subpoena to HP on its behalf.

Very truly yours,

Katherine J. Weall

- 2 -

# EXHIBIT H

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.
(212) 849-7197

WRITER'S INTERNET ADDRESS
katherineweall@quinnemanuel.com

February 29, 2008

**VIA ELECTRONIC AND FIRST CLASS MAIL**

Angelique Kaounis, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197

Re:     IBM in IBM v. Platform Solutions, Inc., Case No. 06-13565 (CLB)

Dear Ms. Kaounis:

I write in reference to Eric Raines' email of February 27, 2008, which was copied to you, regarding International Business Machines Corporation's ("IBM's") request for a 30(b)(6) deposition from a witness from Hewlett Packard Corporation ("HP").

Although we appreciate that HP is a third party in this case, it is hardly a "typical" third party in a litigation such as this one. As you know, HP has been very heavily involved, for a number of years, with key aspects of the development of the Platform Solutions, Incorporated ("PSI") product at issue in this case,

REDACTED     REDACTED     REDACTED

REDACTED     REDACTED

In light of HP's substantial involvement with PSI and in issues that go to the heart of the above-captioned case, we respectfully disagree with HP's assertion that IBM is "almost certainly in a better position to trim the 30(b)(6) topics in a manner that calls for the testimony that [IBM] most need[s] from HP." 02/27/08 Raines Email. IBM believes that all of the proposed 30(b)(6) topics are relevant, likely to lead to the discovery of admissible evidence in this case, and does

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

not believe that the list is overly-burdensome to a third-party that has played such a significant role heretofore.

As it is HP that has objected to the purported "over-breadth" of the deposition topics, IBM has given HP the opportunity to voice specific objections to those topics, and to propose a mutually acceptable list of alternative topics, without having to resort to motion practice. While IBM is certainly willing to consider narrowing the scope of its subpoena, HP is clearly in the best position to assess what information it possesses and the burden associated with producing a knowledgeable witness or witnesses. Accordingly, we again respectfully request that HP proposes what it believes is a list of topics that is not "over-broad."

In the meantime, IBM will issue shortly a formal 30(b)(6) subpoena to HP.

Yours truly,

Katherine J. Weall

# EXHIBIT L

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

AKaounis@gibsondunn.com

March 28, 2008

Direct Dial
(213) 229-7137

Fax No.
(213) 229-6137

Client No.
T 38126-00565

## VIA EMAIL AND U.S. MAIL

Katherine J. Weall, Esq.
Quinn Emanuel Urquhart
Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Re:    *IBM v. PSI*

Dear Ms. Weall:

I write to follow up on our meet and confer call of last Friday, and to give you greater detail on some of the proposals I offered on HP's behalf during that call. Also, with respect to a few of the categories in IBM's 30(b)(6) subpoena, we have further investigated the extent to which HP is able to provide information in response to IBM's subpoena, and thus I provide that information below as well.

We make these proposals while reserving all rights with respect to the scope of IBM's subpoena. As written, every one of the topics proposed in the subpoena lacks the reasonable particularity required by Federal Rules of Civil Procedure 30(b)(6). Additionally, nearly half of the topics in IBM's subpoena contain the phrases "including but not limited to" or "including, without limitation." This language has been rejected as overbroad and improper in the context of a 30(b)(6) subpoena. *See, e.g., Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237, 240 (S.D.N.Y. 2002); *Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000). Moreover, several of the topics call for testimony regarding the ultimate facts of your case with PSI or seek to elicit what can be classified as opinion or expert testimony. We object to these topics on those grounds and based on the burden they would impose as written. *See Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 426-427 (D.N.C. 2005) (suggesting that a court should "give extra consideration to the objections of a non-party, non-fact witness in weighing

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO
LONDON  PARIS  MUNICH  BRUSSELS  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

# GIBSON, DUNN & CRUTCHER LLP

Katherine Weall, Esq.
March 28, 2008
Page 2

burdensomeness versus relevance.").  In the interest of addressing these issues informally, we hope that you will continue to work with us to tailor the subpoena appropriately.

In an effort to reach an informal agreement, in accordance with the request that you made during our March 21 meet and confer, we have attempted to narrow the subpoena's topics so that the subpoena calls for only that which we believe is relevant to your case.  We look forward to your response to our proposal, and of course we will consider counterproposals in line with what we have set forth below.

You also asked us to propose a briefing schedule, in the event that we were unable to resolve our differences informally.  To accommodate your discovery cut-off, we propose that any Motion related to IBM's 30(b)(6) subpoena be filed by April 8th, with any Opposition due by April 22nd and any Reply due by April 29th.  Please let me know if this works with your schedule—we are happy to push this back a week or two if this would provide the parties an additional opportunity to narrow any disputed issues.  Also, we need to speak further to coordinate the time and place for any depositions.  I have also copied counsel for PSI and T3T in the hope that we can all meet and confer further regarding the scope of IBM's subpoena and the timing of any depositions.

In the interest of efficiency, I have classified our proposals according to the topics set forth in IBM's subpoena.

## TOPICS OF EXAMINATION

1. *HP's relationship with PSI, including but not limited to HP's communications and/or dealings with PSI, HP's objectives in communicating and/or dealing with PSI, HP's technical assistance to PSI, and any partnership, whether formal or informal, between HP and PSI.*

   HP's Proposal:  Keeping in mind that HP already has produced the relevant contracts detailing the relationship between HP and PSI for the time period at issue, HP offers the following:

   - A 30(b)(6) witness who can speak to the sales and marketing of HP's hardware in connection with PSI's solution during 2004-2006 for Banca della Marche, Lufthansa, Fidelity, LL Bean, and Estee Lauder, to the extent such efforts took place during that time period.

   - REDACTED   REDACTED

GIBSON, DUNN & CRUTCHER LLP

Katherine Weall, Esq.
March 28, 2008
Page 3

- A general written description of HP's technical assistance to PSI during 2004-2006 for Banca della Marche, Lufthansa, Fidelity, LL Bean, and Estee Lauder, to the extent such efforts took place during that time period.

The only aspects of HP's relationship with PSI that are possibly relevant to the case are: (1) the sales and marketing of HP's hardware in connection with PSI's solution; and (2) REDACTED REDACTED REDACTED We are offering to address each of these topics. HP cannot reasonably be expected to prepare a deponent on every single communication or "dealing" with PSI. We think HP's offer suggests a very practical solution to a request which on its face is not reasonably particularized as required by Federal Rule of Civil Procedure 30(b)(6). We hope you will seriously consider this offer.

2.

# REDACTED    REDACTED

- This is already addressed in HP's response to Topic No. 1.

3.    *HP microprocessors sold for use in servers that compete with IBM's zSeries servers and S/390 servers, including, without limitation, the processing power, cost and capabilities of such microprocessors and the customers that use such microprocessors.*

- This topic (as well as several others) is based on the incorrect assumption that HP manufactures microprocessors for the products at issue. Putting this aside, much of the information concerning microprocessors that HP uses is available publicly—for example, in specification sheets on HP's website.
  HP's Proposal: HP can provide a written list of microprocessors currently used in its hardware if IBM will identify the specific HP hardware for which it seeks this information (provided, of course, this is a reasonable number of items). However, HP is not certain that it can quantify the processing power of these microprocessors in a meaningful way. The power of these processors is measured according to several industry-standard benchmarks. It is unclear whether IBM mainframes have been tested according to the same benchmarks. As IBM is likely aware, if two processors have not been measured against the same benchmarks, one may not be capable of meaningfully comparing their performance. For your information, a list of benchmarks against which HP's Integrity hardware has been tested is available at: http://h20341.www2.hp.com/integrity/cache/514502-0-0-0-121.html?jumpid=reg_R1002_USEN. For IBM to obtain the most reliable data on this point, it would be best for it to consult this website and then go directly to the manufacturers of these processors for further information.

# GIBSON, DUNN & CRUTCHER LLP

Katherine Weall, Esq.
March 28, 2008
Page 4

- It would be excessively burdensome for HP to produce a list of all customers that use such microprocessors.

4.    *HP's Mainframe Alternative Consolidation solutions.*

- <u>HP's Proposal</u>:  HP has already offered to address PSI's solution within the larger context of HP's Mainframe Alternative offerings as set forth in HP's response to Topic No. 1.

- HP does not believe that the entirety of its Mainframe Alternative offerings are relevant to the instant litigation.  Moreover, it would be excessively burdensome for HP to prepare a 30(b)(6) witness to address every aspect of its Mainframe Alternative Solutions program.  Nonetheless, as discussed in Topic No. 3, HP is prepared to provide a written list of microprocessors that could be used as a "Mainframe Alternative."  To the extent IBM seeks additional information regarding HP's mainframe alternative consolidation solutions, we encourage you to visit HP's website at <u>http://h71028.www7.hp.com/enterprise/cache/151824-0-0-225-121.html?jumpid=reg_R1002_USEN</u>, where you will find information on a series of topics related to HP's Mainframe Alternative Solutions, including a general discussion of the benefits that HP believes that its Mainframe Alternative Solutions provide, success stories of clients using HP Mainframe Alternative Solutions, a list of Mainframe Alternative Solution components, and a list of HP's ISV partnerships.

5.    *HP's marketing of and participation in mainframe migration strategies.*

- <u>HP's Proposal</u>:  HP has already offered to address PSI's solution within the larger context of HP's participation in mainframe migration strategies in HP's response to Topic No. 1.

- HP does not believe that the entirety of its participation in mainframe mitigation strategies is relevant to the instant litigation.  Moreover, it would be excessively burdensome for HP to prepare a 30(b)(6) witness to address every aspect of its participation in mainframe mitigation strategies.  To the extent IBM seeks additional information regarding HP's marketing of and participation in mainframe migration strategies, we encourage you to visit HP's website at: <u>www.hp.com/go/offmainframes</u>, where you will find numerous articles and interviews with HP personnel on a series of topics related to this topic, including a general discussion of the advantages of migrating to HP, case studies of migration, migration resource articles, and much more.

# GIBSON, DUNN & CRUTCHER LLP

Katherine Weall, Esq.
March 28, 2008
Page 5

6. *Actual or potential competition for customers and workloads between IBM z/Series and/or S/390 computer servers and computer servers incorporating HP microprocessors.*

- HP is not in a position to address "potential" competition because, among other things, this topic is overly broad. Additionally, HP believes that its responses to Topic Nos. 1 and 4 address all relevant aspects of actual competition which are arguably necessary to elicit from HP.

- HP's Proposal: Presumably, IBM and HP are equally capable of identifying the competition outlined in this request. If IBM can identify specific instances of such competition that are relevant to the instant matter that are not already addressed in HP's responses to Topic Nos. 1 and 4, HP will consider giving additional written responses or testimony regarding the same.

7. *Whether and to what extent HP believes that end-users of IBM mainframes are "locked-in" to continued use of IBM mainframes, including, without limitation, the reason(s) any such lock-in exists; the specific end users whom HP believes are "locked-in;" and HP's response to claims that end users of IBM mainframes are "locked-in."*

- This topic appears to call for an expert or legal conclusion, particularly in light of your explanation that this terminology was lifted right from PSI's counterclaims in this matter. HP does not believe the Rule 30(b)(6) would require it to provide a response to this topic beyond what it has offered to provide in response to Topic Nos. 1 and 4.

8. *The success of HP and OEMs in marketing servers incorporating HP microprocessors to enable partial or total migration of workloads off of IBM mainframes.*

- HP's Proposal: The term "success" indicates that this topic is more appropriately addressed by an expert. Absent clarification of this term, HP will only respond to this topic as described above in response to Topic Nos. 1 and 4. Moreover, as with Topic No. 3, this topic is based on the incorrect assumption that HP manufactures microprocessors for the products at issue. Finally, this topic seeks information regarding other OEMs that is more appropriately directed to those individual companies and therefore this topic imposes an undue burden on HP.

GIBSON, DUNN & CRUTCHER LLP

Katherine Weall, Esq.
March 28, 2008
Page 6

9.  *HP's present and past use of IBM and/or IBM-compatible mainframes; the extent to which HP has moved its workloads off of IBM and/or IBM-compatible mainframes to other platforms, and whether and to what extent HP concluded that it was incapable of migrating any workloads that it was running on IBM mainframes or IBM-compatible mainframes to other platforms.*

- <u>HP's Proposal</u>: During our meet and confer, we asked you to clarify what specifically IBM was seeking by way of this request—*e.g.*, is IBM just looking for a list of instances in which HP—as opposed to a customer or partner of HP—was purportedly incapable of migrating any of its workloads from IBM mainframes to other platforms? You indicated that you would take this question back to your client. Please let us know IBM's response.

10. *The Itanium Solutions Alliance ("ISA"), including, without limitation, the objectives of the ISA and HP's role in founding, promoting, and/or participating in the ISA.*

- <u>HP's Proposal</u>: As I mentioned on our call, because this topic asks HP to produce a 30(b)(6) witness on the objectives of a wholly separate legal entity, we believe this is not an appropriate 30(b)(6) category. Nevertheless, HP will offer to produce a written response that describes HP's role in promoting, and/or participating in the ISA in 2005-2006.

11. *The Mainframe Migration Alliance ("MMA"), including, without limitation, the activities or objectives of the MMA and HP's role in founding, promoting and/or participating in the MMA.*

- HP is not a member of the Mainframe Migration Alliance, so it is unable to provide you with a 30(b)(6) witness on this topic.

12. *Any documents relating to this action.*

- <u>HP's Proposal</u>: During our meet and confer, you indicated that this topic was simply meant to cover authentication of documents that HP produced. We replied that HP would be willing to authenticate, to the extent it could, a reasonable number of documents that you identified by Bates range. This offer is still open.

# GIBSON, DUNN & CRUTCHER LLP

Katherine Weall, Esq.
March 28, 2008
Page 7

     13.     *The five persons at HP most knowledgeable concerning each of the foregoing*
           *topics.*

- HP believes that, according to Federal Rule of Civil Procedure 30(b)(6), it is
  only obligated to produce the identity of one person per reasonably
  particularized category, not five. HP has offered to produce a witness and/or
  written responses to many of the above-listed categories, but believes that
  requiring it to do anything further is unduly burdensome.

Again, our responses are subject to further meeting and conferring with you. In certain of
our responses, we have asked for further clarification, identified more appropriate sources for the
information you appear to seek, and suggested information that you can rely on to better tailor
IBM's subpoena. We look forward to continuing to work with you to resolve this matter
informally.

Very truly yours,

Angelique Kaounis

AK/cdd
cc:    Jeffrey T. Thomas
       Eric M. Raines
       Ryan Kirpatrick
       Elizabeth Walker
       David Patron
100414922_3.DOC

# EXHIBIT M

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7197**

WRITER'S INTERNET ADDRESS
katherineweall@quinnemanuel.com

April 9, 2008

<u>VIA ELECTRONIC AND FIRST CLASS MAIL</u>

Angelique Kaounis, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197

Re:    <u>IBM v. Platform Solutions, Inc.</u>, Case No. 06-13565 (LK)

Dear Ms. Kaounis:

I write in reference to your letter of March 28, 2008, which contained proposals for narrowing the scope of the topics proposed for International Business Machines Corporation's ("IBM's") 30(b)(6) deposition of a witness from Hewlett Packard Corporation ("HP").

Although we are still consulting with our client, we hope and expect that IBM and HP will be able to agree on a mutually acceptable scope for the 30(b)(6) topics.

In the interests of efficiency, I will respond to the categories outlined in your letter in the same order that you proposed them. The following proposals are made for the purpose of initiating a detailed further discussion, and with a full reservation of IBM's right to seek more extensive testimony if necessary.

**quinn emanuel urquhart oliver & hedges, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

## TOPICS OF EXAMINATION

1. **HP's relationship with PSI, including but not limited to HP's communications and/or dealings with PSI, HP's objectives communicating and/or dealing with PSI, HP's technical assistance to PSI, and any partnership, whether formal or informal, between HP and PSI.**

    While reserving its right to seek information from other time periods if necessary, IBM believes that the 2004-2006 timeframe proposed by HP for its response to this topic is acceptable at this time.

    IBM does not expect that HP will prepare a witness to testify to every individual communication or contact between PSI and HP. IBM considers topic 1 to cover three areas of relevance to its case against PSI: a) HP's sales and marketing of PSI's products; REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED and c) technical assistance HP provided PSI to assist it in the development of its product.

    Insofar as HP's sales and marketing of PSI's products is relevant to the antitrust counter-claims brought by PSI in this matter, confining testimony to the named set of customers proposed by HP would not provide the full scope of information required by IBM to defend against those claims. Accordingly, IBM proposes that HP provide a witness who can speak to HP's sales and marketing of PSI's products in general.

## REDACTED    REDACTED

    Finally, IBM seeks testimony regarding assistance that HP gave to PSI to assist it in developing its product, not, as stated in your letter, technical assistance relating to customers of PSI and/or HP. The nature, development and characteristics of PSI's product are significant questions in this case. Any development assistance provided to PSI by HP is absolutely relevant to these issues, and IBM requests that a witness give testimony on this topic.

## REDACTED    REDACTED

3. **HP microprocessors sold for use in servers that compete with IBM's zSeries servers and S/390 servers, including, without limitation, the processing power, cost and capabilities of such microprocessors and the customers that use such microprocessors.**

Thank you for your clarification that HP does not manufacture microprocessors. This will confirm that the intent of this request is to seek testimony regarding actual or potential competition faced by HP's servers, particularly insofar as they compete with IBM's zSeries and S/390 servers. For this reason, topic 3 would not be addressed by topic 1, which focuses on PSI. Testimony concerning HP's experience separate from its involvement with PSI and PSI's product is directly relevant to this case due to the antitrust counter-claims brought by PSI.

A recitation of detailed benchmarking and performance standards are not the focus of IBM's inquiry, and to the extent that HP produces a witness with knowledge of competition between and among the products identified above, that witness should be able to testify to the general criteria used to assess the competitive aspects of different solutions offered by HP.

**4.   HP's Mainframe Alternative Consolidation Solutions.**

IBM proposes that HP provide a deponent knowledgeable about the general benefits that HP believes its Mainframe Alternative Solutions provide, the components that go into HP Mainframe Alternative Solutions, "success stories" involving HP Mainframe Alternative Solutions, and HP's ISV partnerships related to this program.

This topic is distinct from any information that would be covered in topic 1, as it requests testimony about HP Mainframe Alternative Consolidation Solutions that is not solely limited to PSI's product. For that reason, testimony on this topic could not be limited to the finite customer set proposed by HP in response to IBM's request for a witness on topic 1. Again, PSI's antitrust counter-claims against IBM make testimony on HP's Mainframe Consolidation Solutions directly relevant to the instant case.

**5.   HP's marketing of and participation in mainframe migration strategies.**

For reasons similar to those outlined above, IBM believes that HP's marketing of and participation in mainframe migration strategies is directly relevant to the present lawsuit. If HP produces a witness with sufficient knowledge to testify to topics 3 and 4 as clarified above, we would expect that such a witness would be able to address this topic as well.

**6.   Actual or potential competition for customers and workloads between IBM z/Series and/or S/390 computer servers and computer servers incorporating HP microprocessors.**

If HP produces a witness with sufficient knowledge to testify to topics 3 and 4 as clarified above, we would expect that such a witness would be able to address this topic as well.

**7.   Whether and to what extent HP believes that end-users of IBM mainframes are "locked-in" to continued use of IBM mainframes, including, without limitation, the reason(s) any such lock-in exists; the specific end users whom HP believes are**

**"locked-in;" and HP's response to claims that end users of IBM mainframes are "locked-in."**

IBM does not seek expert or legal testimony in response to Topic 7. If HP produces a witness with sufficient knowledge to testify to topics 3 and 4 as clarified above, we would expect that such a witness would be able to address this topic as well.

8. **The success of HP and OEMs in marketing servers incorporating HP microprocessors to enable partial or total migration of workloads off of IBM mainframes.**

First, IBM agrees to limit the scope of this topic to HP's own experience in marketing servers to enable partial or total migration of workloads off of IBM mainframes. If HP` produces a witness with sufficient knowledge to testify to topics 3 and 4 as clarified above, we would expect that such a witness would be able to address this topic as well.

9. **HP's present and past use of IBM and/or IBM-compatible mainframes; the extent to which HP has moved its workloads off of IBM and/or IBM-compatible mainframes to other platforms, and whether and to what extent HP concluded that it was incapable of migrating any workloads that it was running on IBM mainframes or IBM-compatible mainframes to other platforms.**

In the interests of accommodation, IBM agrees to table this topic, reserving its right to request testimony at a later time should IBM be unable to obtain this information through other means.

10. **The Itanium Solutions Alliance ("ISA"), including, without limitation, the objectives of the ISA and HP's role in founding, promoting, and/or participating in the ISA.**

IBM proposes that HP offer a witness who can testify to HP's involvement with the ISA, limited to the topic of the extent of HP's use of the ISA as a vehicle for promoting mainframe migration. Again, this topic could be addressed by a witness who testifies regarding the topics of competition and mainframe migration, as discussed above.

11. **The Mainframe Migration Alliance ("MMA"), including, without limitation, the activities or objectives of the MMA and HP's role in founding, promoting and or participating in the MMA.**

Based on HP's representation that it is not a member of the MMA, IBM agrees to withdraw this topic.

12. **Any documents relating to this action.**

IBM accepts HP's offer to authenticate a reasonable number of documents that IBM identifies to it by Bates number, reserving the right to seek further authentication of documents if necessary.

**13. The five persons at HP most knowledgeable concerning each of the foregoing topics.**

IBM agrees to withdraw this topic.


We hope that HP will give serious consideration to our proposals, and look forward to discussing them with you in more detail later today.

Yours truly,

Katherine J. Weall, Esq.

# EXHIBIT N

| From: | Kaounis, Angelique |
|---|---|
| Sent: | Thursday, April 10, 2008 11:23 PM |
| To: | Katherine Weall |
| Cc: | Raines, Eric |
| Subject: | IBM v. PSI |

Katherine,

I've had a chance to speak to one of my contacts at HP and wanted to report back to you where we stand so we can decide how to move forward. I've summarized the current status of our discussions regarding IBM's 30(b)(6) requests below.

1. HP's relationship with PSI, including but not limited to HP's communications and/or dealings with PSI, HP's objectives in communicating and/or dealing with PSI, HP's technical assistance to PSI, and any partnership, whether formal or informal, between HP and PSI.

   *As of April 9, 2008 meet and confer*:
   HP will provide a 30(b)(6) witness who can speak to the sales and marketing of HP's hardware in connection with PSI's solution during 2004-2006 for Banca della Marche, Lufthansa, Fidelity, LL Bean, and Estee Lauder, to the extent such efforts took place during that time period.

   REDACTED   REDACTED     REDACTED   REDACTED

   HP will provide a declaration/general written description of HP's technical assistance to PSI during 2004-2006 for Banca della Marche, Lufthansa, Fidelity, LL Bean, and Estee Lauder, to the extent such efforts took place during that time period. As I mentioned to you, I don't think there's much to this one, so HP may be able to provide a short declaration to this effect.

2. REDACTED     REDACTED   REDACTED

3. HP microprocessors sold for use in servers that compete with IBM's zSeries servers and S/390 servers, including, without limitation, the processing power, cost and capabilities of such microprocessors and the customers that use such microprocessors.
   *As of April 9 meet and confer*: IBM has revised this category to now seek: "testimony regarding actual or potential competition faced by HP's servers, particularly insofar as they compete with IBM's zSeries and S/390 servers." As re-worded, this topic seems to be coextensive with No. 6, and so we would request that IBM attempt to narrow it in the way we've requested narrowing for No. 6 below.

4. HP's Mainframe Alternative Consolidation solutions.
   *As of April 9 meet and confer*: This is still very broad. As we discussed, HP's website identifies eight ISV relationships and 26 components alone that are part of HP's Mainframe alternative solutions. Please let us know if IBM actually wants a witness who should be prepared to discuss all of these

1

matters, or if this topic can be narrowed in some meaningful way. I've also requested that HP assist me in providing you with a further potential compromise on this topic, and am waiting to hear back.

5. HP's marketing of and participation in mainframe migration strategies.
   *As of April 9 meet and confer:* HP will provide a 30(b)(6) witness re its participation in mainframe migration strategies to the extent that PSI is/was involved in such efforts as set forth in response to No. 1 above. However, this topic is still very broad. As we discussed, this seems to overlap with Topic # 6, and thus we need further clarification or narrowing before we can attempt to identify a potential witness on this topic.

6. Actual or potential competition for customers and workloads between IBM z/Series and/or S/390 computer servers and computer servers incorporating HP microprocessors.
   *As of April 9 meet and confer:* HP will provide a 30(b)(6) witness re actual competition for customers between IBM z/Series and/or S/390 computer servers and HP servers to the extent that PSI is/was involved in those competitions as set forth in response to No. 1 above. We have asked for a further narrowing of this category, by client (or type/size of client), geographic market, or other criteria before we can produce a witness on other aspects of actual competition between HP and IBM (if at all). Please ask IBM if there is any meaningful way that this topic can be narrowed.

7. Whether and to what extent HP believes that end-users of IBM mainframes are "locked-in" to continued use of IBM mainframes, including, without limitation, the reason(s) any such lock-in exists; the specific end users whom HP believes are "locked-in;" and HP's response to claims that end users of IBM mainframes are "locked-in."
   *As of April 9 meet and confer:* IBM states that this topic is aimed at understanding for example, whether a client of IBM's has ever told an HP salesperson that they "can't get their stuff off of IBM." IBM acknowledges that this topic overlaps with the competition topic (No. 6), and is willing to table this topic to the extent HP provides a witness for No. 6.

8. The success of HP and OEMs in marketing servers incorporating HP microprocessors to enable partial or total migration of workloads off of IBM mainframes.
   *As of April 9 meet and confer:* IBM has agreed to limit this topic to HP's own experience in marketing servers to enable partial or total migration off of IBM mainframes. IBM also acknowledges that this topic overlaps with the competition topic (No. 6). We still feel this topic calls for an expert conclusion as to what is a "successful" migration, however, I think this topic may potentially be resolved by way of a response to a narrowed version of Topic #s 5 or 6.

9. HP's present and past use of IBM and/or IBM-compatible mainframes; the extent to which HP has moved its workloads off of IBM and/or IBM-compatible mainframes to other platforms, and whether and to what extent HP concluded that it was incapable of migrating any workloads that it was running on IBM mainframes or IBM-compatible mainframes to other platforms.
   *As of April 9 meet and confer:* IBM has agreed to table this topic (April 9, 2008 letter).

10. The Itanium Solutions Alliance ("ISA"), including, without limitation, the objectives of the ISA and HP's role in founding, promoting, and/or participating in the ISA.
    *As of April 9 meet and confer:* HP would still like to offer to produce a written response that describes HP's role in promoting, and/or participating in the ISA in 2005-2006.

11. The Mainframe Migration Alliance ("MMA"), including, without limitation, the activities or objectives of the MMA and HP's role in founding, promoting and or participating in the MMA.
    *As of April 9 meet and confer:* IBM has withdrawn this topic.

12. Any documents relating to this action.
    *As of April 9 meet and confer:* HP has agreed to assist with the authentication of a reasonable number of documents.

13. The five persons at HP most knowledgeable concerning each of the foregoing topics.
    *As of April 9 meet and confer:* IBM has withdrawn this topic.


As we discussed, it may be preferable at this point to spend little more time trying to narrow these last few categories (which seem to be focused on the larger issues of migration and competition), before we seek the Court's assistance on this.  If you'd like to set up another meet and confer for Monday or Tuesday, perhaps by then we will each have received additional feedback from our clients and may be able to make further progress. Currently, we've agreed that HP would file its motion for a protective order on Tuesday, April 15, so if you want to give the meet and confer efforts one more week, we would be amenable to pushing the briefing schedule back one week to try and resolve these outstanding issues. I'd like to avoid having to file a motion if possible, so please let me know your thoughts.
Thanks,
Angelique

Angelique Kaounis
Gibson, Dunn & Crutcher, LLP
333 South Grand Ave., Los Angeles, CA 90071
akaounis@gibsondunn.com
d: 213.229.7137
f: 213.229.6137

# EXHIBIT O

**Kaounis, Angelique**

| | |
|---|---|
| **From:** | Jonathan Oblak [jonoblak@quinnemanuel.com] |
| **Sent:** | Tuesday, April 22, 2008 1:22 PM |
| **To:** | Kaounis, Angelique |
| **Cc:** | Raines, Eric; Katherine Weall; Elizabeth Walker; Renee Bea |
| **Subject:** | RE: IBM v. PSI - Conference Call |

Angelique:

To follow up on our call yesterday, here is IBM's response to you email, below.

You are generally correct on the level of specificity we are seeking regarding the noticed topics, as clarified during our meet and confer efforts.  IBM expects the HP witness or witnesses to have a general familiarity with HP's Mainframe Alternative Solutions Program, HP's mainframe migration strategies, and HP's overall strategy and conduct in competing with IBM's z/Series and s/390 mainframes, including PSI's possible/actual role in such strategies and efforts.  IBM also expects the witness or witnesses to be able to comment on whether a particular communication, document, component or customer relationship is consistent or inconsistent with HP's strategies and conduct relating to those issues, in the event they do not have specific familiarity with a particular communication, document, component or customer relationship.

One other general clarification regarding the applicable time periods.  As I mentioned yesterday, we believe that the appropriate timeframe with respect to topics relating specifically to PSI is from 2003 until the termination of HP's business relationship with PSI.  We have done some investigation on our end (which is why this email did not go out this morning), and our review of documents produced by PSI reflects that

REDACTED       REDACTED       REDACTED

2003 is the appropriate starting point.

For requests that are not specific to PSI, such as topics 3-8, the relevant time period should be 2003 through the present.

For ease of reference, I have pasted your summary as to the specific categories below, with any further clarification on IBM's part in "all caps."

I hope that, with the clarifications provided herein, we can reach agreement and proceed with the 30(b)(6) deposition without the need of Court intervention.  Please advise of HP's position at your earliest convenience.

Best regards,
Jon

Topics No. 1 and 2 (proposal is for testimony unless otherwise noted):  [ACCEPTABLE WITH THE CLARIFICATION ABOVE AS TO TIME PERIOD, AND AS FURTHER CLARIFIED BELOW]

   * The general reasons why     REDACTED

   * At a general level (not client-by-client), the extent to which HP provided technical support and/or marketing in support of PSI's solution, if at all, during 2004-2006.

   * HP's overall strategy, if any, regarding the use of PSI's solution to enhance HP's competitive position against IBM in marketing mainframe alternatives in 2004-2006.  [AS NOTED YESTERDAY, WE WOULD EXPECT THE WITNESS OR WITNESSES TESTIFYING WITH RESPECT TO HP's RELATIONSHIP WITH PSI TO BE FAMILIAR WITH HP/PSI COMMUNICATIONS RELATING TO THEIR AREA OF KNOWLEDGE (RECOGNIZING THAT HP MAY OFFER MORE THAN ONE WITNESS FOR DIFFERENT ASPECTS OF ITS RELATIONSHIP WITH PSI).

* HP has offered to provide a declaration regarding the technical assistance that HP provided to PSI in the development of its solution, which, as I explained, is fairly limited, in that I believe HP only permitted PSI to do performance testing of its solution on HP hardware.

Topics 3, 4, 5, 6, 7, and 8 (proposal is for testimony unless otherwise noted): [ACCEPTABLE WITH THE CLARIFICATION ABOVE AS TO TIME PERIOD, AND AS FURTHER CLARIFIED BELOW]

* The general purpose and operation of HP's mainframe alternative solutions program during 2004-2006, including a general discussion of whether HP believes it competes or does not compete with IBM's z/series and s/390 servers. [FOR CLARIFICATION, THIS WOULD INCLUDE GENERAL MIGRATION STRATEGIES AND EFFORTS, AS WELL AS SPECIFICALLY WITH RESPECT TO HP'S MAINFRAME ALTERNATIVE SOLUTIONS PROGRAM]

* HP's general understanding of the conditions during 2004-2006 that made migration off of IBM mainframes more or less challenging.

*Caveat with regard to Topic No. 7:  With regard to this Topic, HP continues to believe that this is an inappropriate Topic because it essentially asks HP to opine on an ultimate issue in this case and because any testimony IBM could elicit on this point would be hearsay and unusable in any event.  I would suggest that if IBM believes there are specific customers who have complained about being "locked-in" to IBM's mainframe, that we discuss the possibility of IBM asking general questions about whether HP is aware of efforts to market mainframe alternative solutions to those customers during 2004-2006.  If this is a reasonable compromise, I will take this back to HP for confirmation.  [AS I STATED YESTERDAY, IBM DISAGREES WITH HP's POSITION ON THIS TOPIC AND CANNOT IDENTIFY FOR HP SPECIFIC CUSTOMERS WHO HAVE COMPLAINED TO HP OF "LOCK IN."  WE EXPECT THAT A WITNESS OR WITNESSES WITH KNOWLEDGE REGARDING THE TOPICS AS CLARIFIED ABOVE WOULD ALSO HAVE GENERAL KNOWLEDGE OF THE DEGREE TO WHICH HP HAS EXPERIENCE WITH CUSTOMERS RESPONDING THAT THEY CANNOT FOR SOME REASON MIGRATE WORKLOADS OR APPLICATIONS OFF OF IBM MAINFRAMES, OR THAT HP SERVERS ARE NOT A REASONABLE SUBSTITUTE FOR IBM MAINFRAMES.  IN ADDITION TO HP's GENERAL EXPERIENCE WITH THIS PHENOMENON, IF ANY, WE WOULD ALSO EXPECT THE WITNESS OR WITNESSES TO HAVE KNOWLEDGE OF HP's VIEW AS TO WHETHER THIS TYPE OF "LOCK IN" EXISTS -- IN OTHER WORDS, WHETHER HP BELIEVES THAT IT IS INCAPABLE OF COMPETING OR SERVING AS A REASONABLE SUBSTITUTE FOR CERTAIN WORKLOADS OR APPLICATIONS THAT RUN ON IBM MAINFRAMES.

Topic 9: tabled.

Topic 10: [ACCEPTABLE EXCEPT AS TO TIME PERIOD -- UNLESS HP's INVOLVEMENT IN THE ISA ENDED IN 2006 OR AT SOME OTHER DATE, WE WOULD EXPECT THE TIME PERIOD TO RUN THROUGH THE PRESENT]

* HP has offered to provide a written declaration regarding HP's promotion of and participation in the ISA, during 2005-2006, to the extent that such participation and promotion relates to migration from IBM mainframes.

Topics 11 and 13: withdrawn. [AGREED]

Topic 12: IBM has agreed to accept HP's offer regarding authentication. [AGREED]

Jonathan B. Oblak
Quinn Emanuel Urquhart Oliver & Hedges, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Direct: (212) 849-7156
Main Phone: (212) 849-7000
Main Fax:  (212) 849-7100
E-mail:  jonoblak@quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient (s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review,

dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.  Thank you.

**From:** Kaounis, Angelique [mailto:AKaounis@gibsondunn.com]
**Sent:** Thursday, April 17, 2008 1:17 PM
**To:** Jonathan Oblak
**Cc:** Raines, Eric; Katherine Weall; Elizabeth Walker
**Subject:** RE: IBM v. PSI - Conference Call

Jonathan,

    I write to follow up on our meet and confer efforts of Tuesday, April 15.  The list of topics below reflects HP's effort to propose 30(b)(6) topics (and some written responses) that are consistent with our April 15 meet and confer. Our meet and confer was very helpful, as we now understand that IBM is not requesting that HP prepare a witness to testify regarding the details of (a) HP's mainframe alternative solutions; (b) HP's mainframe migration strategy; or (c) HP's relationships or interactions with specific customers at the "granular" level, but instead is only concerned with the "top line" strategies and actions of HP in competing with IBM's z/series and s/390 machines, and specifically, how PSI would have been a part of that strategy. As we understand your offer, IBM does not expect that HP's potential deponent(s) will be familiar with specific communications, documents, components of HP's mainframe alternative solutions, or client or ISV relationships; however, a deponent may be asked to comment on whether a particular communication, document, component, or relationship would be consistent or inconsistent with HP's understanding and strategy at a broader level. Please let us know if the topics below do not fully reflect IBM's offer and the areas of interest that you expressed over the phone. As I mentioned, HP would like to avoid motion practice if at all possible, and since our current filing deadline is Tuesday, April 22, we would appreciate it if you could respond to the below proposal by tomorrow, April 18.  In light of the below, we are hopeful that IBM will agree to move forward without the need to resort to motion practice.

Best regards,
Angelique

Topics No. 1 and 2 (proposal is for testimony unless otherwise noted):

        * The general reasons why ⟨REDACTED⟩

        * At a general level (not client-by-client), the extent to which HP provided technical support and/or marketing in support of PSI's solution, if at all, during 2004-2006.

        * HP's overall strategy, if any, regarding the use of PSI's solution to enhance HP's competitive position against IBM in marketing mainframe alternatives in 2004-2006.

        * HP has offered to provide a declaration regarding the technical assistance that HP provided to PSI in the development of its solution, which, as I explained, is fairly limited, in that I believe HP only permitted PSI to do performance testing of its solution on HP hardware.

Topics 3, 4, 5, 6, 7, and 8 (proposal is for testimony unless otherwise noted):

        * The general purpose and operation of HP's mainframe alternative solutions program during 2004-2006, including a general discussion of whether HP believes it competes or does not compete with IBM's z/series and s/390 servers.

* HP's general understanding of the conditions during 2004-2006 that made migration off of IBM mainframes more or less challenging.

*Caveat with regard to Topic No. 7:  With regard to this Topic, HP continues to believe that this is an inappropriate Topic because it essentially asks HP to opine on an ultimate issue in this case and because any testimony IBM could elicit on this point would be hearsay and unusable in any event.  I would suggest that if IBM believes there are specific customers who have complained about being "locked-in" to IBM's mainframe, that we discuss the possibility of IBM asking general questions about whether HP is aware of efforts to market mainframe alternative solutions to those customers during 2004-2006.  If this is a reasonable compromise, I will take this back to HP for confirmation.

Topic 9: tabled.

Topic 10:

* HP has offered to provide a written declaration regarding HP's promotion of and participation in the ISA, during 2005-2006, to the extent that such participation and promotion relates to migration from IBM mainframes.

Topics 11 and 13: withdrawn.

Topic 12: IBM has agreed to accept HP's offer regarding authentication.

# EXHIBIT Q

**From:** Kaounis, Angelique
**Sent:** Thursday, April 24, 2008 11:37 AM
**To:** Jonathan Oblak
**Cc:** Raines, Eric; Katherine Weall; Elizabeth Walker; Renee Bea
**Subject:** RE: IBM v. PSI - Conference Call

Jon,

    Thank you for your agreement to allow the filing to take place on Tuesday--we will obviously work with you in good faith to get the remaining issues resolved (hopefully today) so that we can move forward in whatever way is most expeditious.  To answer your question as to the expedited briefing schedule, the Northern District of California has an extremely busy docket (in fact, as I understand it, the busiest in the country right now), so the earliest we can get a regularly noticed motion heard is June 2.  In the Northern District, you can file a motion to shorten the time for a briefing schedule, and we certainly would not oppose such an administrative motion, assuming it provided HP with a reasonable time in which to prepare a reply brief.

# REDACTED    REDACTED    REDACTED REDACTED

REDACTED . Also, as you are likely aware, post-November 2006, PSI remained an authorized reseller of HP hardware, but its relationship with HP was no different than any other reseller.  Thus, to the extent there is no dispute about the scope of these depositions, we will obviously work with both IBM and PSI to schedule the depositions at a mutually convenient time for everyone, as we have offered to do from the start of our discussions on this topic.

    Also, I have now had the chance to speak with HP regarding what seems to be the only remaining dispute at this point --*i.e.*, the timeframe at issue.  Instead of resorting to motion practice at this point, I really do believe the best way to proceed is to go forward with the deposition limited to the 2003-2006 time period with the following caveat:  with respect to the testimony regarding HP's post-2006 competitive efforts in the market for mainframe alternative solutions, in addition to providing testimony regarding the general purpose and operation of HP's mainframe alternative solutions program during 2004-2006 (including a general discussion of whether HP believes it competes or does not compete with IBM's z/series and s/390 servers), we will agree to supplement this topic by preparing a witness to discuss whether, and if so, how the general purpose and operation of HP's mainframe alternative solutions program has changed from 2006 to the present.  The same deponent will be able to discuss whether HP believes that it still competes with IBM's mainframe offerings. However, in the case of post-2006 testimony, this would not include any discussion of non-public information.

    Regarding HP's post-2006 migration strategies, as I have mentioned before, IBM can find responsive material on HP's website, and we have already offered to authenticate this material.  This should be an acceptable substitute for a live witness, and significantly reduces the burden to HP and the risk of divulging highly confidential proprietary information.

    Furthermore, while I appreciate your discussion of the Protective Order, please keep in mind that the protection afforded by the order does not eliminate the requirement that IBM show relevance and necessity for this information.  As I'm sure you can appreciate, once HP demonstrates that this is competitively sensitive information, the burden shifts to IBM to make the requisite Rule 45(c) showing of "substantial need" for the material prior to gaining access to the confidential proprietary and/or trade secret material.  HP is not convinced that IBM's general statement below regarding relevance is sufficient to meet that standard.

    As a final compromise, I would suggest we go forward with the deposition(s) as outlined above, and to the

extent that IBM seeks competitively sensitive information to which HP objects, IBM can later decide whether it needs to move to compel HP to respond to any questions its witnesses do not answer. Please strongly urge IBM to reconsider its position on this. Given that HP is willing to provide so much already, and given the heightened sensitivity of the 2006-2008 information, HP believes that its position is extremely reasonable.

I believe we're very close on reaching an agreement and look to hearing back from you.
Thanks very much,
Angelique